**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

COLLEGESTREET IMPORT & EXPORT
(TIANJIN) CO. LTD. and JIN ZHANG,

     Plaintiffs,

     v.

LOYALIST, LLC,

     Defendant.

Case No. <u>  25-cv-08494          </u>

**DEFENDANT'S NOTICE OF REMOVAL AND PETITION**
**[28 U.S.C. SECTIONS 1331, 1441(a), 1446, and 9 U.S.C. § 205]**

Dated:  October 14, 2025

                  **BIENERT KATZMAN**
                  **LITTRELL WILLIAMS LLP**

        By:     <u>*/s/Anthony R. Bisconti*        </u>
              Anthony R. Bisconti
              360 E. 2nd Street, Ste. 625
              Los Angeles, CA 90012
              T: 213.528.3400
              F: 949.369.3701
              E-mail: tbisconti@bklwlaw.com

              *Counsel to Defendant*

**TO THE HONORABLE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that pursuant to 28 U.S.C. §§ 1331, 1441(a), 1446, and 9 U.S.C. § 205, Defendant Loyalist, LLC ("Loyalist") removes to this Court the civil action entitled *CollegeStreet Import & Export (Tianjin) Co., Ltd. et al. v. Loyalist, LLC*, (the "Action"), previously pending in the Supreme Court of the State of New York, County of New York, index number 655122/2025. Loyalist removes this Action on the following grounds:

### I.    Background

1.    On August 27, 2025, Plaintiffs CollegeStreet Import & Export (Tinajin) Co., Ltd. ("CollegeStreet") and Jin Zhang ("Zhang" and together, "Plaintiffs") filed a complaint in the Supreme Court of the State of New York, County of New York, commencing this Action. Copies of the Summons and Complaint ("Compl.") are attached to this notice of removal ("Notice of Removal") as Exhibits 1 and 2, respectively.

2.    On September 12, 2025, Plaintiffs personally served Loyalist's registered agent in the State of Delaware.

3.    Pursuant to 28 U.S.C. § 1446(a), the state court file will be transmitted to this Court.

4.    Loyalist filed this Notice of Removal within thirty (30) days from the date Loyalist was served with the Summons and Complaint as calculated pursuant to Fed. R. Civ. P. 6(a)(1), and before trial. Accordingly, this removal is timely. 9 U.S.C. § 205.

5.    Loyalist will provide written notice of this Notice of Removal to Plaintiffs as required by 28 U.S.C. § 1446(d) and will file a copy of this Notice of Removal with the Supreme Court of the State of New York, County of New York.

6.    Venue is proper in this Court because the Action is being removed from the Supreme Court of the State of New York in New York County.

7.    By removing the Action to this Court, Loyalist does not waive any defenses, objections, or motions available under state or federal law. Loyalist expressly reserves the right

to move for dismissal of Plaintiffs' claims pursuant to Rule 12 of the Federal Rules of Civil Procedure and/or seek dismissal on grounds of lack of jurisdiction.

II.    **Nature of the case**

8.     At its core, the allegations in this case concern a dispute between CollegeStreet and TLxHF LLC ("TLxHF") about a debt.

9.     Defendant Loyalist is a Delaware company with a principal place of business in New York, New York.  Compl. ¶ 8.  TLxHF is a wholly-owned subsidiary of Loyalist.  *Id.*

10.    Plaintiff CollegeStreet is a Chinese manufacturing company with a principal place of business in Tianjin, China.  Compl. ¶ 6.  Plaintiff Zhang is CollegeStreet's CEO, and is a Chinese citizen residing in Tianjin, China.  *Id.* ¶ 7.  She is also a member of Loyalist.

11.    The amount in controversy in this Action exceeds $75,000.  *Id.* ¶¶ 62, 73, 81.

12.    This Action is Plaintiffs' *third* attempt to turn a simple breach of contract action that CollegeStreet initially asserted against TLxHF into an action for various claims, including torts, against Loyalist (a non-party to the underlying contract) and others.

13.    First, in March 2023, CollegeStreet filed a lawsuit against Loyalist and TLxHF in California state court.  CollegeStreet shortly thereafter filed an amended complaint, asserting alter ego allegations and alleged breach of contract, account stated, breach of duty of good faith and fair dealing, and California Unfair Competition Law ("UCL") claims against both defendants.  *See CollegeStreet Import & Export (Tinajin) Co., Ltd. v. Loyalist, LLC et al.*, Case No. 23-cv-028584.  On a motion by Loyalist and TLxHF, that action was dismissed by the California state court for lack of personal jurisdiction.

14.    Next, in June 2024, CollegeStreet and Zhang filed an action in the Southern District of New York asserting a breach of fiduciary duty claim—individually as well as derivatively on behalf of Loyalist—against Maxwell Ritz (a principal of Loyalist).  *See CollegeStreet Import & Export (Tianjin) Co., Ltd. v. TLxHF, LLC et al.*, Case No. 1:24-cv-04522-JSR, Dkt. 28 (S.D.N.Y August 16, 2024) (Amended Complaint) ("First New York Action").  CollegeStreet also asserted a breach of contract claim against TLxHF and UCL claims against TLxHF and Ritz.  *Id.*  The

defendants moved to dismiss and to compel arbitration under Loyalist's Amended and Restated Limited Liability Company Agreement of Loyalist, LLC dated February 12, 2019 (the "Loyalist LLC Agreement").

15.     On April 2, 2025, the Honorable Jed S. Rakoff issued an order in the First New York Action granting the defendants' motion to compel arbitration of Zhang's claim for breach of fiduciary duty against Ritz, granting in part the defendants' motion to stay as to the the fiduciary-duty claim, granting the defendants' motion to dismiss the UCL claims, and denying the motion to compel arbitration as to the UCL claims and CollegeStreet's claim for breach of contract against TLxHF.  *Id.*, Dkt. 50 at p. 1 (April 2, 2025) (Opinion and Order), attached hereto as Exhibit 3 ("Ex. 3").

16.     On April 18, 2025, TLxHF filed a voluntary petition for relief under Chapter 7 of Title 11, United States Code, commencing the bankruptcy proceeding entitled *In re TLxHF LLC*, Case No. 25-10769 pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Case"). The automatic stay under 11 U.S.C. § 362 stayed the claims asserted against TLxHF in the First New York Action.

17.     As of the filing of this notice of removal, no arbitration has been initiated.

18.     Instead, Plaintiffs filed this Action in the Supreme Court of New York, asserting claims for breach of contract and tortious interference with contract against Loyalist, premised on the very same type of conduct alleged in the First New York Action.  As set forth below, this Action is inextricably intertwined with the allegations already asserted in the First New York Action in which the Court compelled arbitration of certain claims as a result of the Loyalist LLC Agreement..

**III.     Grounds for removal**

19.     The New York Convention ("Convention") is an international treaty that guarantees citizens of any signatory country the right to enforce agreements to arbitrate disputes.  As the United States Supreme Court has explained, "[t]he goal of the convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition

and enforcement of commercial arbitration agreements and international contracts and to unify the standard by which the agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520, n.15 (1974).

20.    In 1970, Congress enacted enabling legislation to enforce the Convention in United States Courts. *See* 9 U.S.C. §§ 201-208. The Federal Arbitration Act ("FAA") governs the enforcement, validity, and interpretation of arbitration clauses in commercial contracts, both in state and federal courts. *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24-25 (1983). Chapter 2 of the FAA, 9 U.S.C. §§ 201-208 ("Convention Act"), which implements the Convention, controls arbitration disputes in the international context.

21.    Loyalist removes this Action to this Court pursuant to 9 U.S.C. § 205 of the Convention Act.

22.    Just this year in the First New York Action, the United States District Court for the Southern District of New York, Hon. Jed S. Rakoff presiding, concluded that Plaintiff Zhang is a party to the Loyalist LLC Agreement. Ex. 3 at ECF 11 ("the Court concludes that Zhang is bound by the LLC Agreement."); *see also* Ex. 4 ("Common Unit Purchase Agreement and Release) at p. 23 (stating that Zhang "(i) has read the LLC Agreement, (ii) accepts and agrees to be bound by the terms the LLC Agreement, (iii) assumes all of the rights and obligations of a Member of the Company and (iv) has executed the LLC Agreement."); Del. Code § 18-101(9) ("A member or manager of a limited liability company or an assignee of a limited liability company interest is bound by the limited liability company agreement whether or not the member or manager or assignee executes the limited liability company agreement.").

23.     In turn, the Loyalist LLC Agreement includes a broad arbitration provision that binds Zhang.  In particular, Section 14.10 (the "Arbitration Agreement") states in pertinent part as follows:

> **Dispute Resolution**.  Any controversy, dispute, or claim arising out of, in connection with, or in relation to the interpretation, performance or breach of this Agreement or any agreement or other instrument executed pursuant hereto or otherwise arising out of the execution of any of the foregoing, including, without limitation, any claim based on contract, tort, or statute, shall be resolved or determined, at the request of any party, by arbitration conducted in Boston, Massachusetts, in accordance with the then-existing Rules for Commercial Arbitration of the American Arbitration Association.

Ex. 5 (Loyalist LLC Agreement).

24.     This Arbitration Agreement is subject to the Convention because, as explained further below, it "falls under" the Convention.  *See* 9 U.S.C. § 202.  In turn, this Action is removable pursuant to 9 U.S.C. § 205 of the Convention Act because it "relates" to the Arbitration Agreement.

25.     In relevant part, 9 U.S.C. § 202 provides:

> An arbitration agreement . . . arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, ***falls under*** the Convention.  An agreement . . . arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.

9 U.S.C. § 202 (emphasis added).

26.     The Arbitration Agreement "falls under" the Convention.  Zhang is a signatory to the Loyalist LLC Agreement.  In turn, Zhang is a Chinese citizen residing in Tianjin, China, Compl. ¶ 7, and Loyalist is a New York business, *id.* ¶ 8.  Both China and the United States are signatories to the Convention.  Moreover, the legal relationship between Plaintiffs and Loyalist is plainly commercial—the Loyalist LLC Agreement, which contains the Arbitration Agreement, pertains (generally speaking) to the business of e-commerce.  The underlying relationship at issue

in the Action is manufacturing and distribution in the apparel manufacturing industry over the course of many years.

27.    9 U.S.C. § 205 provides that litigation involving an arbitration agreement governed by the Convention, like this case, is subject to removal to federal court:

> Where the subject matter of an action or proceeding pending in a State court **relates to an arbitration agreement** or award falling under the Convention, the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending. The procedure for removal of causes otherwise provided by law shall apply, except that the ground for removal provided in this section need not appear on the face of the complaint but may be shown in the petition for removal. For the purposes of Chapter 1 of this title any action or proceeding removed under this section shall be deemed to have been brought in the district court to which it is removed.

9 U.S.C. § 205 (emphasis added).

28.    As required by Section 205, this lawsuit "relates to" the Arbitration Agreement that falls under the Convention. Indeed, in the First New York Action, the Court granted the motion to compel arbitration of Zhang's breach of fiduciary duty claim against Maxwell Ritz that Zhang brought derivatively on behalf of Loyalist and individually against Ritz. Ex. 3 at ECF 8-16. In that claim, amidst other allegations of supposed misbehavior and corporate comingling, Zhang alleged that Ritz caused Loyalist to pay for various TLxHF expenses that improperly reduced Loyalist's profitability and its members' dividends. *Id.* Zhang further alleged that as a result of Ritz's conduct, TLxHF's customer orders also plummeted and therefore caused TLxHF to breach its contractual obligations with CollegeStreet. The Court concluded that this fiduciary-breach claim sounding in tort was "within the core of [the Loyalist LLC Agreement's] broad arbitration provision." *Id.* at ECF 13. Accordingly, because that claim fell "squarely within the scope" of the Arbitration Agreement and because Zhang was a signatory to the Arbitration Agreement, the Court compelled arbitration as to that claim. *Id.* at ECF 16.

29.    Plaintiffs' assertions in this Action mirror those it alleged in connection with the fiduciary-breach claim that that this Court ordered to arbitration in the First New York Action, but Plaintiffs have now styled those allegations as giving rise to claims for breach of contract and

tortious interference against Loyalist. Plaintiffs' claims "relate to" the Arbitration Agreement because, like the fiduciary-breach claim ordered to arbitration in the First New York Action, Plaintiffs' claims involve a signatory's (Zhang) allegations of supposed misbehavior and mismanagement against the very company subject to the Arbitration Agreement (Loyalist). Further, the claims asserted in this Action—breach of contract and tortious interference with contract—fall squarely within the scope of the Arbitration Agreement, which covers "any claim based on contract, tort, or statute….". *See* Ex. 5. The outcome of the arbitration that this Court ordered as to the breach of fiduciary duty claim from the First New York Action would necessarily impact the claims alleged in this Action. The Arbitration Agreement, in turn, conceivably affects the outcome of Plaintiffs' case; indeed, the arbitration that this Court ordered as to the breach of fiduciary duty claim in the First New York Action would bear upon the claims (and facts) alleged in this Action.

30.    For example, similar to the First New York Action, Plaintiffs allege here that TLxHF is "an alter ego of Loyalist," that "the individuals who have controlled both companies have used TLxHF and Loyalist interchangeably with no regard for their separate corporate identities," and that "Loyalist and TLxHF were separate in name only; in practice, they were operated as a single enterprise by Loyalist and its control persons." Compl. ¶ 3. Indeed, Plaintiffs further allege that "Loyalist and its control persons—namely Maxwell Ritz and Alexander Ritz— exercised complete domination and control over TLxHF and ran Loyalist and TLxHF as if it were a single entity," *id.* ¶ 21, and that Loyalist "absorbed customer orders" that should have been placed by TLxHF, *id.* ¶ 36. This Action, at bottom, puts at issue the supposed misuse of Loyalist and TLxHF funds that this Court held (in the First New York Action) must be decided by an arbitrator.

31.    This Court has already determined that a complaint was properly removed under the Convention Act where the Court had previously ordered a plaintiff's declaratory judgment claim for an accounting to arbitration, and the plaintiffs subsequently attempted to assert a *new* declaratory judgment claim in state court, which sought different (but related) information.

*Kenney, Becker LLP v. Kenney*, 494 F. Supp. 2d 252, 253–54 (S.D.N.Y. 2007) (Rakoff, J.) (denying motion for remand).  In denying the motion for remand, the Court observed that the plaintiffs had initiated the state court action "[w]ithout missing a beat," shortly after the order compelling arbitration.  *Id.*  But the plaintiffs could not escape removal.  The same principle holds true here.

32.     For the reasons set forth above, this Court has original jurisdiction over the action under 9 U.S.C. §§ 202, 203, 205 and 28 U.S.C. § 1331.

**IV.     Conclusion**

33.     Loyalist removes this Action from the Supreme Court of the State of New York, County of New York.

Dated:  October 14, 2025

**BIENERT KATZMAN
LITTRELL WILLIAMS LLP**

By:     */s/Anthony R. Bisconti* _____
        Anthony R. Bisconti
        360 E. 2nd Street, Ste. 625
        Los Angeles, CA 90012
        T: 213.528.3400
        F: 949.369.3701
        E-mail: tbisconti@bklwlaw.com

        *Counsel to Defendant*

9

# EXHIBIT 1

*CSC*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

COLLEGESTREET IMPORT & EXPORT (TIANJIN)
CO., LTD. and JIN ZHANG,

                                     Plaintiffs,

                    v.

LOYALIST, LLC,

                                     Defendant.

Index No. _____

**SUMMONS**

---

**TO THE ABOVE NAMED DEFENDANT:**

  **YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve a copy of your answer on the Plaintiffs' attorneys within 20 days of services of this summons, exclusive of the day of service (or within 30 days after service is complete if the summons is not personally delivered to you within the State of New York); and in case of your failure to appear, judgment will be taken against you by default for the relief demanded in the Complaint.

  Plaintiffs designate New York County as the place of trial. The basis of this designation is Defendant's residence in New York County and a substantial part of the events or omissions giving rise to the claims occurred within New York County.

Dated: New York, New York
   August 27, 2025

       KAUFF LATON MILLER LLP

       By: _____
         Adam Kauff
         Jonathan Perrelle
       810 Seventh Avenue, 33rd Floor
       New York, NY 10019
       Tel.: (212) 906-3441
       Fax: (212) 656-1456
       akauff@klmllp.com
       jperrelle@klmllp.com

       *Attorneys for Plaintiffs CollegeStreet Import & Export (Tianjin) Co. Ltd. and Jin Zhang*

TO:   LOYALIST, LLC
      441 Broadway, Floor 2
      New York, New York 10013

# EXHIBIT 2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

COLLEGESTREET IMPORT & EXPORT
(TIANJIN) CO., LTD. and JIN ZHANG,

                           Plaintiffs,

           v.

LOYALIST, LLC,

                           Defendant.

---

Index No. _____

**VERIFIED COMPLAINT**

Plaintiffs CollegeStreet Import & Export (Tianjin) Co., Ltd. ("CollegeStreet") and Jin

Zhang ("Zhang" and collectively with CollegeStreet, "Plaintiffs"), by and through their attorneys,

Kauff Laton Miller LLP, as and for their complaint against Defendant Loyalist, LLC ("Loyalist"

or "Defendant") hereby allege as follows:

**INTRODUCTION**

1.      This action seeks damages arising from the breach of a contract by Loyalist's

wholly owned subsidiary, TL x HF, LLC ("TL x HF").

2.      In 2018, Loyalist created TL x HF to take over the business of a now-defunct

apparel company, Hillflint, Inc. ("Hillflint"). At the time, Hillflint owed $650,000 to

CollegeStreet, its supplier. To address that debt, TL x HF and CollegeStreet entered into a transfer

agreement (the "Transfer Agreement") pursuant to which TL x HF agreed to, among other things,

pay CollegeStreet $350,000 by December 31, 2021, and to "make best efforts" to provide liquidity

to Zhang (CollegeStreet's principal) on $350,000 in equity she was to receive in Loyalist.

3.      Although TL x HF purports to be separate entity, in fact, it is, and at all relevant

times has been, an alter ego of Loyalist. Since TL x HF's formation in 2018, it has shared

employees and offices with Loyalist, it has been controlled by the same individuals who have controlled Loyalist, and the individuals who have controlled both companies have used TL x HF and Loyalist interchangeably with no regard for their separate corporate identities. Loyalist and TL x HF were separate in name only; in practice, they were operated as a single enterprise by Loyalist and its control persons.

4.      Loyalist, and its control persons, used their domination to wrongfully deplete TL x HF's assets and cause TL x HF to avoid its obligations to CollegeStreet. In the over seven years since it signed the Transfer Agreement, TL x HF has not repaid the $350,000 debt it owes CollegeStreet and made zero effort to provide liquidity on Zhang's $350,000 in Loyalist equity even while Loyalist was adding dozens of new investors. Instead, Loyalist used TL x HF to pay hundreds of thousands of dollars of Loyalist's expenses and drained the company of its assets. Although Loyalist and TL x HF acted as one company in their dealings with CollegeStreet, when CollegeStreet demanded that the $350,000 obligation be repaid, Loyalist's control persons hid behind TL x HF's corporate shield and "dwindling" assets. On April 18, 2025, TL x HF filed a petition for bankruptcy claiming that it had only $419 in total assets.

5.      Plaintiffs bring this action to remedy the wrong committed against them and to hold responsible the party that controlled TL x HF and wrongfully caused it to breach the obligations that were owed to Plaintiffs.

## THE PARTIES

6.      Plaintiff CollegeStreet is and at all relevant times has been a Chinese limited company with a principal place of business located in Tianjin, China.

7.      Plaintiff Jin Zhang is a Chinese citizen residing in Tianjin, China.

2

8.      Defendant Loyalist is a Delaware limited liability company with its principal place of business located at 441 Broadway, Floor 2, New York, New York 10013. Loyalist is the sole member of TL x HF, LLC.

## JURISDICTION AND VENUE

9.      Jurisdiction in this Court is proper pursuant to CPLR 301 and 302 because Loyalist maintains its principal places of business in the State of New York, and because it transacted business within the State and this action arises out of that business.

10.     Venue in this Court is proper pursuant to CPLR 503(a) and (d) because Loyalist is a resident of New York County and a substantial part of the events or omissions giving rise to the claims occurred within New York County.

## FACTUAL ALLEGATIONS

**A.      The Transfer Agreement**

11.     CollegeStreet is an export business based in China that specializes in supplying collegiate apparel to companies within the United States.

12.     From 2016 to 2018, one of CollegeStreet's largest clients was Hillflint, a clothing company that was formed in 2013 and sold vintage collegiate apparel. During the course of their relationship, Hillflint purchased millions of dollars' worth of apparel from CollegeStreet, which it then resold to its own customers.

13.     In or around the Fall of 2018, Hillflint was going out of business and owed CollegeStreet $650,000.

14.     Loyalist, a company that describes itself as "an operating platform for emerging brands," was interested in taking over the Hillflint brand. On or about September 21, 2018, it formed TL x HF to, upon information and belief, acquire Hillflint and take over its operations.

3

15. As part of the takeover of Hillflint, Loyalist, TL x HF, and CollegeStreet entered into various agreements to resolve the $650,000 payable Hillflint owed to CollegeStreet, one of which was the Transfer Agreement.

16. Under the terms of the Transfer Agreement, TL x HF agreed to resolve the $650,000 debt by assuming $350,000 of the total debt (the "Assumed Obligation") and agreeing to transfer $350,000 of its equity in Loyalist to CollegeStreet or Zhang. TL x HF also agreed to:

    i. "Make all reasonable best efforts to remit payments on the Assumed Obligation (without interest) through 12/31/2018 out of TL x HF LLC revenues at TL x HF LLC discretion in order to resolve the assumed $350,000 liability with the expectation of payment in full of the Assumed Obligation not later than 1/31/2021"

    ii. "Grant CollegeStreet right of first refusal on any production orders going forward assuming CollegeStreet can offer best pricing, speed, and quality (as determined by TL x HF LLC)"

    iii. "Make best efforts to provide liquidity to CollegeStreet or the individual Zhang Jin on the $350,000 in equity, whether in the form of a buy back, sale to existing or prospective investors, or any other method agreed to by both TL x HF LLC and CollegeStreet OR TL x HF LLC and the individual Zhang Jin"

    iv. "Pay, in addition to cost on production orders, an additional revenue share from profitable sales according to the following schedule: if >50% net margin, 5%; if >30% net margin, 3%; if 20% net margin, 1%; if >10% net margin, 0%"

17. TL x HF and CollegeStreet signed the Transfer Agreement by November 6, 2018. On the same day, CollegeStreet also signed a release in favor of Hillflint forgiving the $650,000 debt Hillflint owed to it.

18. Although Loyalist was not a party to the Transfer Agreement, its terms demonstrate that Loyalist and TL x HF were operated as a single entity. For example, although TL x HF agreed in the Transfer Agreement to transfer $350,000 of its equity in Loyalist, upon information and belief, TL x HF did not actually have any equity in Loyalist. Loyalist is not listed as an owner in

4

the Third Amended and Restated Limited Liability Company Agreement of Loyalist, dated February 12, 2019.

19. Because TL x HF had no equity in Loyalist, it never transferred any equity to CollegeStreet or Zhang as it was required to do under the Transfer Agreement. Instead, on March 1, 2019, Loyalist issued 343,238 units of its total ownership to Zhang pursuant to the terms of a Common Unit Purchase Agreement and Release ("CUPAR") that was signed by Loyalist and Zhang.

20. In other words, TL x HF assumed an obligation it could not meet (since it did not have any equity in Loyalist) because, upon information and belief, it knew that its parent, Loyalist, would satisfy the obligation. And, months after TL x HF assumed this obligation, Loyalist—not TL x HF—satisfied the obligation by directly issuing the required amount of equity to Zhang.

**B.** **Loyalist and Its Control Persons Operate Loyalist and TL x HF as a Single Entity**

21. As the Transfer Agreement demonstrates, from the very beginning, Loyalist and its control persons—namely Maxwell Ritz and Alexander Ritz—exercised complete domination and control over TL x HF and ran Loyalist and TL x HF as if it were a single entity.

22. TL x HF was formed on or about September 21, 2018 as a wholly owned subsidiary of Loyalist. Loyalist has, at all relevant times, been the sole member of TL x HF.

23. TL x HF and Loyalist have, at all relevant times, been controlled by the same individuals.

24. Maxwell Ritz is the President and Co-CEO of TL x HF. He is also member of Loyalist, has represented himself as the Co-Founder and Co-CEO of Loyalist, and communicated with CollegeStreet and its representative from a Loyalist email address. Maxwell Ritz has run both Loyalist and TL x HF with Alexander Ritz.

5

25. Alexander Ritz is the Co-CEO of TL x HF, and a member, manager, and President of Loyalist.

26. Loyalist and TL x HF have, at all relevant times, been operated as a single enterprise under the direction of its control persons.

27. Loyalist and TL x HF have, at all relevant times, shared offices and a business address, which is currently 441 Broadway, 2nd Floor, New York, NY 10013.

28. Loyalist and TL x HF have, at all relevant times, shared employees. For example, after TL x HF's formation, Loyalist employees sent CollegeStreet over a dozen new purchase orders for apparel purportedly being purchased by TL x HF.

29. Loyalist assumed and satisfied obligations of TL x HF, including TL x HF's obligation to provide $350,000 of equity in Loyalist to Zhang or CollegeStreet. Additionally, in March 2021, Loyalist offered to provide Zhang additional equity in Loyalist as payment for a portion of the $350,000 debt TL x HF owed to CollegeStreet (which offer was declined).

30. Loyalist and CollegeStreet shared expenses and shifted costs between the entities. Following the creation of TL x HF, both Loyalist and TL x HF placed new purchase orders for apparel with CollegeStreet that were paid for by either Loyalist or TL x HF without regard for who actually placed the order.

31. During the period from May 2019 to March 2023, Loyalist paid at least $35,000 to CollegeStreet for orders placed by TL x HF, while TL x HF paid at least $350,000 to CollegeStreet for orders placed by Loyalist. Indeed, beginning in February 2021, nearly every single purchase order to CollegeStreet was sent by a Loyalist employee from a Loyalist.com email address and stated on its face that it was from Loyalist but was paid for by TL x HF.

32. For example, on July 14, 2021, Zhang received an email from Reilly Herder, the

6

Manager, Brand Operations at Loyalist, from her Loyalist email account (reilly@loyalist.com)

including a purchase order for new apparel:

> **From:** Reilly Herder<reilly@theloyalist.com>
> **To:** Jin<zhangjin900@hotmail.com>
> **CC:** Erica Annunziata<erica@theloyalist.com>; Lorne Forcum<lorne@theloyalist.com>; Ariel Koff<ariel@theloyalist.com>; jessica@collegestreet-tj.com; zhangjin@collegestreet-tj.com
> **Subject:** Z432 - Harvard Shop Order 2021
> **Date:** 2021/7/14 6:00:42
> **Attachment:** Harvard Creme Sweater 2.JPG; Harvard Creme Sweater 1.JPG
>
> ---
>
> Zhang Jin Ayi,
>
> Please see below a Box Link for a purchase order that we would like to ship ASAP. We will advise on the ship method and port of destination closer to the complete date.
>
> Also, the customer has specified that there have been 2 creme yarns used in the past, and need the creme sweaters in this PO to match the yarn used in the images attached. If you have any questions about this, please let us know. It is very important we use the correct yarn.
>
> Thank you so much and if you have any questions or concerns please do not hesitate to contact us!
>
> Box Link: https://app.boxcn.net/s/nnjjlxc0vbhwmvkzxfz6dr5ur37al2m0
>
> Best,
> Reilly
>
> ---
>
> **REILLY HERDER | Manager, Brand Operations**
> t: 434-956-9099
> e: reilly@theloyalist.com
> New York, NY
>
> LOYALIST

33.    Like the cover email, the purchase order (No. Z432) also stated that it came from

Loyalist:

7

| The Loyalist | | | | Purchase Order | | |
|---|---|---|---|---|---|---|
| 1178 Broadway Floor 3 | | | P.O. NO. | Z432 - Harvard Shop Order 2021 | | |
| New York, NY 10001 | | | DATE | July 13, 2021 | | |
| +1 212.390.8337 | | | Revision Date | | | |
| lorne@hillflint.com | | | | | | |
| VENDOR | Zhang Jin | | BUYER | Lorne Forcum | | |
| | | | | 1178 Broadway | | |
| | | | | New York, NY 10001 | | |
| | | | | +1 212.390.8337 | | |
| Shipping Method | | Shipping Terms | | Delivery Date | | |
| TBD | | TBD | | TBD | | |
| U.S. Port of Delivery | | | | | | |
| TBD | | | | | | |
| | | | | PURCHASE ORDER SUMMARY | | |
| QTY | Total Cost | | | New Graphics | | |
| 534 | $9,617.34 | | | 0 | | |

34.     Following receipt of the email and purchase order, CollegeStreet sent the apparel to Loyalist and issued an invoice to Loyalist in the total amount of $11,547.24, for the cost of the ordered apparel plus freight.

35.     Even though the purchase order was sent by a Loyalist employee from her Loyalist email address and stated that it was from Loyalist, and even though CollegeStreet delivered the goods to Loyalist and issued the invoice for this purchase order to Loyalist, on November 1, 2021, TL x HF (not Loyalist) paid for the goods:[1]

---

[1] The wire TL x HF sent on November 1, 2021 not only included payment for the Z432 purchase order sent on July 14, 2021, but it also included payment for other purchase orders issued by Loyalist.

8



36.    Upon information and belief, Loyalist also absorbed customer orders and revenue that were, or should have been, placed with and earned by TL x HF.

37.    By using TL x HF to pay for Loyalist's expenses and, upon information and belief, shifting orders and revenue from TL x HF, Loyalist was diverting assets from TL x HF for its own use and preventing TL x HF from complying with its contractual obligations to CollegeStreet.

**C.    Under the Control of Loyalist and Its Control Persons, TL x HF Breaches Its Contractual Obligations to CollegeStreet and Then Declares Bankruptcy**

38.    Despite agreeing in the Transfer Agreement to make "all reasonable best efforts" to resolve its $350,000 liability to CollegeStreet by December 31, 2018, and to pay the obligation in full no later than January 31, 2021, TL x HF made no effort to repay the $350,000 by December 31, 2018 or January 31, 2021.

39.    After the January 31, 2021 deadline passed, on or about February 25, 2021,

9

CollegeStreet met with Maxwell Ritz, during which meeting an agreement was reached that $72,986.13 in cost of goods sold payments that were made to CollegeStreet would be applied towards the debt and that $19,004.76 in unpaid purchase orders would be added to the debt, leaving the total amount of the debt owed to CollegeStreet as $296,018.63

40.    TL x HF provided CollegeStreet assurances that it would pay the remaining amount owed.  However, it failed to make any payments towards the debt, prompting CollegeStreet to demand payment of the entire outstanding liability in full.

41.    TL x HF did not pay all remaining portion of its liability in response to these demands.  Instead, it used its assets to pay the expenses of Loyalist, including for goods Loyalist purchased from CollegeStreet, which left it with insufficient assets to pay off the outstanding debt.

42.    In or about February 2023, Maxwell Ritz told CollegeStreet that TL x HF did not have sufficient assets to pay the entire debt, that he was planning to dissolve the company by May 2023, and that TL x HF would only agree to repay $180,000 of the remaining $296,018.63 debt.

43.    CollegeStreet declined to accept $180,000 to resolve the debt and again demanded repayment in full.  TL x HF continued to refuse to make payments on the debt and instead used whatever funds it had for other purposes, including to pay Loyalist's expenses.  To date, TL x HF has not paid the remaining $296,018.63 it owes to CollegeStreet.

44.    TL x HF's obligation to pay CollegeStreet the entire $350,000 debt is not the only term of the Transfer Agreement that it breached.  TL x HF (and Loyalist) also failed to "make best efforts" to provide liquidity to Zhang on her equity in Loyalist in breach of its agreement to do so. In the over six years since the Transfer Agreement was signed, neither TL x HF nor Loyalist ever offered to buy back her shares or attempted to sell them to any prospective or existing investors in Loyalist even though Loyalist was, according to Maxwell Ritz, adding new investors.

10

45.     Indeed, according to a declaration signed by Maxwell Ritz on September 26, 2023, Loyalist "has approximately 30 equitable owners", which is many more than it had in February 2019. Thus, despite the agreement to "make best efforts to provide liquidity" on Zhang's equity in Loyalist, her units remained unsold while several new investors were apparently acquiring equity in the company.

46.     Nor did TL x HF comply with its other obligations in the Transfer Agreement to grant CollegeStreet a right of first refusal on production orders or to pay an additional revenue share from profitable sales. To date, TL x HF has paid CollegeStreet only $4,257.78 in additional revenue share from profitable sales despite having ordered and sold hundreds of thousands of dollars' worth of apparel.

47.     Rather than comply with the Transfer Agreement, on April 18, 2025, TL x HF filed a Chapter 7 bankruptcy petition so that it could avoid its obligations and close the company. In its bankruptcy petition, TL x HF listed $393,250.64 in liabilities, which includes the $350,000 debt owed to CollegeStreet, and only $419 in total assets. Loyalist is also listed as a creditor in the bankruptcy petition in the amount of $26,432.72.

**D.     Litigation History**

48.     Following the February 2023 meeting with Maxwell Ritz, on March 2, 2023, CollegeStreet filed an action against TL x HF and Loyalist in the Superior Court of California, County of Alameda, captioned *CollegeStreet Import & Export (Tianjin) Co. Ltd. v. XL x HF, LLC, et al.*, Case No. 23CV028584 (the "California Action").

49.     Loyalist and TL x HF moved to quash the complaint for lack of personal jurisdiction, and, on May 3, 2024, the California Action was dismissed without prejudice upon the request of CollegeStreet.

11

50.     On June 12, 2024, Plaintiffs filed an action in the United States District Court for the Southern District of New York against TL x HF and Maxwell Ritz, captioned *CollegeStreet Import & Export (Tianjin) Co. Ltd. v. TL x HF, LLC, et al.*, Case No. 24-cv-4522 (JSR) (the "SDNY Action"), asserting claims for breach of the Transfer Agreement against TL x HF, for violation of Section 71200 of the California Business and Professions Code against TL x HF and Maxwell Ritz, and for breach of fiduciary claim against Maxwell Ritz, which was asserted by Zhang individually and derivatively on behalf of Loyalist. As a result of the derivative claim, Loyalist was included as a nominal defendant.

51.     On February 5, 2025, the Southern District of New York, per the Honorable Jed S. Rakoff, issued an order in the SDNY Action compelling arbitration of the breach of fiduciary duty claim and dismissing the Section 71200 of the California Business and Professions Code.

52.     On April 22, 2025, the SDNY Action was automatically stayed as a result of TL x HF's bankruptcy petition.

## AS AND FOR A FIRST CAUSE OF ACTION
### (By CollegeStreet for Breach of Contract)

53.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 52 of this Complaint as though fully set forth herein.

54.     The Transfer Agreement constitutes a valid and enforceable contract between CollegeStreet and TL x HF.

55.     CollegeStreet performed all of its obligations under the Transfer Agreement.

56.     As described above, TL x HF committed multiples breaches of the Transfer Agreement, including by: (1) failing to pay CollegeStreet $350,000 for the liability it assumed; (2) failing to make all reasonable best efforts to remit payments on the $350,000 obligation; (3) failing

12

to grant CollegeStreet right of first refusal on production orders after November 6, 2018; and (4) failing to pay additional revenue share from profitable sales.

57. As a result of TL x HF's breaches, CollegeStreet has been damaged in an amount to be determined at trial, but that is not less than $296,018.63, plus interest, attorneys' fees, costs, and expenses.

58. Loyalist is liable for the damages incurred by CollegeStreet from TL x HF's foregoing breaches of the Transfer Agreement based on the doctrine of corporate veil piercing.

59. Loyalist, and its control persons, exercised complete domination and control over TL x HF and operated TL x HF and Loyalist as a single enterprise, such that TL x HF was a sham or mere façade for Loyalist.

60. Loyalist's, and its control persons', complete domination and control over TL x HF is evidenced by, among other things, the following: (1) TL x HF is wholly owned by Loyalist; (2) TL x HF has disregarded corporate formalities, including failing to register to do business in the State of New York even though its principal place of business is located in New York; (3) TL x HF and Loyalist have, at all relevant times, shared offices, addresses, phone numbers, and employees; (4) TL x HF and Loyalist have, at all relevant times, been managed, operated, and controlled by the same persons; (5) TL x HF and Loyalist have not dealt with each other at arms' length, are not treated as independent profit centers, and have been used interchangeably with no regard for their separate identities; (6) Loyalist and TL x HF have shared expenses without regard to which entity incurred the expense, and have been operated as a single enterprise; (7) Loyalist used TL x HF assets to pay its expenses and, upon information and belief, diverted revenue from TL x HF to itself; (8) Loyalist assumed and satisfied obligations of TL x HF; and (9) TL x HF has been inadequately capitalized and is now insolvent.

13

61.    Loyalist, and its control persons, used its domination and control over TL x HF to commit multiple wrongs and injustices against CollegeStreet, including by depleting TL x HF of its assets to shield TL x HF from its obligations to CollegeStreet and engaging with CollegeStreet as if Loyalist and TL x HF were a single enterprise only to hide behind TL x HF's corporate shield when CollegeStreet demanded payment of the entire $350,000 owed to it.

62.    As a result of Loyalist's conduct, CollegeStreet is entitled to pierce the corporate veil of TL x HF to obtain a judgment against its owner, Loyalist, for the damages it has incurred from TL x HF's breach of the Transfer Agreement in an amount to be determined at trial, but that is not less than $296,018.63, plus interest, attorneys' fees, costs, and expenses.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(By Zhang for Breach of Contract)**

63.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 62 of this Complaint as though fully set forth herein.

64.    On March 1, 2019, Zhang received 343,328 Units in Loyalist pursuant to the terms of the CUPAR in satisfaction of TL x HF's obligation in the Transfer Agreement to transfer equity in Loyalist with a value of $350,000 to CollegeStreet or Zhang.

65.    As a result of the March 1, 2019 transfer of equity in Loyalist to her, Zhang is an intended third-party beneficiary of the Transfer Agreement in that TL x HF is obligated to make best efforts to provide liquidity to CollegeStreet or Zhang on the $350,000 in equity in Loyalist.

66.    As described above, this provision of the Transfer Agreement was breached by TL x HF and/or Loyalist because they each failed to make best efforts to provide liquidity to Zhang on her equity in Loyalist.

67.    Although Loyalist was not a party to the Transfer Agreement it assumed an obligation to make best efforts to provide Zhang with liquidity on her equity in Loyalist because,

14

among other reasons, (1) it assumed and satisfied TL x HF's obligation to provide Zhang with the equity in the first place; and (2) the express language of the Transfer Agreement, including the reference to "a buy back" and "sale to existing or prospective investors" of Loyalist, contemplated that this was an obligation of Loyalist.

68. As a result of the breach of this provision of the Transfer Agreement, Zhang has been damaged in an amount to be determined at trial, but that is not less than $350,000, plus interest, attorneys' fees, costs, and expenses.

69. Accordingly, Loyalist is liable to Zhang for its breach of this obligation, and Zhang is entitled to a judgment against Loyalist in an amount to be determined at trial, but that is not less than $350,000, plus interest, attorneys' fees, costs, and expenses.

70. Alternatively, to the extent that the obligation belonged solely to TL x HF, Loyalist is liable to Zhang based on the doctrine of corporate veil piercing.

71. As described above, Loyalist, and its control persons, exercised complete domination and control over TL x HF and operated TL x HF and Loyalist as a single enterprise, such that TL x HF was a sham or mere façade for Loyalist.

72. Loyalist, and its control persons, used its domination and control over TL x HF to commit multiple wrongs and injustices against Zhang, including by causing TL x HF to breach its obligations to Zhang and by depleting TL x HF of its assets to shield TL x HF from its obligations to Zhang.

73. As a result of Loyalist's conduct, Zhang is entitled to pierce the corporate veil of TL x HF to obtain a judgment against Loyalist for the damages she has incurred from TL x HF's breach of the Transfer Agreement in an amount to be determined at trial, but that is not less than $350,000, plus interest, attorneys' fees, costs, and expenses.

15

## AS AND FOR A THIRD CAUSE OF ACTION
### (By Plaintiffs for Tortious Interference With Contract)

74.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 73 of this Complaint as though fully set forth herein.

75.    As described above, The Transfer Agreement constitutes a valid and enforceable contract between CollegeStreet and TL x HF of which Zhang is an intended third-party beneficiary.

76.    Loyalist had actual knowledge of the Transfer Agreement.

77.    Loyalist intentionally and wrongfully procured TL x HF to breach the Transfer Agreement without justification.

78.    Loyalist procured the breach in its own self-interest, and/or with malice or illegal means, including by using TL x HF's assets to pay for Loyalist's expenses and, upon information and belief, diverting orders and revenue from TL x HF, so that TL x HF had insufficient assets to meet its obligations to CollegeStreet and Zhang and, eventually, declared bankruptcy.

79.    But for Loyalist's conduct, TL x HF would not have breached the Transfer Agreement.

80.    As a result of Loyalist's tortious interference with the Transfer Agreement, Plaintiffs have been damaged in an amount to be determined at trial, but that, collectively, is not less than $646,018.63, plus interest, attorneys' fees, costs, and expenses.

81.    Accordingly, Plaintiffs are entitled to obtain a judgment against Loyalist for the damages they have incurred from its tortious interference with the Transfer Agreement in an amount to be determined at trial, but that is not less than $646,018.63, plus interest, attorneys' fees, costs, and expenses.

WHEREFORE, Plaintiffs respectfully pray for the following relief:

16

(a)    That judgment be entered in favor of CollegeStreet and against Loyalist on the First Cause of Action for breach of contract awarding CollegeStreet damages in an amount to be determined at trial but that is not less than $296,018.63, plus interest, attorneys' fees, costs, and expenses;

(b)    That judgment be entered in favor of Zhang and against Loyalist on the Second Cause of Action for breach of contract awarding Zhang damages in an amount to be determined at trial but that is not less than $350,000, plus interest, attorneys' fees, costs, and expenses;

(c)    That judgment be entered in favor of Plaintiffs and against Loyalist on the Third Cause of Action for tortious interference with contract awarding Plaintiffs damages in an amount to be determined at trial but that is not less than $646,018.63, plus interest, attorneys' fees, costs, and expenses; and

(d)    That the Court award Plaintiffs such other and further relief as is just and proper.

Dated: New York, New York
       August 27, 2025

KAUFF LATON MILLER LLP

By: _____

    Adam Kauff
    Jonathan Perrelle
    810 Seventh Avenue, 33rd Floor
    New York, NY 10019
    Tel.: (212) 906-3441
    Fax: (212) 656-1456
    akauff@klmllp.com
    jperrelle@klmllp.com

*Attorneys for Plaintiffs CollegeStreet Import & Export (Tianjin) Co. Ltd. and Jin Zhang*

17

## VERIFICATION

JIN ZHANG affirms pursuant to CPLR 2106 as follows:

I am the CEO and owner of Plaintiff CollegeStreet Import & Export (Tianjin) Co. Ltd. I have read the foregoing Complaint and know the contents thereof; that the same is true to my knowledge, except as to the matters therein stated to be alleged upon information and belief, and that as to those matters I believe them to be true.

I affirm this 27 day of August 2025 under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

*Jin Zhang*

JIN ZHANG, individually and as
CEO of CollegeStreet Import &
Export (Tianjin) Co. Ltd.

**8/27/2025**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF** NEW YORK
-------------------------------------------------------------------x
COLLEGESTREET IMPORT & EXPORT (TIANJIN)
CO., LTD. and JIN ZHANG

Plaintiff/Petitioner,

       - against -                    Index No. 655122/2025

LOYALIST, LLC

Defendant/Respondent.

-------------------------------------------------------------------x

**NOTICE OF ELECTRONIC FILING**
**(Mandatory Case)**
(Uniform Rule § 202.5-bb)

**You have received this Notice because**:

    1) The Plaintiff/Petitioner, whose name is listed above, has filed this case using the New York State Courts E-filing system ("NYSCEF"), and

    2) You are a Defendant/Respondent (a party) in this case.

- **If you are represented by an attorney:**
  Give this Notice to your attorney.  (<u>Attorneys</u>: see "Information for Attorneys" pg. 2).

- **If you are not represented by an attorney:**
  **You will be served with all documents in paper and you must serve and file your documents in paper, unless you choose to participate in e-filing.**

  **If you choose to participate in e-filing, you <u>must</u> have access to a computer and a scanner or other device to convert documents into electronic format, a connection to the internet, and an e-mail address to receive service of documents.**

The **benefits of participating in e-filing** include:

- serving and filing your documents electronically

- free access to view and print your e-filed documents

- limiting your number of trips to the courthouse

- paying any court fees on-line (credit card needed)

**To register for e-filing or for more information about how e-filing works:**

- visit: www.nycourts.gov/efile-unrepresented or
- contact the Clerk's Office or Help Center at the court where the case was filed. Court contact information can be found at www.nycourts.gov

To find legal information to help you represent yourself visit www.nycourthelp.gov

**Information for Attorneys**
**(E-filing is Mandatory for Attorneys)**

An attorney representing a party who is served with this notice must either:

1) immediately record his or her representation within the e-filed matter on the NYSCEF site www.nycourts.gov/efile ; or

2) file the Notice of Opt-Out form with the clerk of the court where this action is pending and serve on all parties. Exemptions from mandatory e-filing are limited to attorneys who certify in good faith that they lack the computer hardware and/or scanner and/or internet connection or that they lack (along with all employees subject to their direction) the knowledge to operate such equipment. [Section 202.5-bb(e)]

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: nyscef@nycourts.gov).

Dated:  8/29/25

Jonathan Perrelle                                     810 Seventh Avenue, 33rd Floor
              Name                                                        Address

Kauff Laton Miller LLP                              New York, NY 10019

         Firm Name

                                                               212-906-3445
                                                                    Phone

                                                              jperrelle@klmllp.com
                                                                    E-Mail

To:    Loyalist, LLC

         441 Broadway, Floor 2

         New York, NY 10013

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
COLLEGESTREET IMPORT & EXPORT
(TIANJIN) CO. LTD., et al.,

          Plaintiffs,

     -v-

TL X HF, LLC, et al.,

          Defendants.
```

24-cv-4522 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.:

On February 5, 2025, the Court issued a bottom-line order in the above-captioned case. See ECF No. 48. That order granted the motion of defendant Maxwell Ritz to compel the arbitration of plaintiff Jin Zhang's claim for breach of fiduciary duty, denied the motion of Ritz and co-defendant TL x HF, LLC ("TL x HF") to compel arbitration of co-plaintiff College Street's claims under section 17200 of the California Business & Professions Code, and denied the motion of TL x HF to compel arbitration of College Street's claim for breach of contract. The Court granted Ritz's motion to stay the fiduciary-duty claim but denied the motions of TL x HF and Ritz to stay the other claims. Finally, the Court granted defendants' motion to dismiss the section 17200 claims.

This Opinion explains the reasons for the Court's decisions.

I.   **Factual Background**

This case relates to a business deal between plaintiff College Street and defendants TL x HF and Loyalist.[1] College Street's amended complaint alleges the following facts, which the Court accepts as true for purposes of deciding defendants' motion to dismiss. In late 2018, Hillflint Inc. was in dire financial straits, but it owed $650,000 to College Street. Am. Compl. ¶ 25. Hillflint, like the corporate parties in this case, was in the business of college-clothing distribution. Id. ¶ 7.

TL x HF and Loyalist acquired Hillflint and assumed its debt to College Street. Id. ¶ 26. That debt was soon restructured. Id. Rather than jointly owe College Street $650,000 in cash, TL x HF assumed $350,000 of the total debt, and Loyalist transferred 343,324 units of its total ownership to College Street's CEO, Jin Zhang.[2] Id. The parties finalized their new arrangement in three contracts: (1) a Common Unit Purchase Agreement and Release ("CUPAR") between College Street and Loyalist; (2) an Obligation Release of Debt and Payables against Hillflint, executed by College Street; and (3) a Transfer Agreement between College Street and TL x HF. Id. ¶ 29; see also Ex. A to Am. Compl., id. at 22–31.

_____

[1] Maxwell Ritz -- the manager of both TL x HF and Loyalist -- is the third co-defendant in the case. Likewise, Jin Zhang -- the CEO of College Street -- is a co-plaintiff in the case.

[2] At first, the parties intended for College Street to own the Loyalist equity, but Loyalist ultimately asked that Zhang accept the shares to avoid tax issues that it believed might arise from having a foreign company as a Loyalist shareholder. Am. Compl. ¶ 27.

In addition to assuming $350,000 of the underlying debt, TL x HF also agreed to four obligations in the Transfer Agreement, which generally aimed to facilitate timely repayment. Am. Compl. ¶¶ 34–35. Specifically, TL x HF promised to:

- "Make all reasonable best efforts to remit payments on the Assumed Obligation (without interest) through 12/31/2018 out of TL x HF LLC revenues at TL x HF LLC discretion in order to resolve the assumed $350,000 liability with the expectation of payment in full of the Assumed Obligation not later than 1/31/2021";

- "Grant CollegeStreet right of first refusal on any production orders going forward assuming CollegeStreet can offer best pricing, speed, and quality (as determined by TL x HF LLC)";

- "Make best efforts to provide liquidity to CollegeStreet OR the individual Zhang Jin on the $350,000 in equity, whether in the form of a buy back, sale to existing or prospective investors, or any other method agreed to by both TL x HF LLC and CollegeStreet OR TL x HF LLC and the individual Zhang Jin"; and

- "Pay, in addition to cost on production orders, an additional revenue share from profitable sales according to the following schedule: if >50% net margin, 5%; if >30% net margin, 3%; if 20% net margin, 1%; if >10% net margin, 0%."

Ex. A to Am. Compl., id. at 31; see also Am. Compl. ¶ 35.

According to College Street, TL x HF "fail[ed] to fulfill almost all its . . . obligations." Id. ¶ 36. College Street claims that "TL x HF made no effort to repay any of the $350,000 to College Street by January 31, 2021." Id. ¶ 37. In 2022 and 2023, College Street demanded that TL x HF (and its manager, defendant Maxwell Ritz) repay the debt, but Ritz allegedly told a College Street employee "that only about $180,000 of the . . . cash debt would be repaid and that his proposal would be non-negotiable." Id. ¶¶ 39–40. At one point, Ritz

also "threatened to dissolve TL x HF" if College Street did not agree
and added that "he would 'shift' future orders placed with Loyalist
to TL x HF, so that TL x HF could repay its debt to College Street."
Id. ¶¶ 41-42.

TL x HF allegedly did not fulfill its other promises either.
College Street alleges that "TL x HF did not inform College Street
[of] all its production orders and thus did not provide College Street
its opportunity and right to offer 'best pricing, speed, and quality'
to earn all TL x HF's production orders." Id. ¶ 43. In fact, in 2023,
Ritz "reaffirmed that TL x HF indeed had such orders in . . . 2023
. . . and asked whether College Street would accept its orders," and
"College Street confirmed it would." Id. But TL x HF still did not
follow through. College Street adds that TL x HF never offered "any
'buy back, sale to existing or prospective investors, or any other
method' to liquidate the $350,000 cash debt," and, despite having
earned more than $875,000, paid only $4,257.78 in the promised
"additional revenue share from profitable sales." Id. ¶¶ 44-48.

College Street claims that Loyalist is at fault too. Central to
its allegations against Loyalist is the conduct of Ritz -- "a board
member, a member, and an officer of both Loyalist and TL x HF."
Id. ¶ 51 (emphasis added). According to College Street, "Loyalist and
TL x HF share a same customer order intake and distribution system";
because of this shared system, "Ritz has the authority to select which
customer order would be completed by Loyalist and which would be
completed by TL x HF." Id. ¶¶ 50-51. College Street alleges that Ritz

abused this power, "divert[ing] customer orders placed with TL x HF to Loyalist," with the goal of "increas[ing] Loyalist's profitability" and "attract[ing] more investors into Loyalist." Id. ¶ 53. As a result, "TL x HF's customer orders plummeted, and TL x HF breached its contractual obligations with College Street." Id. Later, however, Ritz needed "to ease creditors' pressure on TL x HF" and thus "randomly diverted customer order[s] from Loyalist to TL x HF and shifted costs from TL x HF to Loyalist." Id. ¶ 54. College Street suggests that Ritz's position at both companies created an "actual conflict of interest between these two entities." Id. ¶ 56.

## II.  Procedural Background

College Street filed a complaint against Ritz, Loyalist, and TL x HF on June 12, 2024. See ECF No. 1. The next month, defendants moved to dismiss the complaint, see ECF No. 18, and moved to compel arbitration, see ECF No. 24. In response, College Street amended its complaint -- adding Zhang as a plaintiff -- on August 19, 2024. See ECF No. 32. Around two weeks later, defendants again moved to dismiss plaintiffs' complaint. See ECF No. 37. In November 2024, defendants confirmed that they continue to pursue the motion to compel arbitration and indicated that they had addressed the amended complaint's impact on that motion in their reply brief. See ECF No. 34 (reflecting that defendants' reply brief in support of the motion to compel was filed four days after the amended complaint was filed).

The amended complaint brings three causes of action. First, College Street sues TL x HF for "B[r]each Of Written Contract."

Am. Compl. ¶¶ 70-77. Second, College Street sues TL x HF and Ritz for "Violation of Cal. Bus. & Prof. Code Section 17200" -- a provision of California law that deals with "unfair competition." Id. ¶¶ 78-89. Third, Zhang -- both "derivatively on behalf of Loyalist and individually" -- sues Ritz for "B[r]each of Fiduciary Duty." Id. ¶¶ 90-95.

## III. Analysis

### A. Motion to Compel Arbitration

Defendants move to compel arbitration of the claims in the amended complaint, i.e., Zhang's fiduciary-duty claim against Ritz and College Street's claims against TL x HF and Ritz. The question of whether parties have submitted a particular dispute to arbitration, i.e., the "question of arbitrability," is "an issue for judicial determination," unless "the parties clearly and unmistakably provide otherwise." AT & T Techs., Inc. v. Commc'ns Workers, 475 U.S. 643, 649 (1986).[3] While there exists a strong and "liberal federal policy favoring arbitration agreements," Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 625 (1985), "such agreements must not be so broadly construed as to encompass claims and parties that were not intended by the original contract," Thomson-CSF, S.A. v. Am. Arb. Ass'n, 64 F.3d 773, 776 (2d Cir. 1995). Simply put, the "FAA does not require parties to arbitrate when they have not agreed

---

[3] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, footnotes, and citations.

to do so . . . ." <u>Volt Info. Scis., Inc. v. Bd. of Trs. of Leland</u>
<u>Stanford Junior Univ.</u>, 489 U.S. 468, 478 (1989).

"The issue of whether the parties are obliged to arbitrate their
dispute therefore breaks down into two questions: '(1) whether the
parties have entered into a valid agreement to arbitrate, and, if so,
(2) whether the dispute at issue comes within the scope of the
arbitration agreement.'" <u>Nat'l Union Fire Ins. Co. of Pittsburg v.</u>
<u>Beelman Truck Co.</u>, 203 F. Supp. 3d 312, 316-17 (S.D.N.Y. 2016) (quoting
<u>In re Am. Express Fin. Advisors Sec. Litig.</u>, 672 F.3d 113, 128 (2d
Cir. 2011)).

In support of their motion, defendants cite the Third Amended and
Restated Limited Liability Company Agreement of Loyalist, LLC ("LLC
Agreement"), which includes a broad arbitration provision that
requires the arbitration of "[a]ny controversy . . . arising out of,
in connection with, or in relation to the interpretation, performance
or breach" of the LLC Agreement, "or any agreement or other instrument
executed pursuant" to the LLC Agreement, "including, without
limitation, any claim based on contract, tort, or statute."[4] Ex. 1 to
ECF No. 33 section 14.10 at 43 (hereinafter "LLC Agreement").

---

[4] The Court takes judicial notice of the LLC Agreement. <u>See</u> ECF Nos. 23,
26, 33, 41. Attached to the complaint is the CUPAR, which references
the LLC Agreement. <u>See</u> Am. Compl. at 23. In this way, the document is
"integral" to the complaint. <u>See</u> <u>Faulkner v. Beer</u>, 463 F.3d 130, 134
(2d Cir. 2006); <u>see also</u> <u>Cox v. Perfect Bldg. Maint. Corp.</u>, No. 16-
cv-7474, 2017 WL 3049547, at *3 ("[C]ourts have regularly taken
judicial notice of arbitration awards and collective bargaining
agreements in considering a motion to dismiss or to compel
arbitration."). Although College Street opposes defendants' request
for judicial notice, its arguments go to the merits of whether Zhang

Because each of the three claims involves different sets of factual circumstances, the following sections of this Opinion assess each claim independently. See Zachman v. Hudson Valley Fed. Credit Union, 49 F.4th 95, 101 (2d Cir. 2022) (recognizing that "some, but not all, of the claims in the case" may be subject to arbitration).

### i. Zhang's Fiduciary-Duty Claim

Jin Zhang, College Street's CEO, sues Maxwell Ritz, "a board member, a member, and an officer" of Loyalist, for breach of fiduciary duty. Am. Compl. ¶ 51. Zhang alleges that Ritz, who was also "a board member, a member, and an officer" of TL x HF, "caused Loyalist to pay for various expenses incurred by and solely attributable to TL x HF, reducing Loyalist's profitability and its members' dividend." Id. ¶¶ 51–52. Similarly, Zhang claims that Ritz "randomly diverted customer order[s] from Loyalist to TL x HF and shifted costs from TL x HF to Loyalist." Id. ¶ 54. According to Zhang, this "ad hoc order diversion and cost shifting . . . was done without regard to the interest of Loyalist's minority members." Id. ¶ 55. Zhang also asserts that Ritz's management of different companies "in the same business of college clothing distribution" involved an "actual conflict of interest between these two entities." Id. ¶¶ 56–57. Ritz moves to compel arbitration of Zhang's claim.

---

or College Street is bound by the LLC Agreement (considered below, see infra at pp. 9–11, 16–18) and not to identifying a dispute regarding the authenticity or accuracy of the LLC Agreement. See ECF No. 43.

The parties focus on the first step of the Court's inquiry -- whether Ritz and Zhang entered a valid agreement to arbitrate. "The party seeking to compel arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." Zachman, 49 F.4th at 101-02. That party must demonstrate "only that an agreement to arbitrate existed," not that the agreement would be enforceable. Id. at 102. "Once the existence of an agreement to arbitrate is established, the burden shifts to the party seeking to avoid arbitration to show the agreement to be inapplicable or invalid." Id.

Zhang does not contest that Ritz may invoke the arbitration provision's protection; indeed, the LLC Agreement bears Ritz's signature. See LLC Agreement at 46. Instead, the parties dispute whether Zhang is a signatory to the arbitration agreement. At this early stage of the litigation, the record does not include any copy of the LLC Agreement signed by Zhang. Still, Ritz advances several arguments in support of holding Zhang to the LLC Agreement. To start, Ritz points out that Zhang signed the CUPAR -- which plaintiffs attached to the amended complaint -- in which she "acknowledge[d] that [she] (i) has read the LLC Agreement, (ii) accepts and agrees to be bound by the terms [of] the LLC Agreement, (iii) assumes all of the rights and obligations of a Member of the Company and (iv) has executed the LLC Agreement." Ex. A to Am. Compl.; see also Reply Mem., ECF No. 34 at 2. He adds that under Delaware law, a member of a limited liability company "is bound by the limited liability company agreement whether or not the member . . . executes the limited liability company

agreement." See Reply Mem., ECF No. 34 at 3 (quoting Del. Code tit. 6, § 18-101(9)). But even if the Court concludes that Zhang did not sign the agreement (or is not otherwise bound under Delaware law), Ritz insists that the doctrines of incorporation by reference and estoppel require Zhang to arbitrate under the LLC Agreement.

Zhang responds that "Loyalist . . . has never sent or asked Jin Zhang or College Street to review or signed [sic] the LLC Agreement -- any time before or after the merger and acquisition." Opp'n Mem., ECF No. 31 at 8. Compounding this shortcoming, according to Zhang, is the fact that "[she] and College Street lacked (and still does [sic] lack) English proficiency." Id. at 10. Zhang closes by arguing that the "theories" by which a court may enforce an arbitration agreement against a nonsignatory do not apply.[5] See id. at 10-13.

Ritz has the better of the arguments. It bears repeating that the CUPAR is attached to the complaint and signed by Zhang; that agreement clearly states: "The Purchaser [Zhang] acknowledges that the Purchaser . . . has read the LLC Agreement, . . . accepts and agrees to be bound by the terms [of] the LLC Agreement . . . and . . . has executed the LLC Agreement." Ex. A to Am. Compl. at 23. Other than argumentative characterizations of the provisions of the CUPAR, see Opp'n Mem.,

_____

[5] Zhang addresses five such theories: incorporation by reference, assumption, agency, veil-piercing/alter ego, and estoppel. Opp'n Mem., ECF No. 31 at 10 (citing Thomson-CSF, S.A. v. Am. Arb. Ass'n, 64 F.3d 773, 776 (2d Cir. 1995)). Defendants address only incorporation by reference and estoppel in their briefing, so this Opinion is so limited.

ECF No. 31 at 6 ("Located in the throw-away 'definitions' section
. . .") (emphasis added), see also id. ("Located in a mis-numbered
'Acknowledgement' section in Debt Purchase Agreement is a mis-numbered
Section 1(b) . . .") (emphases added), Zhang does not cite any
authority or submit any theory that would allow this Court to disregard
her clear statement in the CUPAR. And while she suggests, without any
substantiation, that she did not actually receive, review, or sign the
LLC Agreement, the CUPAR itself, integrated into the complaint,
expressly contradicts that assertion. Moreover, Zhang does not explain
why Delaware Code section 18-101(9), which provides that "[a] member
. . . of a limited liability company . . . is bound by the limited
liability company agreement whether or not the member . . . executes
the limited liability company agreement," does not foreclose any
argument that she is not bound by the LLC Agreement. Loyalist is a
Delaware limited liability company, see LLC Agreement section 2.1 at
9, and under the CUPAR "[t]he Company and the Board of Managers . . .
admit[ted] [Zhang] as a Member of the Company pursuant to the terms
of the LLC Agreement," Ex. A to Am. Compl. at 24. Whether under the
clear terms of the CUPAR or under Delaware law, the Court concludes
that Zhang is bound by the LLC Agreement.

The Court must next consider the second step -- whether the
dispute at issue falls within the scope of the arbitration agreement.
Defendants argue that the Court should not reach this question because
the breadth of the arbitration provision indicates that the parties
agreed to submit questions of arbitrability to the arbitrator.

See Reply Mem., ECF No. 34 at 9. Indeed, defendants cite caselaw that has interpreted similar language ("[a]ny controversy, dispute, or claim") and reference to the "Rules for Commercial Arbitration of the American Arbitration Association" as evidence of the parties' intent to arbitrate issues of arbitrability. Id.; see also WTA Tour, Inc. v. Super Slam Ltd., 339 F. Supp. 3d 390, 402 (S.D.N.Y. 2018) ("[T]he Second Circuit has squarely held that adopting the AAA's Commercial Arbitration Rules constitutes clear and unmistakable evidence of the parties' intent to arbitrate issues of arbitrability."); Shaw Grp. Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 121 (2d Cir. 2003) (identifying the language of "all disputes" as one factor supporting the conclusion that parties intended to arbitrate questions of arbitrability).

Defendants, however, did not raise this argument until their reply brief. And not only did defendants delay, but they adopted an inconsistent position in their opening brief -- namely, that "the Complaint's allegations leave no doubt that the Complaint's claims are all within the scope of the LLC Agreement's arbitration clause." Def. Mem., ECF No. 25 at 7. Arguments raised for the first time on reply are waived, so the Court will not consider the argument that the parties delegated questions of arbitrability to the arbitrator. See Prospect Cap. Corp. v. Credito Real USA Fin. LLC, 702 F. Supp. 3d 178, 190 n.6 (S.D.N.Y. 2023).

Otherwise, the parties do not discuss in detail whether Zhang's fiduciary-breach claim falls within the scope of the arbitration

agreement. Defendants suggest that the "LLC Agreement sets forth the rights, duties, and obligations of Loyalist's members and managers," and thus the "claim that Mr. Ritz breached his fiduciary duties [is] . . . arbitrable under the LLC Agreement." Def. Mem., ECF No. 25 at 7. In support, defendants cite a Delaware Supreme Court decision that concluded that a breach-of-fiduciary-duty claim brought against a manager of an LLC arose under the LLC Agreement. See Elf Atochem N. Am. v. Jaffari, 727 A.2d 286, 293-94 (Del. 1999). Zhang does not respond to these arguments.

Although "doubts as to whether a claim falls within the scope of [an arbitration] agreement should be resolved in favor of arbitrability," courts "must treat agreements to arbitrate like any other contract." Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001). Of course, the Court's conclusion that defendants have forfeited any argument about arbitrating questions of arbitrability does not foreclose the observation that the arbitration agreement is broad. It covers "[a]ny controversy, dispute, or claim arising out of, in connection with, or in relation to the interpretation, performance or breach of this Agreement . . . including, without limitation, any claim based on . . . tort." LLC Agreement section 14.10 at 43.

Zhang's fiduciary-breach claim falls within the core of this broad arbitration provision. This claim against Ritz derives solely from his status as "a board member, a manager, and an officer" of Loyalist and from his actions managing the company. Those actions, in

13

turn, are governed by Article V of the LLC Agreement, which concerns the management of Loyalist. See id. sections 5.1–5.3 at 19–22. Indeed, Ritz's fiduciary duties are outlined in the LLC Agreement: "all Managers shall, with respect to their actions and conduct in their respective capacities as such, be subject to the fiduciary duties applicable to directors of a for-profit stock corporation organized and existing under the DGCL." Id. section 5.3 at 21–22. In short, Zhang's fiduciary-breach claim -- a claim based in tort -- arises from the Loyalist LLC Agreement.

Zhang resists this conclusion by arguing that "the doctrine of 'waiver by litigation' squarely applies."[6] Opp'n Mem., ECF No. 31 at 14. Defendants, she explains, have, "[i]n the last 18 months . . . litigated present claims and their similars [sic] before three different courts," but "[n]ot once . . . requested [p]laintiffs' claims be arbitrated." Id. at 14–15. To be sure, some of the parties to this dispute have engaged in prior proceedings in California state and

---

[6] Both sides submit evidence related to prior litigation between the parties in California. See ECF Nos. 20, 23, 30, 35. The Court takes judicial notice of these materials. See Glob. Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court . . . to establish the fact of such litigation and related filings.").

federal court.[7] In March 2023, College Street sued TL x HF[8] and Loyalist in California state court. See ECF No. 31-1 at 8. Two months later, defendants removed the case to the Northern District of California, see id. at 18; soon after, defendants moved to dismiss the complaint under Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure, see id. at 19. The parties fully briefed the motion, but the magistrate judge eventually remanded the action to state court in August 2023. See id. at 19–21. Back in state court, defendants moved to quash the service of summons for lack of personal jurisdiction, which the court granted around two months after remand. See Ex. 3 to ECF No. 35 at 38–40. In April 2024, College Street moved to dismiss the case. See ECF No. 31-1 at 15. (It refiled in this Court around one month later. ECF No. 1.)

But Zhang never explains how Ritz's right to arbitrate is waived: Ritz was not a party to the California litigation and moved to compel in this Court in accordance with the case-management plan. See ECF Nos. 17, 24. Neither Zhang nor College Street cites any evidence

---

[7] Prior litigation in a different forum is relevant to determining whether defendants have waived the right to arbitrate in this case. See PPG Indus., Inc. v. Webster Auto Parts, Inc., 128 F.3d 103, 108 n.2 (2d Cir. 1997) ("We have previously stated that the prior litigation of the same legal and factual issues as those the party now wants to arbitrate results in waiver of the right to arbitrate. It is irrelevant that the prior litigation occurred as part of a separate action or in a different court.").

[8] In addition to defendant Loyalist, LLC, the California docket lists "XL x HF LLC" rather than "TL x HF LLC." Both parties proceed on an understanding that TL x HF was a party to the California litigation -- and neither party draws any significance from "XL" -- so the Court will do the same for purposes of deciding this motion.

indicating that Ritz has previously litigated the aforementioned claims or identifies any authority that would allow the Court to impute TL x HF's and Loyalist's prior litigation to Ritz. Ritz has not waived his right to arbitrate.

Because Ritz and Zhang entered a valid agreement to arbitrate under the LLC Agreement, and because Zhang's fiduciary-duty claim falls squarely within the scope of that agreement, the Court compels arbitration of Ritz's fiduciary-breach claim against Ritz.

### ii. College Street's Section 17200 Claims

College Street sues TL x HF and Ritz under section 17200 of the California Business and Professions Code. That provision defines unfair competition as including "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "Private causes of action for violations of . . . section 17200 are authorized by Business and Professions Code section 17204." Chabner v. United of Omaha Life Ins. Co., 225 F.3d 1042, 1048 (9th Cir. 2000). College Street's section 17200 claims in this case center on the promises made by TL x HF in the Transfer Agreement. See generally Am. Compl. ¶¶ 82–89. Specifically, it asserts that "[d]efendants Maxwell Ritz and TL x HF did not make the slightest effort to cause to fulfill or fulfil [sic] any of TL x HF obligations [sic] under the written contract." Id. ¶ 85. For that reason, College Street contends that defendants "decided . . . that they needed to engage in deceptive and fraudulent conduct to make more profits," in violation of § 17200. Id. TL x HF and Ritz ask the Court to compel arbitration of those claims.

The Court must first determine whether either (i) College Street and TL x HF, or (ii) College Street and Ritz agreed to arbitrate. As earlier explained, Ritz signed the LLC Agreement.[9] But Ritz's (or TL x HF's) signature is only half of the equation. The question is whether Ritz and College Street (or TL x HF and College Street) entered an agreement to arbitrate. It is undisputed that College Street did not sign the LLC Agreement. And while Zhang is the president of College Street and did sign the LLC Agreement, she signed the agreement as a prospective member of Loyalist. In fact, the parties expressly decided to issue the Loyalist shares to Zhang and not to College Street.

Still, defendants argue on other grounds that the arbitration provision extends to College Street's claims. Their strongest argument relies on the doctrine of estoppel, which provides that "a company knowingly exploiting an agreement with an arbitration clause can be estopped from avoiding arbitration despite having never signed the agreement." Trina Solar US, Inc. v. Jasmin Solar Pty Ltd., 954 F.3d 567, 572 (2d Cir. 2020) (quoting MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC, 268 F.3d 58, 61–63 (2d Cir. 2001)). Invoking this doctrine, defendants contend that "CollegeStreet should . . . be estopped from denying their duty to arbitrate because [it has] . . . received tangible benefits from the LLC Agreement." Reply Mem., ECF No. 34 at 5. Chief among these benefits was "the benefit of the

---

[9] TL x HF did not sign the LLC Agreement, but College Street does not argue that TL x HF cannot enforce the arbitration provision.

Loyalist membership units (valued at $350,000) that were issued as consideration for CollegeStreet's agreement to the Transfer Agreement." Id.

College Street's argument has intuitive appeal, particularly given the importance of Loyalist's shares to the overall transaction between the parties. But the Second Circuit has required a closer relationship between the purported benefit and the agreement containing the arbitration provision: "[t]he benefits of exploiting the agreement . . . must flow directly from the agreement, rather than indirectly from the contractual relationship of the parties to the agreement." Trina Solar, 954 F.3d at 572. Caselaw confirms that College Street falls in the latter category. See id. at 572-73 (concluding that estoppel did not apply even though the party "benefited from the contractual relationship," because the contract itself did not provide it "any direct benefit"); cf. Am. S.S. Owners Mut. Prot. & Indem. Ass'n v. Am. Boat Co., LLC, No. 11-cv-6804, 2012 WL 527209, at *5 (S.D.N.Y. Feb. 17, 2012) (finding that party was estopped from arguing that it was not subject to a forum selection clause when it had claimed entitlement to payment of its legal defense costs under the same contract). Here, although College Street benefitted, at least in a colloquial sense, from its CEO's owning Loyalist equity, it did not receive any concrete benefit from the LLC Agreement itself, which outlines the rights of and restrictions on Loyalist members and managers.

Furthermore, even if defendants' argument were correct, the Court's construction of the scope of the arbitration provision would not cover the section 17200 claims asserted here. The arbitration provision generally covers disputes connected to the LLC Agreement; these unfair-competition claims, however, arise from College Street's business deal with TL x HF and not at all from the management or operation of Loyalist. So too for Ritz, whose conduct that is alleged to form the basis of this claim relates directly to his role as manager of TL x HF. See Compl. ¶¶ 82-89. TL x HF's obligations, doubtless, arise from the same overall business transaction that resulted in the transfer of Loyalist's shares to Zhang; but to require arbitration on that connection alone would allow the LLC Agreement's arbitration provision to sweep far beyond its plain terms. That outcome would run roughshod over the Supreme Court's instruction that lower courts should interpret arbitration agreements under basic principles of contract law. See Morgan v. Sundance, Inc., 596 U.S. 411, 418 (2022) ("[A] court must hold a party to its arbitration contract just as the court would to any other kind. But a court may not devise novel rules to favor arbitration over litigation. . . . The federal policy is about treating arbitration contracts like all others, not about fostering arbitration.").

For the foregoing reasons, the Court denies TL x HF and Ritz's motion to compel arbitration of College Street's section 17200 claims.

### iii. College Street's Breach of Contract Claim

The Court's resolution of TL x HF's motion to compel arbitration of College Street's breach-of-contract claim flows from the analysis in the previous subsection. The gravamen of College Street's breach-of-contract claim mirrors that of its section 17200 claims: TL x HF's alleged failure to fulfill the contractual obligations in the Transfer Agreement. Therefore, for the same reasons described above, the Court denies TL x HF's motion to compel arbitration of the breach-of-contract claim. As a nonsignatory, College Street is not bound to the LLC Agreement, and even if it were, TL x HF's breach of a separate contract would not fall within the scope of the arbitration provision.

\* \* \*

To summarize, the Court grants Maxwell Ritz's motion to compel arbitration of Jin Zhang's fiduciary-breach claim, but it denies Ritz and TL x HF's motion to compel arbitration of College Street's section 17200 claims and TL x HF's motion to compel arbitration of College Street's breach-of-contract claim.

The Court faces a final question: whether to grant a stay of this litigation while Ritz and Zhang pursue the fiduciary-breach claim in arbitration. In their opening brief, defendants moved to stay under § 3 of the Federal Arbitration Act. Granted, a stay under § 3, when properly invoked, is mandatory. See Smith v. Spizzirri, 601 U.S. 472, 478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding."). Section 3,

however, applies only when "the parties agreed to arbitrate." See
Guyden v. Aetna, Inc., 544 F.3d 376, 382 (2d Cir. 2008). Here, only
two of the parties agreed to arbitrate: Zhang and Ritz. Accordingly,
the Court will stay the fiduciary-breach claim between those parties.

But "[t]he decision to stay the balance of the proceedings pending
arbitration is a matter largely within the district court's discretion
to control its docket." Winter Invs., LLC v. Panzer, No. 14-cv-6852,
2015 WL 5052563, at *11 (S.D.N.Y. Aug. 27, 2015) (citing Genesco, Inc.
v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 856 (2d Cir. 1987)); see
also Sierra Rutile Ltd. v. Katz, 937 F.2d 743, 750 (2d Cir. 1991)
("[D]istrict courts have 'inherent power' to grant stays in certain
circumstances," including when issues in the case may be decided in a
pending arbitration.). "In exercising its discretion, a court
considers, among other factors, the interests of plaintiffs and the
prejudice that may result from delay, the interests of defendants, the
interests of the courts, the interests of non-parties, and the public
interest." City of Almaty v. Sater, No. 19-cv-2645, 2021 WL 4940304,
at *3 (S.D.N.Y. Oct. 22, 2021) (Nathan, J.).

The factors in this case weigh in favor of allowing the litigation
of the section 17200 claims and the breach-of-contract claim to
proceed. As explained, those claims derive from a contractual dispute
between College Street and TL x HF that is separate from the tort
claim set to be arbitrated between Ritz and Zhang. This fundamental
difference means that ongoing litigation will not risk inconsistent
decisions from this Court and from the arbitrator. To the contrary,

allowing the litigation to proceed safeguards the parties' interest in a timely resolution of the dispute between College Street and TL x HF, and protects the public interest in the efficient administration of justice.

For the foregoing reasons, the Court grants the stay under § 3 of the fiduciary-breach claim, but denies the stay under its own discretionary authority of the section 17200 claims and the breach-of-contract claim.

### B. Motion to Dismiss

The Court now turns to defendants' motion to dismiss. Because the parties are required to arbitrate the fiduciary-breach claim, the Court cannot decide defendants' motion to dismiss that claim. The Court, then, is left only with the motion to dismiss the section 17200 claims.

To survive a motion to dismiss for failure to state a claim, a complaint must include "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A complaint must offer more than "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 557 (2007). If plaintiff has "not nudged [its] claim[] across the line from conceivable to plausible, [its] complaint must be dismissed." Id. at 570. The Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable

22

inferences in the plaintiff's favor." Goldstein v. Pataki, 516 F.3d 50, 56 (2d. Cir. 2008).

Defendants argue that the "UCL [section 17200] claim must be dismissed because the UCL does not apply extra-territorially to reach the conduct [of] non-residents of California occurring outside of California." Def. Mem., ECF No. 38 at 5. Defendants are correct that "the UCL does not apply to actions occurring outside of California that injure non-residents." Ice Cream Distribs. of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc., No. 09-cv-5815, 2010 WL 3619884, at *8 (Sept. 10, 2010) (internal quotation marks omitted); see also Sullivan v. Oracle Corp., 254 P.3d 237, 248 (Cal. 2011) ("Neither the language of the UCL nor its legislative history provides any basis for concluding the Legislature intended the UCL to operate extraterritorially. Accordingly, the presumption against extraterritoriality applies to the UCL in full force.").

Here, the complaint alleges that the injured party, College Street, is "a citizen of China, because it is a China limited company having its principal place of business in China." Am. Compl. ¶ 13. The complaint further alleges that defendant TL x HF is a "citizen of Delaware and New York," and that defendant Maxwell Ritz is a "citizen of New York." Id. ¶¶ 16-17. Based on the complaint's allegations, the conduct forming the basis of the section 17200 claims was undertaken by New York residents in New York against a Chinese company. Section 17200 does not stretch to reach such a claim with no connection to California.

College Street counters by pointing to allegations in the complaint that "[s]tarting from August 2022, College Street began operating significant business in the City of Hayward, California . . . [b]ecause [Zhang] relocated to City of Hayward, California." Id. ¶ 38. College Street further alleges that Ritz and TL x HF's breach, including a refusal to pay the $350,000 debt, occurred during this period. See id. ¶¶ 39-42. College Street is correct that this Court must accept all factual allegations as true when resolving defendants' motion to dismiss. But even accepting that College Street operated out of California because Zhang had temporarily relocated there, College Street does not identify any authority that would allow this Court to change a company's citizenship based on where its CEO -- also a foreign national -- travels. Moreover, College Street cites no authority supporting the proposition that section 17200 applies to parties who are injured while traveling through California. To the contrary, the caselaw indicates that section 17200 applies to residents, not to parties who happen to be in California when allegedly injured.[10] See supra at p. 23. This makes sense because the harm from anticompetitive conduct is felt in the company's corporate home and not where it is temporarily located.

---

[10] In fact, defendants submit search information from the website of the California Secretary of State reflecting no results for College Street as a business authorized to operate in California. See ECF Nos. 45, 46. Although the Court notes that these facts "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," see Fed. R. Evid. 201(b)(2), they are not critical to its analysis of the section 17200 claims.

College Street appears to recognize this shortcoming and so characterizes defendants' allegedly unlawful underline conduct as occurring in California. Yet again, it cites no authority to suggest that a New York party making a call from New York to a foreign company that happens to be answered in California is covered by section 17200 (or any other statute that does not apply extraterritorially). The Court thus grants defendants' motion to dismiss College Street's section 17200 claims.

SO ORDERED.

New York, NY
April **2**, 2025

JED S. RAKOFF, U.S.D.J.

# EXHIBIT 4

# COMMON UNIT PURCHASE AGREEMENT AND RELEASE

THIS COMMON UNIT PURCHASE AGREEMENT AND RELEASE (this "Agreement") is entered into as of March 1, 2019 by Loyalist, LLC, a Delaware limited liability company (the "Company"), and Jin Zhang (the "Purchaser").

WHEREAS, Purchaser and TL x HF LLC ("TLxHF") entered into a Transfer Agreement, dated November 6, 2018 (the "Transfer Agreement"), pursuant to which Purchaser consented the assumption of a $350,000 liability incurred by Hillflint, Inc. ("Hillflint") in consideration for the transfer of equity in the Company.

WHEREAS, Purchaser and Company desire to fully and finally to settle, compromise, release, and dispose of all such matters contemplated under the Transfer Agreement, pursuant to the terms of this Agreement.

**SECTION 1.  ACQUISITION OF UNITS.**

(a) **Transfer**.  On the terms and conditions set forth in this Agreement, the Company agrees to issue 343,328 Units to the Purchaser in consideration for the release set forth in Section 1(b) below, supported by Exhibit A.  The closing shall occur electronically on the date set forth above and time as the parties may agree (the "Closing").

(b) **RELEASE**.  In consideration of the transfer of the Units, Purchaser, on behalf of itself and on behalf of its affiliates, successors in interest, predecessors in interest, beneficiaries, assigns, agents, servants, representatives, and administrators shall release, remise and forever discharge the Company, Hillflint, and all their respective related entities, including but not limited to, all past, present, and future parent or subsidiary entities, and all of their respective affiliates, directors, officers, employees, agents, attorneys, stockholders, insurers, successors and/or assigns and any and all affiliates of each of the foregoing entities and persons ("Company Releases"), of and from any and all claims, liabilities, demands, charges, causes of action, costs, expenses, penalties, attorneys' fees, damages, interest, awards, indemnities and obligations of every kind and nature, in law, equity, or otherwise, which Purchaser asserts or could assert against the Company Releases at common law or under any statute, rule, regulation, order or law, whether federal, state or local, on any ground whatsoever, known and unknown, suspected and unsuspected, disclosed and undisclosed, arising out of or in any way related to agreements, events, acts, or conduct at any time prior to the date of this Agreement. Exhibit B should survive this Section 1(b) and remain an obligation of TL x HF.

(b) **Acknowledgement**s. The Purchaser acknowledges that the Purchaser (i) has read the LLC Agreement, (ii) accepts and agrees to be bound by the terms the LLC Agreement, (iii) assumes all of the rights and obligations of a Member of the Company and (iv) has executed the LLC Agreement.

(c) **Consent**. The Company and the Board of Managers hereby consent to the admission of the Purchaser and hereby admit the Purchaser as a Member of the Company pursuant to the terms of the LLC Agreement.

(d) **Defined Terms**.  Capitalized terms not defined above are defined in Section 9 of this Agreement.

## SECTION 2. REPRESENTATIONS AND WARRANTIES OF THE COMPANY

(a) **Organization and Standing**.  The Company is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware.  The Company has the full and unrestricted limited liability company power and authority to own, operate and lease its assets, to carry on its businesses as currently conducted, to execute and deliver this Agreement and to carry out the transactions contemplated hereby.

(a) **Capitalization**.  As of immediately prior to the Closing, the capital of the Company, as set forth in the LLC Agreement, shall consist of 11,182,683 total Units, of which (A) 11,178,845 Units are issued and outstanding and (B) 3,838 Units have been reserved for issuance pursuant to the Company's equity plan.  The outstanding Units are all duly and validly authorized and issued, fully paid and nonassessable, and were issued in accordance with the registration or qualification provisions of the Securities Act of 1933, as amended, and any relevant state securities laws, or pursuant to valid exemptions therefrom.

(b) **Authorization; No Conflict.**

(i)  The execution and delivery by the Company of this Agreement, and the performance of its obligations hereunder, the fulfillment of and compliance with the respective terms and provisions hereof, and the consummation of the transactions contemplated hereby has been duly authorized (which authorization has not been modified or rescinded and is in full force and effect).  No other action is necessary for the Company to enter into this Agreement and to consummate the transactions contemplated hereby.

(ii)  The execution and delivery by the Company of this Agreement, and the performance of its obligations hereunder, the fulfillment of and compliance with the respective terms and provisions hereof, and the consummation by the Company of the transactions contemplated hereby do not and will not conflict with, or violate any provision of, any federal or state statute, rule or regulation applicable to the Company, or any provision of the LLC Agreement.

(c) **Binding Obligation**.  This Agreement constitutes a valid and binding obligation of the Company, enforceable in accordance with its terms, except to the extent limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws of general application related to the enforcement of creditors' rights generally and principles of equity.

(d)    **Status of Units**.  The Units being issued to the Purchasers hereunder have been duly authorized by all necessary limited liability company action on the part of the Company, and when issued in accordance with this Agreement will be validly issued, fully paid and nonassessable with no personal liability attaching to the ownership thereof and will be free and clear of all encumbrances except as provided in the LLC Agreement.  The

## SECTION 3.  REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS; TRANSFER RESTRICTIONS

(a) **Purchaser Representations**.   In connection with the issuance and acquisition of Units under this Agreement, each Purchaser hereby represents and warrants to the Company as follows:

(i)    Such Purchaser is acquiring and will hold the Purchased Units for investment for his or her account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act.

(ii)    Such Purchaser understands that the Purchased Units have not been registered under the Securities Act by reason of a specific exemption therefrom and that the Purchased Units must be held indefinitely, unless they are subsequently registered under the Securities Act or such Purchaser obtains an opinion of counsel, in form and substance satisfactory to the Company and its counsel, that such registration is not required.  Such Purchaser further acknowledges and understands that the Company is under no obligation to register the Purchased Units.

(iii)    Such Purchaser is aware of the adoption of Rule 144 by the Securities and Exchange Commission under the Securities Act, which permits limited public resales of securities acquired in a non-public offering, subject to the satisfaction of certain conditions, including (without limitation) the availability of certain current public information about the issuer, the resale occurring only after the holding period required by Rule 144 has been satisfied, the sale occurring through an unsolicited "broker's transaction," and the amount of securities being sold during any three-month period not exceeding specified limitations.  Such Purchaser acknowledges and understands that the conditions for resale set forth in Rule 144 have not been satisfied and that the Company has no plans to satisfy these conditions in the foreseeable future.

(iv)    Such Purchaser will not sell, transfer or otherwise dispose of the Purchased Units in violation of the Securities Act, the Securities Exchange Act of 1934, or the rules promulgated thereunder, including Rule 144 under the Securities Act.  Such Purchaser agrees that he, she or it will not dispose of the Purchased Units unless and until he, she or it has complied with all requirements of this Agreement applicable to the disposition of Purchased Units and he or she has provided the Company with written assurances, in substance and form satisfactory to the Company, that (A) the proposed disposition does not require registration of the Purchased Units under the Securities Act or all appropriate action necessary for compliance with the registration requirements of the Securities Act or with any exemption from registration available under the Securities Act (including Rule 144) has been taken and (B) the proposed disposition will not result

in the contravention of any transfer restrictions applicable to the Purchased Units under state securities law.

(v)    Such Purchaser has been furnished with, and has had access to, such information as he or she considers necessary or appropriate for deciding whether to invest in the Purchased Units, and such Purchaser has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the issuance of the Purchased Units.

(vi)    Such Purchaser is aware that his or her investment in the Company is a speculative investment that has limited liquidity and is subject to the risk of complete loss. Such Purchaser is able, without impairing his or her financial condition, to hold the Purchased Units for an indefinite period and to suffer a complete loss of his or her investment in the Purchased Units.

(vii)    Such Purchaser is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D of the Securities Act.

(b) **Securities Law Restrictions**. Regardless of whether the offering and sale of Units under this Agreement have been registered under the Securities Act or have been registered or qualified under the securities laws of any State, the Company at its discretion may impose restrictions upon the sale, pledge or other transfer of the Purchased Units (including the placement of appropriate legends on Unit certificates or the imposition of stop-transfer instructions) if, in the judgment of the Company, such restrictions are necessary or desirable in order to achieve compliance with the Securities Act, the securities laws of any State or any other law.

(c) **Market Stand-Off**. In connection with any underwritten public offering by the Company of its equity securities pursuant to an effective registration statement filed under the Securities Act, including the Company's initial public offering, such Purchaser or a Transferee shall not directly or indirectly sell, make any short sale of, loan, hypothecate, pledge, offer, grant or sell any option or other contract for the purchase of, purchase any option or other contract for the sale of, or otherwise dispose of or transfer, or agree to engage in any of the foregoing transactions with respect to, any Purchased Units without the prior written consent of the Company or its managing underwriter. Such restriction (the "Market Stand-Off") shall be in effect for such period of time following the date of the final prospectus for the offering as may be requested by the Company or such underwriter. In no event, however, shall such period exceed 180 days plus such additional period as may reasonably be requested by the Company or such underwriter to accommodate regulatory restrictions on (i) the publication or other distribution of research reports or (ii) analyst recommendations and opinions, including (without limitation) the restrictions set forth in Rule 2711(f)(4) of the National Association of Securities Dealers and Rule 472(f)(4) of the New York Stock Exchange, as amended, or any similar successor rules. The Market Stand-Off shall in any event terminate two years after the date of the Company's initial public offering. In the event of the declaration of a distribution of Units, a spin-off, a Unit split, an adjustment in conversion ratio, a recapitalization or a similar transaction affecting the Company's outstanding securities without receipt of consideration, any new, substituted or

additional securities which are by reason of such transaction distributed with respect to any Units subject to the Market Stand-Off, or into which such Units thereby become convertible, shall immediately be subject to the Market Stand-Off.  In order to enforce the Market Stand-Off, the Company may impose stop-transfer instructions with respect to the Purchased Units until the end of the applicable stand-off period.  The Company's underwriters shall be beneficiaries of the agreement set forth in this Subsection (c).  This Subsection (c) shall not apply to Units registered in the public offering under the Securities Act.

(d) **Rights of the Company**.  The Company shall not be required to (i) transfer on its books any Purchased Units that have been sold or transferred in contravention of this Agreement or the LLC Agreement or (ii) treat as the owner of Purchased Units, or otherwise to accord voting, distribution or liquidation rights to, any transferee to whom Purchased Units have been transferred in contravention of this Agreement or the LLC Agreement.

## SECTION 4.  SUCCESSORS AND ASSIGNS.

Except as otherwise expressly provided to the contrary, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Company and its successors and assigns and be binding upon each Purchaser and each such Purchaser's legal representatives, heirs, legatees, distributees, assigns and transferees by operation of law, whether or not any such person has become a party to this Agreement or has agreed in writing to join herein and to be bound by the terms, conditions and restrictions hereof.

## SECTION 5.  LEGENDS.

All certificates, if any, evidencing Purchased Units shall bear the following legends:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LOCK-UP PERIOD OF UP TO 180 DAYS AFTER THE EFFECTIVE DATE OF THE ISSUER'S INITIAL REGISTRATION STATEMENT FILED UNDER THE ACT, AS AMENDED, AS SET FORTH IN AN AGREEMENT BETWEEN THE COMPANY AND THE ORIGINAL HOLDER OF THESE SECURITIES, A COPY OF WHICH MAY BE OBTAINED AT THE ISSUER'S PRINCIPAL OFFICE.  SUCH LOCK-UP PERIOD IS BINDING ON TRANSFEREES OF THESE UNITS."

If required by the authorities of any State in connection with the issuance of the Purchased Units, the legend or legends required by such State authorities shall also be endorsed on all such certificates.

## SECTION 6.  NOTICE.

Any notice required by the terms of this Agreement shall be given in writing.  It shall be deemed effective upon (i) personal delivery, (ii) deposit with the United States Postal Service, by registered or certified mail, with postage and fees prepaid or (iii) deposit with Federal Express Corporation, with shipping charges prepaid.  Notice shall be addressed to the

Company at its principal executive office and to each Purchaser at the address that he or she most recently provided to the Company in accordance with this Section 6.

### SECTION 7.  ENTIRE AGREEMENT.

This Agreement and the LLC Agreement constitute the entire contract between the parties hereto with regard to the subject matter hereof.  It supersedes any other agreements, representations or understandings (whether oral or written and whether express or implied) that relate to the subject matter hereof.

### SECTION 8.  CHOICE OF LAW.

This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, as such laws are applied to contracts entered into and performed in such State.

### SECTION 9.  DEFINITIONS.

(a)  "**Agreement**" shall mean this Common Unit Purchase Agreement.

(b)  "**Board of Managers**" shall mean the Board of Managers of the Company, as constituted from time to time pursuant to the Third Amended and Restated LLC Agreement.

(c)  "**LLC Agreement**" shall mean the Third Amended and Restated Limited Liability Company Agreement of Loyalist, LLC, dated as of February 12, 2019, by and among the Members of the Company.

(d)  "**Purchased Units**" shall mean the Units purchased by the Purchaser pursuant to this Agreement.

(e)  "**Purchase Price**" shall mean the dollar value of the consideration for which one Unit is purchased pursuant to this Agreement, as specified in Section 1(b).

(f)  "**Securities Act**" **shall** mean the Securities Act of 1933, as amended.

(g)  "**Unit**" shall mean one Common Unit of the Company and any subsequent form that such ownership interest may take, including, without limitation, as a result of an exchange or conversion by virtue of a merger, consolidation, recapitalization, spin-off, change in the Company's organizational form, or other similar transaction

(h)  "**Total Units**" shall have the meaning assigned to it in Section 1(a).

(i)  "**Transferee**" shall mean any person to whom the Purchaser has directly or indirectly transferred any Purchased Unit.

IN WITNESS WHEREOF, each of the parties has executed this Agreement, in the case of the Company by its duly authorized officer, as of the day and year first above written.

**COMPANY:**

Loyalist, LLC

By:_____

Name and Title: Alexander Ritz, President

**PURCHASER:**

Jin Zhang

By:_____

Name: Jin Zhang

Title:  President, Collegestreet

## EXHIBIT A

### RELEASE OF LIEN BY COLLEGESTREET

Collegestreet Import & Export (Tianjin) Co., Ltd.
#915 Kangyue Building, No. 35 Xikanglu, Heping Dist.
Tianjin, China

OBLIGATION RELEASE OF DEBT AND PAYABLES AGAINST HILLFLINT, INC

CollegeStreet Import & Export (Tianjin) Co., Ltd. (**"CollegeStreet"**) consents to forgive the following payable amount currently owed by Hilflint, Inc.:

**USD $650,000**

Signed: _____
Jin Zhang, President, CollegeStreet

Date: _____Nov. 06. 2018_____

# EXHIBIT B

# TRANSFER OF OBLIGATIONS AND ISSUANCE OF COMPENSATION IN LIEU OF LIEN FOR COLLEGESTREET

Collegestreet Import & Export (Tianjin) Co., Ltd.
#915 Kangyue Building, No. 35 Xikanglu, Heping Dist.
Tianjin, China

TL x HF LLC
109 S. 5th St., 4108
Brooklyn, New York 11249

### TRANSFER AGREEMENT

CollegeStreet Import & Export (Tianjin) Co., Ltd. (**"CollegeStreet"**) consents to the below treatment of Hillflint's outstanding payable to CollegeStreet:

- Liability assumed by  TL x HF LLC:
  **USD $350,000 (the "Assumed Obligation")**

- Transfer of equity in the Loyalist, LLC (equity owned by TL x HL, LLC) with a value of US **$350,000**  in favor of the entity CollegeStreet Import & Export (Tianjin) Co., Ltd. OR the individual Jin Zhang

TL x HF LLC agrees to the following:

- Make all reasonable best efforts to remit payments on the Assumed Obligation (without interest) through 12/31/ 2018 out of TL x HF LLC revenues at TL x HF LLC discretion in order to resolve the assumed $350,000 liability with the expectation of payment in full of the Assumed Obligation not later than 1/31/2021

- Grant CollegeStreet right of first refusal on any production orders going forward assuming CollegeStreet can offer best pricing, speed, and quality (as determined by TL x HF LLC)

- Make best efforts to provide liquidity to CollegeStreet OR the individual Zhang Jin on the $350,000 in equity, whether in the form of a buy back, sale to existing or prospective investors, or any other method agreed to by both TL x HF LLC and CollegeStreet OR TL x HF LLC and the individual Zhang Jin

- Pay, in addition to cost on production orders, an additional revenue share from profitable sales according to the following schedule: if >50% net margin, 5%; if >30% net margin, 3%; if 20% net margin, 1%; if >10% net margin, 0%

The parties below agree to the terms set out in this letter

Signed: _____
Jin Zhang, President, CollegeStreet

Date: ____ Nov. 06. 2018 ____

Signed: _____
Maxwell Ritz, Co-Founder, TL x HF LLC

Date: ____ Oct 31, 2018 ____

# EXHIBIT 5

**LOYALIST, LLC**

**THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**

**February 12, 2019**

## TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ...................................................................................... 1
    1.1    Definitions ..................................................................................... 1

ARTICLE II FORMATION OF LIMITED LIABILITY COMPANY ...................... 9
    2.1    Formation ....................................................................................... 9
    2.2    Name and Principal Place of Business ........................................ 10
    2.3    Agreement .................................................................................... 10
    2.4    Business ........................................................................................ 10
    2.5    Definitions ................................................................................... 10
    2.6    Term ............................................................................................. 10

ARTICLE III MEMBERS AND INTERESTS .......................................................... 10
    3.1    Units Generally ............................................................................ 10
    3.2    Classes of Units; Incentive Plans ............................................... 11
    3.3    Members ....................................................................................... 12
    3.4    Representations and Warranties .................................................. 12
    3.5    Additional Members .................................................................... 14
    3.6    Resignation or Withdrawal of a Member .................................... 15
    3.7    Meetings of the Members ............................................................ 15
    3.8    Action by Written Consent .......................................................... 16
    3.9    Limited Liability of Members ..................................................... 16
    3.10   No Appraisal Rights .................................................................... 17
    3.11   General Voting Rights ................................................................. 17
    3.12   No Fiduciary Duties Owed by the Members ............................... 17
    3.13   Related Party Transactions .......................................................... 17
    3.14   Guaranteed Payments .................................................................. 18

ARTICLE IV CONTRIBUTIONS TO CAPITAL; WITHDRAWALS; ADVANCES ............. 18
    4.1    Capital Contributions ................................................................. 18
    4.2    No Right of Withdrawal .............................................................. 18
    4.3    Advances ..................................................................................... 18

ARTICLE V MANAGEMENT AND RESTRICTIONS .......................................... 19
    5.1    Management by Board of Managers; Board of Managers ........... 19
    5.2    Amendment of Certificate or Agreement .................................... 21
    5.3    No Fiduciary Duties .................................................................... 21

ARTICLE VI NOTICES ........................................................................................... 22
    6.1    Notices ......................................................................................... 22
    6.2    Waiver of Notice ......................................................................... 22

ARTICLE VII OFFICERS ........................................................................................ 22
    7.1    Officers ........................................................................................ 22
    7.2    Reliance by Third Parties ............................................................ 23

7.3     Actions and Determinations of the LLC ................................................. 23

ARTICLE VIII ACCOUNTING AND RECORDS ........................................ 24
8.1     Financial and Tax Reporting ................................................. 24
8.2     Members Access to Certain Information ................................... 24
8.3     Supervision; Inspection of Books ......................................... 24
8.4     Tax Information .............................................................. 24
8.5     Tax Matters Partner ......................................................... 24
8.6     Confidentiality .............................................................. 24

ARTICLE IX CAPITAL ACCOUNTS AND  ALLOCATIONS OF NET INCOME AND
NET LOSS ........................................................................... 25
9.1     Capital Accounts ............................................................ 25
9.2     Allocations of Net Income and Net Loss ................................. 26
9.3     Special Allocation Provisions ............................................. 27
9.4     Curative Allocations ....................................................... 28
9.5     Tax Allocations ............................................................. 29
9.6     Compliance with Section 704(b) of the Code ........................... 29
9.7     Safe Harbor Election ....................................................... 29

ARTICLE X DISTRIBUTIONS ................................................................ 30
10.1    Distributions ................................................................ 30
10.2    Tax Distributions ........................................................... 30
10.3    Liquidation Event Distributions .......................................... 32
10.4    No Other Withdrawals ...................................................... 33
10.5    Distribution Limitations ................................................... 33

ARTICLE XI TRANSFER OF MEMBERSHIP ........................................... 33
11.1    Transfer ...................................................................... 33
11.2    Transfer Void ................................................................ 33
11.3    Effect of Assignment ....................................................... 33
11.4    Legends ...................................................................... 33
11.5    Publicly Traded Partnership Limitations ................................ 34
11.6    Effective Date ............................................................... 34
11.7    "Market Stand-Off" Agreement ........................................... 34
11.8    Drag-Along Right ........................................................... 35
11.9    Redemption .................................................................. 36

ARTICLE XII INDEMNIFICATION AND LIMITATION OF LIABILITY ......... 37
12.1    Indemnification .............................................................. 37
12.2    Exculpation by Members ................................................... 38
12.3    Limitation of Liability ..................................................... 38
12.4    Counsel to the LLC ......................................................... 38

ARTICLE XIII DISSOLUTION AND TERMINATION ............................... 39
13.1    Dissolution .................................................................. 39
13.2    Authority to Wind Up ....................................................... 39

13.3    Winding Up and Certificate of Cancellation ...................................... 39
13.4    Distribution of Assets ........................................................................ 39

ARTICLE XIV MISCELLANEOUS .......................................................... 40
14.1    Amendment ........................................................................................ 40
14.2    Power of Attorney ............................................................................. 41
14.3    Withholding ....................................................................................... 42
14.4    Apportionment of Amounts Withheld at the Source or Paid by the
         LLC ................................................................................................... 42
14.5    Notice to and Consent of Members ................................................... 43
14.6    Further Assurances ............................................................................ 43
14.7    Binding Effect ................................................................................... 43
14.8    Governing Law .................................................................................. 43
14.9    Title to LLC Property ........................................................................ 43
14.10   Dispute Resolution ............................................................................ 43
14.11   Entire Agreement .............................................................................. 44
14.12   Counterparts ...................................................................................... 44
14.13   No State-law Partnership ................................................................... 44
14.14   Tax Classification ............................................................................. 44
14.15   Severability ....................................................................................... 45
14.16   No Third Party Beneficiary ............................................................... 45
14.17   Interpretation .................................................................................... 45
14.18   Aggregation of Units ......................................................................... 45

EXHIBIT A         Members; Units
EXHIBIT B         Board of Managers; Officers; Tax Matters Member

## LOYALIST, LLC

## THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

This Third Amended and Restated Limited Liability Company Agreement (the "**Agreement**") of Loyalist, LLC (the "**LLC**") is entered into pursuant to the Delaware Limited Liability Company Act, Delaware Code Ann. Title 6, §§18-101, et seq. (the "**Act**"), effective as of February 12, 2018 (the "**Effective Date**"), by and among the Members set forth on Exhibit A hereto, each having duly executed this Agreement or a counterpart to this Agreement intending to be legally bound by the following terms and conditions, and such other Persons who may hereafter be admitted from time to time as members in accordance with the provisions hereof (collectively, the "**Members**").

### RECITALS

WHEREAS, certain of the Members entered into that certain Amended and Restated Limited Liability Company Agreement of the LLC, dated as of June 16, 2015, (the "**Prior Agreement**"); and

WHEREAS, the Members now desire to amend and restate the Prior Agreement in its entirety.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby amend and restate the Prior Agreement as follows:

### ARTICLE I

### DEFINITIONS

**1.1** **Definitions**. The following terms shall have the meanings set forth for purposes of this Agreement:

"**1934 Act**" shall mean the Securities Exchange Act of 1934, as amended.

"**Accounting Period**" shall mean for each Fiscal Year the period beginning on the 1st of January and ending on the 31st of December; *provided, however*, that the first Accounting Period commenced on the date of formation of the LLC and shall end on December 31 of the year of formation of the LLC; and *provided, further*, that, at the election of the Board of Managers, a new Accounting Period shall commence on any date on which an Additional Member is admitted to the LLC or a Member ceases to be a Member for any reason.

"**Act**" shall have the meaning ascribed to it in the Preamble.

"**Additional Interests**" shall have the meaning ascribed to it in Section 3.5(a).

"**Additional Member**" shall have the meaning ascribed to it in Section 3.5(b).

"**Affiliates**" shall mean, with respect to any specified Person, a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, the Person specified, including, without limitation, any venture capital fund now or hereafter existing which is controlled by or under common control with such Person or which shares the same management company with such Person.

"**Agreement**" shall mean this Limited Liability Company Agreement of the LLC as the same shall be amended from time to time.

"**Award**" shall mean a grant of Common Units pursuant to the Equity Incentive Plan or the acquisition of Common Units upon exercise of an option to acquire Common Units issued pursuant to the Equity Incentive Plan.

"**Awardee**" shall mean the holder of an Award.

"**Beneficial Owner**" shall have the meaning ascribed to it in Section 3.4(g).

"**Board of Managers**" or "**Board**" shall mean the LLC's Board of Managers, as constituted from time to time, as described more fully in Article V.

"**Bonus Profit Plan**" shall have the meaning ascribed to it in Section 3.2(b).

"**Business Day**" shall mean any day on which banks located in New York, New York are not required or authorized by law to remain closed.

"**Capital Account**" shall mean, with respect to any Member, the account maintained for such Member in accordance with the provisions of Section 9.1(a) hereof.

"**Capital Contribution**" shall mean, with respect to any Member, any contribution to the LLC by such Member of cash or other property. Any reference in this Agreement to the Capital Contribution of a Member shall include the Capital Contribution made by any predecessor holder of the Interest of that Member.

"**Carrying Value**" shall mean:

(a) with respect to any LLC asset, the asset's adjusted basis for U.S. federal income tax purposes, except as follows:

(i) the Carrying Value of any asset contributed or deemed contributed by a Member to the LLC shall be the fair market value of such asset at the time of contribution as determined by agreement of the Members;

(ii) the Carrying Value of any asset distributed or deemed distributed by the LLC to any Member shall be adjusted immediately prior to such distribution to equal its fair market value at such time;

(iii)     the Carrying Values of all LLC assets shall be adjusted to equal their respective fair market values as of the following times:

(1)     immediately prior to the date of the acquisition of any additional Interest (including any Common Units issued as Profits Interests) by any new or existing Member, other than in exchange for a de minimis Capital Contribution (except with respect to the issuance of Common Units issued as Profits Interest);

(2)     immediately prior to the date of the distribution of more than a de minimis amount of LLC property to a Member;

(3)     the liquidation of the LLC within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and

(4)     in connection with the grant of an Interest (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the LLC or a subsidiary of the LLC by an existing Member acting in a partner capacity, or by a new Member acting in a partner capacity in anticipation of becoming a Member; provided that an adjustment described in subclauses (1), (2) and (4) of this clause (iii) shall be made only if the Board of Managers reasonably determines that such adjustment is necessary to reflect the collective economic interests of the Members in the LLC.

In the case of any asset that has a Carrying Value determined pursuant to subclause (1), (2) or (4) above, depreciation or deductions shall be computed based on the asset's Carrying Value as so determined, and not on the asset's adjusted tax basis, as more fully described under the definition of Net Income and Net Loss below.

(b)     with respect to any liability, at a given time, the amount of such liability to the extent:

(i)     reflected in the basis of any asset;

(ii)     previously or currently deductible in computing Net Income or Net Loss or otherwise for Capital Account maintenance purposes; or

(iii)     otherwise previously taken into account for Capital Account maintenance purposes.

"**Certificate**" shall have the meaning ascribed to it in Section 2.1.

"**Chairman of the Board**" shall have the meaning ascribed to it in Section 5.1(c).

"**Class**" shall mean the group of Members owning all of the outstanding Units of a particular class of Units as set forth in Section 3.2(a) hereof.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Common Members**" shall mean Members holding Common Units, their permitted successors and assigns and any other Person who may be admitted to the LLC as a Common Member in accordance with the terms of this Agreement.

"**Common Units**" shall have the meaning ascribed to it in Section 3.2(a).

"**Compensation Amount**" shall have the meaning ascribed to it in Section 3.13.

"**Contingent Consideration**" shall have the meaning ascribed to it in Section 10.3(b).

"**Convertible Securities**" means convertible Units or other securities convertible into or exchangeable for (i) Units or (ii) any other securities evidencing an ownership interest in the LLC, including, without limitation warrants and options.

"**DGCL**" shall mean the Delaware General Company Law, 8 Del. Code § 101 et seq.

"**Delivery**" shall mean the occurrence of an event specified in Section 6.1(i) through (iv).

"**Designated Jurisdiction**" shall mean New York, NY.

"**Disability**" shall mean that the person is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment.

"**Effective Date**" shall have the meaning ascribed to it in the Preamble.

"**Electronic Signature**" shall have the meaning ascribed to it in Section 14.12.

"**Equity Incentive Plan**" shall have the meaning ascribed to it in Section 3.2(b).

"**Equity Securities**" shall mean any Units, any securities evidencing an ownership interest in the LLC, or any Convertible Securities.

"**Estimated Tax Period**" shall mean, for each Fiscal Year, the periods of January 1 through March 31, April 1 through May 31, June 1 through August 31, and September 1 through December 31.

"**Estimated Tax Distribution**" shall have the meaning ascribed to it in Section 10.2.

"**Fiscal Year**" shall mean the taxable year of the LLC, which shall be the period from January 1 to December 31 of each year, except as otherwise required by the Code.

"**Founders**" shall mean Patrick J. Gilbert, Alexander Ritz, Adam Schwartz and Josh Abramson.

"**GAAP**" shall mean United States generally accepted accounting principles.

"**Indebtedness**" shall mean as to any Person: (a) all obligations, whether or not contingent, of such Person for borrowed money (including, without limitation, reimbursement and all other obligations with respect to surety bonds, letters of credit and bankers' acceptances, whether or not matured); (b) all obligations of such Person evidenced by notes, bonds, debentures or similar instruments; (c) all obligations of such Person under leases which have been or should be, in accordance with GAAP, recorded as capital leases; (d) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is non-recourse to the credit of that Person; and (e) all Indebtedness of any other Person referred to in clauses (a) through (e) above, guaranteed, directly or indirectly, by that Person; but excluding all obligations of such Person for deferred rent.

"**Initial Public Offering**" shall mean a firm commitment underwritten public offering of the equity of the LLC (or its successor entity).

"**Interest**" shall mean the Units of a Member in the LLC and includes all of the respective rights and responsibilities appurtenant thereto including the right, if any, to vote, the Capital Account maintained for such Member and the right to receive allocations of Net Income and Net Losses pursuant to Article IX, and the right to receive distributions of cash or property of the LLC.

"**Law**" shall mean any constitutional provision, law, statute, rule, regulation (including any stock exchange rule or regulation), ordinance, treaty, order, decree, license, permit, policy, guideline, consent, approval, certificate, judgment or decision of any governmental authority or any judgment, decree, injunction, writ, order or like action of any court or other judicial or quasi-judicial tribunal.

"**LLC**" shall have the meaning ascribed to it in the Preamble.

"**LLC Counsel**" shall have the meaning ascribed to it in Section 12.4.

"**Lien**" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, encumbrance, lien (statutory or other) or other security interest of any kind or nature whatsoever, including, without limitation, those created by, arising under or evidenced by any conditional sale or other title retention contract, the interest of a lessor under a lease which in accordance with GAAP should be recorded as a capital lease, or any financing lease having substantially the same economic effect as any of the foregoing.

"**Liquidation Event**" shall mean, in one transaction or series of related transactions, (a) the closing of the sale, transfer, exclusive license,  or other disposition (whether by merger, consolidation or otherwise) of all or substantially all of (1) the assets of the LLC or (2) the assets or equity securities of one or more direct or indirect subsidiaries of the LLC constituting all or substantially all of the assets of the LLC (determined on a consolidated basis with all of the LLC's direct and indirect subsidiaries); (b) the consummation of the merger or consolidation of the LLC with or into another entity (except a merger or consolidation of the LLC in which the holders of equity securities of the LLC immediately prior to such merger or consolidation continue to hold (1) at least fifty percent (50%) of the voting power of the equity

securities of the surviving entity of such merger or consolidation in substantially the same proportions (relative to all such holders) as immediately prior to the merger or consolidation and (2) securities with rights, preferences and powers that are substantially identical to the rights, preferences and powers of the securities they held immediately prior to such merger or consolidation); (c) the closing of the transfer (whether by merger, consolidation or otherwise) in one transaction or series of related transactions to a Person or group of affiliated Persons (other than an underwriter of the LLC's securities) of the LLC's securities if, after such closing, such Person or group of affiliated Persons would hold fifty percent (50%) or more of the outstanding voting securities of the LLC (or the surviving or acquiring entity); (d) the consummation of the merger or consolidation of one or more direct or indirect subsidiaries of the LLC, the assets of which subsidiary or subsidiaries (including, without limitation, the equity securities of such subsidiary or subsidiaries) constitute all or substantially all of the assets of the LLC (determined on a consolidated basis with all of the LLC's direct and indirect subsidiaries) with or into another entity (except a merger or consolidation of such subsidiary or subsidiaries (1) in which the holders of equity securities of the LLC immediately prior to such merger or consolidation continue to hold (x) at least fifty percent (50%) of the voting power of the equity securities of the surviving entity of such merger or consolidation in substantially the same proportions (relative to all such holders) as immediately prior to the merger or consolidation, (y) securities with rights, preferences and powers that are substantially identical to the rights, preferences and powers of the securities they held immediately prior to such merger or consolidation, and (z) the surviving or acquiring entity in such merger or consolidation is a wholly owned direct or indirect subsidiary of the LLC or (2) a merger or consolidation of a wholly owned direct or indirect subsidiary of the LLC with the LLC or another such wholly owned direct or indirect subsidiary); or (e) the liquidation, dissolution or winding up of the LLC.

"**Majority in Interest of the Members**" shall mean, unless otherwise expressly set forth herein, the Common Member(s) who are entitled to vote at least a majority of the outstanding Common Units; *provided* that Common Units issued out of Reserved Incentive Common Units that are designated as Non-Voting Units shall not vote and shall have no voting rights.

"**Manager**" shall have the meaning ascribed to it in Section 5.1(a).

"**Members**" and "**Member**" means the Persons listed as members on <u>Exhibit A</u> (as may be amended from time to time) and any other Person that both acquires an Interest and is admitted to the LLC as a Member in accordance with the terms of this Agreement.

"**Net Income**" and "**Net Loss**" shall mean, for each Accounting Period, an amount equal to the LLC's net taxable income or loss for such Accounting Period, determined in accordance with Code Section 703(a) (it being understood that for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in such taxable income or loss) and determined in accordance with the accounting method used by the LLC for U.S. Federal income tax purposes with the following adjustments (without duplication):

(a)      all items of income, gain, loss or deduction specifically allocated pursuant to Section 9.3 shall not be taken into account in computing such taxable income or loss;

(b)    any income of the LLC that is exempt from U.S. Federal income taxation and not otherwise taken into account in computing Net Income and Net Loss shall be added to such taxable income or loss;

(c)    if the Carrying Value of any asset differs from its adjusted tax basis for U.S. Federal income tax purposes, any gain or loss resulting from a disposition of such asset shall be calculated with reference to such Carrying Value;

(d)    upon an adjustment to the Carrying Value of any asset pursuant to clauses (ii) or (iii) of subsection (a) of the definition of Carrying Value (other than an adjustment in respect of depreciation), the amount of the adjustment shall be included as gain or loss in computing such taxable income or loss;

(e)    if the Carrying Value of any asset differs from its adjusted tax basis for U.S. Federal income tax purposes the amount of depreciation, amortization or cost recovery deductions with respect to such asset for purposes of determining Net Income and Net Loss shall be an amount which bears the same ratio to such Carrying Value as the U.S. Federal income tax depreciation, amortization or other cost recovery deductions bears to such adjusted tax basis (*provided* that if the U.S. Federal income tax depreciation, amortization or other cost recovery deduction is zero, the Board of Managers may use any reasonable method for purposes of determining depreciation, amortization or other cost recovery deductions in calculating Net Income and Net Loss; and

(f)    except for items set forth in clauses (a) through (e) above, any expenditures of the LLC not deductible in computing taxable income or loss, not properly capitalizable and not otherwise taken into account in computing Net Income and Net Loss pursuant to this definition shall be treated as deductible items.

"**Nonrecourse Deductions**" shall be as defined in Treasury Regulations Section 1.704-2(b).  The amount of Partner Nonrecourse Deductions for a Fiscal Year equals the net increase, if any, in the amount of Partnership Minimum Gain during that Fiscal Year, determined according to the provisions of Treasury Regulations Section 1.704-2(c).

"**Non-Voting Unit**" shall mean a Common Unit that does not vote, has no voting rights, and shall have no right or authority to act for the LLC or vote upon or approve any matters submitted to the Members for approval.  The Board of Managers may designate any Common Units issued out of Reserved Incentive Common Units as Non-Voting Units.

"**Officer**" shall have the meaning ascribed to it in Section 7.1.

"**Partner Nonrecourse Debt Minimum Gain**" shall mean an amount with respect to each partner nonrecourse debt (as defined in Treasury Regulations Section 1.704-2(b)(4)) equal to the Partnership Minimum Gain that would result if such partner nonrecourse debt were treated as a nonrecourse liability (as defined in Treasury Regulations Section 1.752-1(a)(2)) determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"**Partner Nonrecourse Deductions**" shall be as defined in U.S. Treasury Regulations Section 1.704-2(i)(2).

"**Partnership Minimum Gain**" shall be as defined in Treasury Regulations Section 1.704-2(b)(2) and 1.704-2(d).

"**Permitted Disclosee**" shall have the meaning ascribed to it in Section 8.6(a).

"**Person**" shall mean a natural person, partnership (whether general or limited and whether domestic or foreign), LLC, foreign limited liability company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or representative capacity.

"**Plans**" shall have the meaning ascribed to it in Section 3.2(b).

"**Profits Interest Threshold Amount**" for a Common Unit intended to be a Profits Interest shall mean, unless otherwise determined by the Board of Managers, an amount equal to the amount that would be distributed in respect of a Common Unit that has no Profits Interest Threshold Amount, if, immediately after such Common Unit is issued, the LLC were to liquidate completely and in connection with such liquidation (i) sell all of its assets at their fair market values, (ii) settle all of its liabilities to the extent of the available assets of the LLC (but limited, in the case of nonrecourse liabilities as to which the creditors' rights to repayment are limited solely to one or more assets of the LLC, to the value of such assets), and (iii) each holder of Units were to pay to the LLC at that time the amount of any obligation then unconditionally due to the LLC, and then the LLC were to distribute any remaining cash and other proceeds to the holders of Units in accordance with the distribution provisions of Section 10.3(a); *provided*, *however*, the Profits Interest Threshold Amount shall not be less than zero dollars ($0). The Board of Managers shall have the discretion to set any Common Unit's Profits Interest Threshold Amount to equal an amount that is greater than the amount determined in the prior sentence. The Profits Interest Threshold Amount of a Common Unit shall be reduced (but not below zero dollars ($0)) dollar-for-dollar by the amount by which distributions with respect to such Common Unit were previously reduced by reason of the existence of the Profits Interest Threshold Amount. The Board of Managers shall have the discretion to reduce the Profits Interest Threshold Amount with respect to any Common Unit if, subsequent to the grant of such Common Unit, the fair market value (as determined by the Board of Managers in its sole discretion) of the LLC declines.

"**Profits Interest**" shall mean a Common Unit that is issued with a Profits Interest Threshold Amount that is at least equal to the Fair Market Value of a Common Unit on the date of issuance (subject to adjustment as provided herein). A Common Unit with a Profits Interest Threshold Amount that is at least equal to the Fair Market Value of a Common Unit is intended to meet the definition of a "profits interest" in I.R.S. Revenue Procedures 93-27 and 2001-43. A Common Unit that is issued with a Profits Interest Threshold Amount that is at least equal to the Fair Market Value of a Common Unit shall be treated as a Common Unit for all purposes of this Agreement except (i) as provided in the Equity Incentive Plan; (ii) with respect to adjustments of amounts distributable with respect to such Profits Interest as provided in

Articles X and XIII, and (iii) with respect to voting for Common Units issued out of Reserved Incentive Common Units that are designated as Non-Voting Units.

"**Proposed Revenue Procedure**" shall have the meaning ascribed to it in Section 9.3(j).

"**Proprietary Information**" shall have the meaning ascribed to it in Section 14.13.

"**Reserved Incentive Common Units**" shall have the meaning ascribed to it in Section 3.2(a).

"**Rules**" shall have the meaning ascribed to it in Section 12.4.

"**Safe Harbor**" shall have the meaning ascribed to it in Section 9.7.

"**SEC**" shall mean the U.S. Securities and Exchange Commission.

"**Securities Act**" shall mean the Securities Act of 1933, as amended from time to time, and the rules and regulations thereunder.

"**Tax Matters Partner**" shall have the meaning ascribed to it in Section 8.4.

"**Terminated Founder**" any Founder whose services to the LLC have been terminated, and any Founder who has suffered a Disability.

"**Transfer**" shall have the meaning ascribed to it in Section 11.1.

"**Treasury Regulations**" shall mean regulations issued pursuant to the Code.

"**Units**" shall mean units of Interests held by a Member representing such Member's membership interest in the LLC, whether held in the form of Common Units or other type of units or other Interests in the LLC as may be issued by the LLC.

## ARTICLE II

## FORMATION OF LIMITED LIABILITY COMPANY

**2.1**    **Formation**.  The LLC has been formed as a Delaware limited liability company by the execution and filing of a Certificate of Formation (as the same may be amended from time to time, the "**Certificate**") by an authorized person as required by the Act.  The rights, powers, duties, obligations and liabilities of the Members (in their respective capacities as such) shall be determined pursuant to the Act and this Agreement.  To the extent that the rights, powers, duties, obligations and liabilities of any Member (in its capacity as such) are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

**2.2** **Name and Principal Place of Business**. Unless and until amended in accordance with this Agreement and the Act, the name of the LLC will be "Loyalist, LLC." The principal place of business of the LLC shall initially be located at 54 West 22nd Street, 4th Floor, New York, NY 10010, or such other location as the Board of Managers may, from time to time, designate. The address of the LLC's registered office in the State of Delaware, and the name of the registered agent for service of process, shall be The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, or such other place or person in the State of Delaware as the Board of Managers shall designate.

**2.3** **Agreement**. For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members executing this Agreement hereby agree to the terms and conditions of this Agreement, as it may from time to time be amended. It is the express intention of the parties hereto that this Agreement shall be the sole statement of agreement among them, and, except to the extent a provision of this Agreement expressly incorporates federal income tax rules by reference to sections of the Code or Treasury Regulations or is expressly prohibited or ineffective under the Act, this Agreement shall govern even when inconsistent with or different from the provisions of the Act or any other law or rule. To the extent any provision of this Agreement is prohibited or ineffective under the Act, this Agreement shall be considered amended to the smallest degree possible in order to make this Agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make valid any provision of this Agreement that was formerly invalid, such provision shall be considered to be a part of this Agreement from and after the date of such interpretation or amendment.

**2.4** **Business**. The purpose of the LLC is to (i) engage in the business of e-commerce, (ii) enter into, make, and perform all contracts and other undertakings, and (iii) carry on any other business or activity relating thereto or arising therefrom and to carry on anything incidental, convenient or necessary to the foregoing. Notwithstanding the foregoing, the LLC may engage in any lawful business permitted under the Act or the laws of any jurisdiction in which the LLC may do business.

**2.5** **Definitions**. Terms not otherwise defined in this Agreement shall have the meanings set forth in Article I.

**2.6** **Term**. The term of the LLC commenced on the date the Certificate was filed with the Secretary of State of the State of Delaware in accordance with the Act and shall continue unless the LLC's existence is terminated pursuant to Article XIII of this Agreement.

## ARTICLE III

## MEMBERS AND INTERESTS

**3.1** **Units Generally**. The Interest of each of the Members in the LLC shall consist of a number of "**Units**." Units may be issued in one or more classes or series of classes, as approved by the Board of Managers. Except as otherwise provided in this Agreement, the Equity Incentive Plan or the Act, each Member holding a Unit or Units shall have (a) the right to share in the Net Income and Net Loss of the LLC as provided in this Agreement, (b) a right to

the Capital Account maintained for such Member according to Article IX hereof, (c) the right to receive distributions from the LLC as provided in this Agreement, (d) the right to receive information concerning the business and affairs of the LLC as provided in this Agreement or non-waivable provisions of the Act; and (e) the right, if any, to vote as provided in this Agreement.  The Units shall be uncertificated unless the Board of Managers determines that the Units shall be represented by certificates in such form as shall be determined by the Board of Managers from time to time.  If applicable, the LLC may issue a new certificate in place of any certificate therefore issued by it, alleged to have been lost, stolen or destroyed, and the LLC may require the owner of the lost, stolen or destroyed certificate, or his or her legal representative to give the LLC a bond sufficient to indemnify it against any claim that may be made against it on account of that alleged loss, theft or destruction of any such certificate or the issuance of such new certificate.

     **3.2**    **Classes of Units; Incentive Plans**.

     (a)    <u>Classes of Units</u>.  Initially, there shall be one class of Units designated "Common Units" (the "**Common Units**").  The Common Units shall have the rights set forth in Section 3.1(a) through (e) and such other relative rights, powers and duties as are set forth in this Agreement.  Subject to the terms and conditions of Articles III and IV hereof, the LLC is authorized to issue up to fourteen million ([12,457,901]) Units in the aggregate, divided as follows: fourteen million ([12,457,901]) Units shall be authorized Common Units, of which (i) twelve million four hundred fifty four thousand and sixty three ([12,454,063]) Common Units are issued and outstanding and owned by the Common Members as of the Effective Date and (ii) [three thousand thirty eight (3,838)] Common Units (the "**Reserved Incentive Common Units**") are reserved for issuance pursuant to the Equity Incentive Plan and allocation or deemed issuance pursuant to the Bonus Profit Plan.

     (b)    <u>Incentive Plans</u>.  Following the Effective Date, the Board of Managers may adopt an Equity Incentive Plan (the "**Equity Incentive Plan**") or a Bonus Profit Plan (the "**Bonus Profit Plan**", and together with the Equity Incentive Plan the "**Plans**") in a form reasonably acceptable to the Board of Managers and without the requirement that either Plan be approved by the Members.  The Members hereby agree that the Board of Managers shall have the authority to adopt and administer the Plans, or appoint an administrator thereof, in accordance with the terms of each Plan and this Agreement.  The Board of Managers shall be permitted to issue or deem to be issued or allocated up to the number of Reserved Incentive Common Units (or Net Income of the LLC or gain from a Liquidation Event that would be attributable to such Common Units if such Units were issued) pursuant to the Plans, and any such Reserved Incentive Common Unit may be issued with a Profits Interest Threshold Amount, may be designated by the Board of Managers as Non-Voting Units and may be subject to vesting or other restrictions as determined by the Board of Managers.  The Reserved Incentive Common Units may be increased with the approval of the Board of Managers and the Majority in Interest of the Members.  Any Bonus Profit Plan adopted by the Board of Managers shall be unfunded for tax purposes and for purposes of Title I of the Employee Retirement Income Security Act of 1974, as it may be amended from time to time.  Unless otherwise provided in the Equity Incentive Plan or pursuant to a Unit grant agreement, Common Units that are Non-Voting Units issued under the Equity Incentive Plan shall represent solely an economic interest in the LLC. Holders of such Non-Voting Units shall be entitled to the allocations and distributions

attributable to such Common Units, but shall otherwise have no rights or powers (including, without limitation, voting power) to participate in the management of the LLC with respect to their Common Units, and shall not be treated as, nor possess any of the rights of, a member of a limited liability company under the Act.  Any Member who receives Common Units for services shall make a timely and effective election under Section 83(b) of the Code in accordance with Section 1.83-2 of the Treasury Regulations with respect to such Common Units unless the Board of Managers determines that such Member shall not be required to file such election.  With respect to any Common Unit issued that is intended to be a Profits Interest, both the LLC and all Members will (i) treat such Common Units as outstanding for U.S. federal income tax purposes, (ii) treat such Member as a partner for U.S. federal income tax purposes with respect to such Common Units and (iii) file all tax returns and reports consistently with the foregoing, and neither the LLC nor any of its Members will deduct any amount (as wages, compensation or otherwise) from the fair market value of such Common Units for U.S. federal income tax purposes.

3.3    **Members**.  The Members of the LLC, including those Awardees who receive their Awards in accordance with the terms of the Equity Incentive Plan, are set forth on Exhibit A hereto, each of whom is admitted to the LLC as a Member as of the Effective Date. The name and place of residence of each Member is as set forth on Exhibit A attached hereto. Each Member shall be entitled to review such Member's Exhibit A.  Unless otherwise determined by the Board of Managers, no Member, other than a Founder who is not a Terminated Founder, shall be entitled to receive a copy of, review or inspect any other Member's Exhibit A.  Each Member hereby waives any rights such Member may have pursuant to the Act to receive, review or inspect, directly or indirectly, any other Member's Exhibit A or any other books, records or documents containing substantially equivalent information.

3.4    **Representations and Warranties**.  Each Member hereby represents and warrants to the LLC and each other Member as follows:

(a)    Good Standing; Due Organization.  If such Member is a Person who is not an individual, such Member is duly organized, validly existing, and in good standing under the law of its state of organization and has full organizational power to execute and deliver this Agreement and to perform its obligations hereunder.

(b)    Accredited Investor.  (i) Except with respect to (a) the Founders, and (b) Members issued Reserved Incentive Common Units, such Member is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D of the Securities Act, or (ii) such Member is acquiring the respective Interest in compliance with Federal, state, local or foreign laws.

(c)    Purchase Entirely for Own Account.  The Member is acquiring its Interest in the LLC for the Member's own account for investment purposes only and not with a view to or for the resale, distribution, subdivision or fractionalization thereof, and has no contract, understanding, undertaking, agreement or arrangement of any kind with any Person to Transfer to any Person its Interest or any part thereof, nor does such Member have any plans to enter into any such agreement.

(d)     Investment Experience.  By reason of the Member's business or financial experience, the Member has the knowledge, experience and capacity to evaluate and protect its own interests in connection with the transactions contemplated hereunder, is able to bear the economic and financial risks of an investment in the LLC for an indefinite period of time, and at the present time could afford a complete loss of such investment.

(e)     Disclosure of Information.  The Member is aware of the LLC's business affairs and financial condition and has acquired sufficient information about the LLC to reach an informed and knowledgeable decision to acquire a membership interest in the LLC.

(f)     Federal and State Securities Laws.  Assuming federal and state securities laws apply to the interests described herein, the Member acknowledges that the Units have not been registered under the Securities Act or any state securities laws, inasmuch as they are being acquired in a transaction not involving a public offering, and, under such laws, may not be resold or transferred by the Member without appropriate registration or the availability of an exemption from such requirements.  In this connection, the Member represents that it is familiar with SEC Rule 144, as presently in effect, and understands the resale limitations imposed thereby and by the Securities Act.

(g)     Publicly Traded Partnership Rules.   At least one of the following statements is true with respect to such Member and, except to the extent otherwise approved by the Board of Managers, will continue to be true throughout the period during which such Member holds any Units:

(i)     such Member is not a partnership, grantor trust or S corporation (or entity disregarded as separate from a partnership, grantor trust or S corporation) for U.S. federal income tax purposes; or

(ii)     such Member is a partnership, grantor trust, or S corporation (or entity disregarded as separate from a partnership, grantor trust or S corporation) for U.S. federal income tax purposes, and, with regard to each Beneficial Owner of such Member,

(1)     the principal purposes for the establishment or use of such Member (or, in the case of a Member that is an entity so disregarded as separate from a partnership, grantor trust or S corporation, the principal purposes for the establishment of or use of its sole owner) do not include avoidance of the one hundred (100) partner limitation set forth in Treasury Regulations Section 1.7704-1(h)(1)(ii) with respect to the LLC; or

(2)     not more than fifty percent (50%) of the value of such Beneficial Owner's interest in such Member (or in the case of a Member that is an entity so disregarded as separate from a partnership, grantor trust or S corporation, not more than fifty percent (50%) of the value of the Beneficial Owner's interest in its sole owner) is attributable to such Member's Units.

For purposes of this subsection (g), the term "**Beneficial Owner**" shall have the meaning assigned to such term in Treasury Regulations Section 1.7704-1(h)(3).  In the event that a Member's representation pursuant to this Section 3.4 shall at any time fail to be true, such Member shall promptly (and in any event within ten (10) days) notify the Board of Managers of

such fact and shall promptly thereafter deliver to the Board of Managers any information regarding such Member and its beneficial owners reasonably requested by counsel to the LLC for purposes of determining the number of the LLC's partners within the meaning of Treasury Regulations Section 1.7704-1(h).

3.5    **Additional Members**.

(a)    Additional Interests.  The Board of Managers shall have the right to cause the LLC to issue or sell to any Persons and admit any such Person as a Member (including Members and Affiliates of Members) any of the following (which for purposes of this Agreement shall be "**Additional Interests**"): (i) Units in the LLC in addition to Units issued pursuant to the Equity Incentive Plan; (ii) Convertible Securities; (iii) Awards or other rights to purchase or otherwise acquire Units issued pursuant to the Equity Incentive Plan, and (iv) Common Units deemed issued or allocated pursuant to the Bonus Profit Plan; in each case and in the aggregate up to the number of authorized Units set forth in Section 3.2(a) hereof; provided that any issuance or sale of Additional Interests pursuant to the foregoing clauses (i) or (ii) shall also require the consent of the Members necessary to amend this Agreement pursuant to Section 14.1(a).  The Board of Managers shall have the right to cause the LLC to issue such Additional Interests subject to repurchase or forfeiture based on vesting, and the Board of Managers shall have the right to cause the LLC to repurchase or reacquire such Additional Interests pursuant to the terms governing the vesting of such Additional Interests.  Upon any such repurchase or forfeiture, such repurchased or reacquired Additional Interests may be resold and reissued pursuant to the terms of this Article III and the Equity Incentive Plan (if applicable).  If an Additional Interest is issued to an existing Member in accordance with the terms of this Agreement, the Board of Managers shall amend Exhibit A without the further vote, act or consent of any other Person to reflect the issuance of such Additional Interest and, upon the amendment of such Exhibit A, such Member shall be issued its Additional Interest. Notwithstanding the foregoing, the Board of Managers shall not have the right to cause the LLC to issue any such Additional Interests if such Units are not currently authorized under Section 3.2(a) of this Agreement.

(b)    Additional Members.  In order for a Person, other than an existing Member, to be admitted as a Member of the LLC with respect to an Additional Interest as defined in Section 3.5(a) above:  (i) such Additional Interest shall have been issued or sold in accordance with the terms of this Agreement; (ii) such Person shall have delivered to the LLC a counterpart signature page to this Agreement and shall have delivered such other documents and instruments as the Board of Managers determine to be necessary or appropriate and as are consistent with the terms of this Agreement in connection with the issuance or sale of such Additional Interest to such Person or to effect such Person's admission as a Member; (iii) if such Person is an Awardee, such Awardee receives an Award whereby the Awardee acquires Units pursuant to the Equity Incentive Plan; and (iv) the Board of Managers shall amend Exhibit A without the further vote, act or consent of any other Person to reflect such new Person as a Member and its Interests.  Upon the amendment of Exhibit A, such Person shall be admitted as an additional Member (an "**Additional Member**") and deemed listed as such on the books and records of the LLC and thereupon shall be issued its Additional Interest.

**3.6**    **Resignation or Withdrawal of a Member**.    Except as specifically provided herein, and subject to the provisions for Transfers contained in Article XI, no Member shall have the right to resign or withdraw from membership in the LLC or withdraw its Interest in the LLC.

**3.7**    **Meetings of the Members**.

(a)    Annual Meetings.    Annual meetings of Members entitled to vote shall be held at such date and time as shall be designated from time to time by the Board of Managers and stated in the notice of the meeting.

(b)    Special Meetings.    Special meetings of the Members, for any purpose or purposes, may be called by the Board of Managers, and shall be called by the LLC at the request of Members holding at least ten percent (10%) of the outstanding Units (any Units held by an Affiliate of a Member shall be treated as owned by such Member for purposes of determining the number of Units held by such Member).    Business transacted at any special meeting of Members shall be limited to the purposes stated in the notice.

(c)    Place of Meeting.    All meetings of Members shall be held at such place within or without the State of Delaware as the Board of Managers shall designate, including but not limited to by means of remote communication as herein provided.

(d)    Notice of Meetings.    Notice of all meetings of Members, including those meetings specified in Sections 3.7(a) and (b), stating the time, place and purpose of the meeting, shall be Delivered at least twenty-four (24) hours before the meeting.    Any adjourned meeting may be held as adjourned without further notice, *provided* that any adjourned session or sessions are held within ninety (90) days after the date set for the original meeting.    No notice need be given (i) to any Member if a written waiver of notice, executed before or after the meeting by such Member or his or her attorney thereunto duly authorized, is filed with the records of the meeting, or (ii) to any Member who attends the meeting without protesting prior thereto or at its commencement the lack of notice to him or her.    A waiver of notice need not specify the purposes of the meeting.

(e)    Quorum.    A quorum shall be present at any meeting of the Members if a Majority in Interest of the Members are represented at the meeting in person or by proxy, except as otherwise provided by law.    Once a quorum is present at the meeting of the Members, the Members represented in person or by proxy and entitled to vote at the meeting may conduct such business as may be properly brought before the meeting until it is adjourned, and the subsequent withdrawal from the meeting of any Member prior to adjournment or the refusal of any Member to vote shall not affect the presence of a quorum at the meeting.    If, however, such quorum shall not be present at any meeting of the Members, the Members represented in person or by proxy and entitled to vote at such meeting shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until the holders of the requisite amount of Units shall be present or represented.

(f)    Proxies.    Interests of Members may be voted in person or by an agent or agents authorized by a written proxy executed by such Member or his or her duly authorized agent, which shall be filed with the Secretary of the LLC at or before the meeting at which it is to

be used.  A proxy purporting to be executed by or on behalf of a Member shall be deemed valid unless challenged at or prior to its exercise and the burden of proving invalidity shall rest on the challenger, *provided* that no proxy shall be voted on or after three years from its date unless the proxy provides for a longer period. Unless and until voted, every proxy shall be revocable at the pleasure of the person who executed it or of his or her legal representatives or assigns, except in those cases where an irrevocable proxy permitted by statute has been given.

(g)     Electronic Communications.  Members may participate in any meeting of Members by means of telephone conference or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

(h)     Voting on Matters.  For purposes of voting on matters (other than a matter for which the affirmative vote of a specified portion of the Members or a Class of Members is required by the Act or this Agreement, in which case the act of the Members shall be such specified portion of the Members or Class of Members) at any meeting of the Members at which a quorum is present, the act of the Members shall be the affirmative vote of Members holding a majority of the Units represented at such meeting (unless the Act requires a greater percentage to approve such matters, in which case the Act shall govern and control).  For any vote taken by written consent in lieu of a meeting (other than with respect to a matter for which the affirmative vote of a specified portion of the Members or a Class of Members is required by the Act or this Agreement, in which case the act of the Members shall be such specified portion of the Members or Class of Members), the act of the Members shall be the affirmative written consent of Majority in Interest of the Members (unless the Act requires a greater percentage to approve such matters, in which case the Act shall govern and control).

**3.8     Action by Written Consent**.  Any action required to be taken at any annual or special meeting of Members or otherwise, or any action which may be taken at any annual or special meeting of Members or otherwise (including without limitation any consent, approval, vote or other action of the Members required or contemplated under or by this Agreement, the Act or otherwise), may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the Members required to approve such action as set forth in the last sentence of Section 3.7(h) above.  Unless the consent of all Members entitled to vote has been solicited in writing, prompt notice of the taking of action by Members without a meeting pursuant to this Section 3.8 by less than unanimous written consent shall be given to each of those Members who have not consented in writing.

**3.9     Limited Liability of Members**.

(a)     General.  No Member or any of its Affiliates shall have any liability for the debts, obligations or liabilities of the LLC or of any other Member or their respective Affiliates.  The debts, obligations and liabilities of the LLC, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the LLC, and no Member or former Member shall be obligated personally for any such debt, obligation or liability of the LLC solely by reason of being a Member or former Member.

(b)    _Deficit Capital Accounts_.    Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that there exists a deficit in the Capital Account of any Member, upon dissolution of the LLC such deficit shall not be an asset of the LLC and such Members shall not be obligated to contribute such amount to the LLC to bring the balance of such Member's Capital Account to zero.

3.10    **No Appraisal Rights**.    No Member shall have any right to have its Units appraised and paid out under the circumstances provided in Section 18-210 of the Act, or under any other circumstances except as set forth herein or in any applicable agreement between such Member and the LLC.

3.11    **General Voting Rights**.    Whether by person or by proxy, each Common Member shall have the right to one (1) vote for each Common Unit held by it, _provided_ that (A) Common Units issued out of Reserved Incentive Common Units that are designed by the Board of Managers as Non-Voting Units shall not vote and shall have no voting rights and (B) Common Units issued out of Reserved Incentive Common Units that are not designated as Non-Voting Units shall vote and shall have voting rights.    A Member who has assigned some, but not all, of his or her Units shall be treated as a Member and entitled to a vote on all matters to the extent of his or her retained Units.    Irrespective of any provision of Section 18-209 of the Act, but subject to the terms of this Agreement, a merger or other Liquidation Event shall not require approval by any separate class or group of Members.    Except for this Agreement, no Member shall deposit any Units owned by such Member in a voting trust or subject any such Units to any arrangement or agreement with respect to the voting of such Units.

3.12    **No Fiduciary Duties Owed by the Members**.    To the fullest extent permitted by applicable Law (including Section 18-1101 of the Act), no Member or Affiliate of a Member acting under this Agreement shall have any fiduciary or similar duty, at law or in equity, or any liability relating thereto, to the LLC or any other Member or Affiliate of a Member, with respect to or in connection with the LLC or the LLC's business or affairs; and, without limitation, each Member when approving or disapproving any action, shall be entitled to consider only such interests and factors as such Member desires and may consider such Member's own interests or the interests of the other Members and shall have no other duty or obligation, fiduciary or otherwise, to give any consideration to any interest of or factors affecting the LLC or any other Member or Affiliate of any other Member; _provided, however_, that such other interests or other factors are known by or disclosed to the other Members, unless the failure to make such disclosure does not prejudice the interests of the LLC or such other Members or Affiliates of such other Members.    The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Member or Affiliate of a Member otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Member or Affiliate of a Member.    For the sake of clarity, this Section 3.14 only applies to a Member or any of its Affiliates, solely in their capacity as Members and not if such Member or such Affiliate of such Member is also serving the LLC in a different capacity.

3.13    **Related Party Transactions**.    No transaction or contract to which the Company is or may be a party shall be void, voidable or a breach of fiduciary responsibility for the reason that any Member, or any affiliate of any Member, is a party thereto, and such Member or its

affiliates may receive fees, compensation and remuneration from the Company for services rendered relating to the Company business; provided, however, that such fees, compensation and other remuneration shall be generally consistent with the amount that would be paid to an unaffiliated person for similar services in the same or similar geographical area as the Company's principal place of business.

**3.14** **Guaranteed Payments**.  In addition to the distributions provided for in Section 10.1, each Member may receive guaranteed payments (i.e., a payment in the nature of salary or bonus) within the meaning of Code Section 707(c) from the LLC (any such payments a "**Compensation Amount**") in such Member's capacity as a Manager, Officer, Employee, Consultant or other service provider to the LLC in such amount as may be determined by the Board of Managers.  Each Member hereby understands and agrees that, (a) except as may be approved pursuant to the preceding sentence, he or she shall not be entitled to receive any Compensation Amount from the LLC, and (b) all amounts otherwise distributable by the LLC may be paid to the Members pursuant to the foregoing sentence and, accordingly, no amounts may be available for distribution to the Members and assignees pursuant to Section 10.1.

## ARTICLE IV

## CONTRIBUTIONS TO CAPITAL; WITHDRAWALS; ADVANCES

**4.1** **Capital Contributions**.  Each Member, excluding Members who have been or are granted Common Units issued as Profits Interests, has made, or concurrently with the execution of this Agreement is making, a Capital Contribution to the LLC in the amount set forth in the records of the LLC.  No Member shall be entitled to any interest or compensation with respect to such Member's Capital Contribution or share of the capital of the LLC, except as expressly provided herein.  No Member shall have any liability for the repayment of the Capital Contribution of any other Member and each Member shall look only to the assets of the LLC for return of such Member's Capital Contributions to the extent permitted herein.  Each Common Member holds an Interest in the LLC represented by the Common Units set forth opposite the Member's name on Exhibit A.

(a)    Additional Capital Contributions.  Except as otherwise provided herein, no Member shall be permitted or required to make any additional Capital Contribution without the consent of the Board of Managers and such Member.

(b)    Interest.  No Member shall be entitled to any interest with respect to contributions to or share of the capital of the LLC.

**4.2** **No Right of Withdrawal**.  No Member shall have the right to withdraw or receive any return of, or interest on, any portion of such Member's contributions to capital of, or to receive any distributions from, the LLC, except as provided in Articles X and XIII.

**4.3** **Advances**.  If any Member shall advance any funds to the LLC in excess of its Capital Contributions, the amount of such advance shall neither increase its Capital Account nor entitle that Member to any increase in its share of the distributions of the LLC.  The amount of any such advance shall be a debt obligation of the LLC to such Member and shall be repaid to it

by the LLC with interest at a rate and upon such other terms and conditions which the Board of Managers determines in good faith are, taken as a whole, not materially less favorable to the LLC than would be available to the LLC from an unrelated commercial lender, as shall be agreed by the LLC and such Member.  Any such advance shall be payable and collectible only out of LLC assets, and the other Members shall not be personally obligated to repay any part thereof. No Person who makes any loan to the LLC shall have or acquire, as a result of making such loan, any direct or indirect interest in the profits, capital or property of the LLC, other than as a creditor.

## ARTICLE V

## MANAGEMENT AND RESTRICTIONS

### 5.1    Management by Board of Managers; Board of Managers.

(a)    Management by Board of Managers.  Subject to the limitations set forth in this Agreement, the Certificate or the Act, the business and affairs of the LLC shall be managed by or under the direction of the Board of Managers, which may exercise all powers of the LLC and do all lawful acts on behalf of the LLC.  The Board of Managers shall have full, exclusive and complete discretion to take all such actions as they deem necessary or appropriate to accomplish the purposes of the LLC as set forth herein.  The Board of Managers shall only act collectively or by one or more committees designated by the Board of Managers in accordance with Section 5.1(h).  The Board of Managers acting collectively shall be a "**manager**" within the meaning of Section 18-101(10) or Section 18-402 of the Act and no individual Manager shall be a "**manager**" except if he or she is so designated by the Board of Managers.  No Manager or Member acting in his or her individual capacity shall have the right, power or authority to act on behalf of or bind the LLC, except (i) that a Manager or Member who is also an Officer of the LLC may act on behalf of or bind the LLC in his or her capacity as an Officer of the LLC to the extent that he or she is authorized to do so or (ii) to the extent a Manager is so authorized by the Board of Managers.

(b)    Size of the Board of Managers.  The Board of Managers shall initially be comprised of up to three (3) Managers, which number may be increased or decreased by amendment to this Agreement pursuant to Section 14.1.  The Managers shall be appointed in accordance with Section 5.1(c).

(c)    Composition of the Board of Managers.  The Managers shall be appointed to the Board of Managers by a Majority in Interest of the Members, and the initial Managers shall be as set forth on Exhibit B.  Any Manager may be removed at any time by a Majority in Interest of the Members.  Upon the termination of a Founder's services to the LLC or upon Disability of a Founder, if such Founder is then serving as a Manager such Founder shall no longer have voting or consent rights as a Manager of the LLC and such Founder shall, unless otherwise determined by the other Managers, automatically be removed as a Manager effective upon such termination or Disability without any further action on behalf of the Members or Managers.  In the event of a vacancy in the Board of Managers resulting or proposed to result from the removal of a Manager, such vacancy shall be filled by vote of a Majority in Interest of the Members in accordance with this Section 5.1(c), and the LLC shall take such reasonable

actions as are necessary to facilitate such removals or appointments, including, without limitation, calling a special meeting for the election of Managers and soliciting the votes of the appropriate Members.  The Managers shall annually elect one member of the Board of Managers to serve as Chairman of the Board of Managers (the "**Chairman of the Board**") for a term of one year, who shall initially be as set forth on Exhibit B.

(d)    Meetings of the Board of Managers.  The Board of Managers may hold meetings, both regular and special, either within or without the State of Delaware.  The first meeting of each newly elected Board of Managers shall be held immediately after the annual meeting of Members and at the same place, and no notice of such meeting shall be necessary to the newly elected Managers in order to legally constitute the meeting, provided a quorum is present.  In the event such meeting is not held at that time and place, the meeting may be held at such time and place as shall be specified in a notice given as hereinafter provided for special meetings of the Board of Managers, or as shall be specified in a written waiver signed by all of the Managers.  The Board of Managers shall meet once per calendar quarter unless otherwise agreed by all of the Managers.  Regular meetings of the Board of Managers may, unless otherwise required by the Board of Managers, be held on not less than forty-eight (48) hours' notice from the Chairman of the Board of Managers to the other Managers delivered either personally, by telephone, by mail, by facsimile, by email or by any other reasonable means of communication, at such time and place as shall from time to time be specified in such notice.  Special meetings of the Board of Managers may be called by the Chairman of the Board on not less than forty-eight (48) hours' notice to each Manager, either personally, by telephone, by mail, by facsimile, by email or by any other reasonable means of communication.  Special meetings of the Board of Managers shall be called by the Chairman of the Board in like manner and on not less than forty-eight (48) hours' notice on the written request of one or more of the Managers.  Notice of a meeting need not be given to any Manager if a written waiver of notice, executed by such Manager before or after the meeting, is filed with the records of the meeting, or to any Manager who attends the meeting without protesting prior thereto or at its commencement, the lack of notice.  A waiver of notice need not specify the purposes of the meeting.  All Managers shall be reimbursed for their reasonable travel and other expenses incurred in connection with their attendance of Board of Managers meetings and other LLC-related business.

(e)    Quorum and Acts of the Board of Managers.  Each Manager shall be entitled to one (1) vote with respect to any matter before the Board of Managers or committee thereof.  At all meetings of the Board of Managers, the attendance of a majority of Managers shall constitute a quorum for the transaction of business.  If a quorum shall not be present at any meeting of the Board of Managers, the Managers present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.  Subject to the terms of this Agreement, the act of a majority of the Managers present at any meeting at which there is a quorum shall be the act of the Board of Managers.  Any action required or permitted to be taken at any meeting of the Board of Managers or of any committee thereof may be taken without a meeting, if all members of the Board of Managers or committee, as the case may be, consent thereto in writing, and the writing, writings, electronic transmission or transmissions are filed with the minutes of proceedings of the Board of Managers or committee.  Such consent shall be treated as a vote of the Board of Managers for all purposes.

(f)    <u>Electronic Communications</u>.   Managers, or members of any committee designated by the Board of Managers, may participate in a meeting of the Board of Managers, or any committee, by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

(g)    <u>Compensation of Managers</u>.   The LLC shall pay all non-employee Managers their reasonable out-of-pocket expenses, if any, of attendance at meetings of the Board of Managers.   No such payment shall preclude any Manager from serving the LLC in any other capacity and receiving compensation therefor.

(h)    <u>Committees, General</u>.   The Board of Managers may, by resolution passed by the Board of Managers, designate one or more committees.   Any such committee, to the extent provided in the resolution of the Board of Managers, shall have and may exercise all the powers and authority of the Board of Managers, but, unless the resolutions expressly so provide, no such committee shall have the power or authority to authorize the issuance of Units.   Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the Board of Managers.   Each committee shall keep regular minutes of its meetings and report the same to the Board of Managers when required.

**5.2    <u>Amendment of Certificate or Agreement</u>**.   Subject to the provisions of this Agreement, the Board of Managers shall have the duty and authority to amend the Certificate or this Agreement consistent with Section 14.1(a) and Section 14.1(b), respectively.

**5.3    <u>No Fiduciary Duties</u>**.   To the fullest extent permitted by the Act (including Section 18-1101 of the Act) and other applicable law, and in all instances solely to the extent not inconsistent with the specific provisions of the Certificate or this Agreement, it is the intention of the parties that the Managers in their respective capacities as such shall have the rights, powers, authority, duties and responsibilities of directors of, and the Board of Managers, shall act and function as, a board of directors of a for-profit stock corporation organized and existing under the DGCL to which provisions of Subchapter XIV of the DGCL, 8 Del. Ch. §§ 341 ff., are not applicable, as such rights, powers, authority, duties and responsibilities are interpreted and defined by decisions of state and federal courts having jurisdiction to interpret and define the same, except that (i) to the maximum extent that reduction or elimination of such duties is permitted by Section 102(b)(7) of the DGCL, such duties shall not be applicable to the Managers, (ii) the provisions of Section 5.3 shall, to the maximum extent necessary to give effect thereto, be construed as a "renunciation" of interest or expectancy in, or in being offered an opportunity to participate in, business opportunities presented to the LLC contemplated by Section 122(17) of the DGCL, unless such opportunity is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Manager expressly and solely in such Manager's capacity as a Manager of the LLC, and (iii) any action that may be taken by the Board of Managers may be taken by a duly authorized committee of the Board of Managers in accordance with Section 5.1(h).   Any amendment, repeal or modification of the foregoing provisions of this Section 5.3 shall not adversely affect any right or protection of a Manager existing at the time of, or increase the liability of any Manager with respect to any acts or omissions of such Manager occurring prior to, such amendment, repeal or modification.   Subject to, but without limiting generality of, the foregoing, all Managers shall, with respect to their

actions and conduct in their respective capacities as such, be subject to the fiduciary duties applicable to directors of a for-profit stock corporation organized and existing under the DGCL.

## ARTICLE VI

## NOTICES

**6.1** **Notices**.  Any notice, payment, demand or other communication required or permitted to be given by any provision of this Agreement shall be deemed to have been delivered and given for all purposes (i) if delivered personally to the party or to an officer of the party to whom the same is directed, when received by such party, (ii) if delivered by confirmed telecopy transmission, when received if received on a Business Day during normal business hours of the recipient, and if not, on the next Business Day, (iii) by a nationally recognized overnight courier services or (iv) whether or not the same is actually received, if sent by registered or certified mail, return receipt requested, postage and charges prepaid, addressed as follows:  If to the LLC, at its principal place of business the address of which is set forth in Section 2.2; if to a Member, at such Member's address set forth on Exhibit A hereto, or to such other address as such Member may from time to time specify by written notice to the Members and the LLC; such notice shall be deemed to be given five (5) days after the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid.  Any party may by written notice to the other parties specify a different address or facsimile number for notice purposes by sending notice thereof in the foregoing manner.

**6.2** **Waiver of Notice**.  Whenever any notice is required to be given under the provisions of the Act, the Certificate or this Agreement, a waiver thereof in writing, signed by the Person or Persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent thereto.

## ARTICLE VII

## OFFICERS

**7.1** **Officers**.

(a)    The Board of Managers may, from time to time, designate one or more persons to be officers of the LLC (each such person an "**Officer**").  Any Officers designated by the Board of Managers shall have such authority and perform such duties as the Board of Managers may, from time to time, delegate to them.  The Board of Managers may assign titles to particular Officers and, unless the Board of Managers decides otherwise, if the title is one commonly used for officers of a business corporation formed under the General Corporation Law of the State of Delaware, the assignment of such title shall constitute the delegation to such Officer of the authority and duties that are normally associated with that office, subject to any restrictions on such authority imposed by the Board of Managers.  Any number of offices may be held by the same person.  No Officer need be a resident of the State of Delaware or of the United States of America.

(b)     Each Officer shall hold office until his or her successor shall be duly designated and qualified or until his or her death or until he or she shall resign or shall have been removed in the manner hereinafter provided.

(c)     Any Officer may resign as such at any time.  Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Board of Managers.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

(d)     Any Officer may be removed as such, either with or without cause, by the Board of Managers whenever in their judgment the best interests of the LLC will be served thereby.  Any vacancy occurring in any office of the LLC may be filled by the Board of Managers.

(e)     To the fullest extent permitted by the Act and other applicable law, and in all instances solely to the extent not inconsistent with the specific provisions of the Certificate or this Agreement, it is the intention of the parties that those Officers with titles expressly referenced in the DGCL or customarily used in corporations organized under the DGCL, in their respective capacities as such, shall, unless otherwise provided herein or determined by the Board of Managers, have the statutory and customary rights, powers, authority, duties and responsibilities of officers with similar titles of a for-profit stock corporation organized and existing under the DGCL.  Without limiting the generality of the foregoing, without the approval of the Board of Managers or, to the extent required hereby or by non-waivable provisions of applicable law, no Officer shall have any right, power or authority to cause the LLC to enter into any transaction or to take any other action which would, if the LLC were a for-profit stock corporation organized and existing under the DGCL to which provisions of Subchapter XIV of the DGCL, 8 Del. Code §§ 341ff., are not applicable, require a vote or other approval of the board of directors or stockholders of such corporation.  The Members and the Board of Managers hereby delegate to each Officer such rights, powers and authority with respect to the management of the business and affairs of the LLC as may be necessary or advisable to effect the provisions of this Section 7.1(e).

(f)     The initial Officers of the LLC shall be those individuals designated as the Officers on Exhibit B.

**7.2     Reliance by Third Parties**.  In dealing with the LLC and its duly appointed agents, no Person shall be required to inquire as to the LLC's or such agents' authority to bind the LLC.

**7.3     Actions and Determinations of the LLC**.  Except as otherwise expressly provided herein, whenever this Agreement provides that a determination shall be made or an action shall be taken by the LLC, such determination or act shall be made or taken by the Board of Managers or, pursuant to this Agreement or with the authorization of the Board of Managers (which may be a general authorization and need not be specific as to any named person, Officer or particular transaction), by any Officer.

## ARTICLE VIII

## ACCOUNTING AND RECORDS

**8.1**    **Financial and Tax Reporting**.  The LLC shall prepare its financial statements and its income tax information returns using such methods of accounting and tax year as the Board of Managers deems necessary or appropriate as permitted by the Code and Treasury Regulations.

**8.2**    **Members Access to Certain Information**.    To the extent required by, and subject to the limitations set forth in, Section 18-305 of the Act and subject to any limitation set forth in any Plan or Unit grant agreement, subject to Section 8.6, the LLC shall make available, upon at least three (3) Business Days' prior written notice to the LLC, for inspection at reasonable times during business hours by a Member, the most recent balance sheet and income statement of the LLC and such other information and documents required by such Section 18-305 to be made available to Members, *provided, however*, that a Member shall not be entitled to submit more than one (1) such written notice per month; *provided further, however*, unless otherwise provided in any Equity Incentive Plan or pursuant to a Unit grant agreement or option agreement, a Person holding solely Common Units that are Non-Voting Units issued under the Equity Incentive Plan shall have no such information access rights.

**8.3**    **Supervision; Inspection of Books**.  Proper and complete books of account and records of the business of the LLC (including those books and records identified in the Act) shall be kept at the LLC's principal office and at any other place as designated by the Board of Managers.

**8.4**    **Tax Information**.  The LLC shall transmit to each Member, and to each person (or legal representative thereof) who was a Member during any part of the Fiscal Year in question, within a reasonable time after the end of each Fiscal Year a copy of such person's Schedule K-1 to Form 1065 for such Fiscal Year.  In the event the LLC elects to provide additional information to Members, the LLC shall be permitted to withhold any information from a Member (other than such Member's Schedule K-1 to Form 1065 for a Fiscal Year) if the LLC determines, in its reasonable discretion, that such Member has taken any action or entered into any transaction that a reasonable person would view, at the time of the action or transaction,  as trading against, or in any way contrary to, the best interests of the LLC or that would make it impossible to carry on the affairs of the LLC.

**8.5**    **Tax Matters Partner**.  The Member identified on Exhibit B as the Tax Matters Member is hereby designated as the LLC's "**Tax Matters Partner**" for purposes of the Code, to serve until his resignation or removal from the Board of Managers.  If the then serving Tax Matters Partner ceases to be a Manager, the Board of Managers shall appoint a new Tax Matters Partner.

**8.6**    **Confidentiality**.

(a)    Each Member hereby acknowledges that by virtue of such Member's Interests, such Member may have access, or the LLC may allow such Member access, to

business, technical, other information, materials and/or ideas or this Agreement ("**Proprietary Information**," which term shall include, without limitation, anything such Member learns or discovers as a result of exposure to or analysis of any Proprietary Information). Therefore, each Member hereby agrees that such Member will hold in confidence and will not possess or use (except as required to evaluate the proposed business relationship within the U.S.) or disclose any Proprietary Information without the prior written consent of the Board of Managers, except such information that (a) was in the public domain prior to the time it was furnished to such Member, (b) is or becomes (through no willful improper action or inaction by such Member) generally available to the public, (c) was in its possession or known by such Member without restriction prior to receipt from the LLC, (d) was rightfully disclosed to such Member by a third party without restriction, (e) was independently developed without any use of the LLC's confidential information, (f) legal counsel, accountants or representatives for such Member who are bound by a duty of confidentiality, or (g) is required to be disclosed by law or the rules of any national securities exchange, association or marketplace, provided that, the Member shall notify the LLC of any such disclosure requirement as soon as practicable and reasonably cooperate with the LLC (at the LLC's cost) if the LLC seeks a protective order or other remedy in respect of any such disclosure; and furnish only that portion of the Proprietary Information which the Member is legally required to disclose. Each Member agrees that is will not reverse engineer or attempt to derive the composition or underlying information, structure or ideas of any Proprietary Information. The foregoing does not grant any Member a license in or to any of the Proprietary Information. In accordance herewith, each Member also acknowledges and agrees that due to the unique nature of the Proprietary Information, any breach of this Section 14.13 would cause irreparable harm to the LLC for which damages are not an adequate remedy, and that the LLC shall therefore be entitled to equitable relief in addition to all other remedies available at law.

(b)     To the maximum extent permitted by the Act, subject to the provisions of this Agreement, the Board of Managers shall have the right to keep confidential from the Members or other Persons, for such period of time as the Board of Managers deems reasonable, any information (including, to the extent permitted by the Act, any information for which a member or manager of a limited liability company may otherwise be entitled to obtain or examine pursuant to Section 18-305 of the Act) which the Board of Managers reasonably in good faith believes to be in the nature of trade secrets or other information the disclosure of which the Board of Managers reasonably in good faith believes is not in the best interest of the LLC or could damage the LLC or its business or which the LLC is required by law or by agreement with a third party to keep confidential.

## ARTICLE IX

### CAPITAL ACCOUNTS AND
### ALLOCATIONS OF NET INCOME AND NET LOSS

### 9.1    Capital Accounts.

(a)     A separate capital account (the "**Capital Account**") shall be established and maintained for each Member. The Capital Account of each Member shall be credited with such Member's Capital Contributions to the LLC (net of any liabilities secured by any

contributed property that the LLC is considered to assume or take subject to), all Net Income allocated to such Member pursuant to Section 9.2 and any items of income or gain which are specially allocated pursuant to Section 9.3; and shall be debited with all Net Losses allocated to such Member pursuant to Section 9.2, any items of loss or deduction of the LLC specially allocated to such Member pursuant to Section 9.3, and all cash and the Carrying Value of any property (net of liabilities assumed by such Member and the liabilities to which such property is subject) distributed by the LLC to such Member. To the extent not provided for in the preceding sentence, the Capital Accounts of the Members shall be adjusted and maintained in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), as the same may be amended or revised. Any references in any section of this Agreement to the Capital Account of a Member shall be deemed to refer to such Capital Account as the same may be credited or debited from time to time as set forth above. In the event of any Transfer of any Interest in the LLC in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest. Whenever the LLC would be permitted to adjust the Capital Accounts of the Members pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) to reflect revaluations of LLC property, the Board of Managers may adjust the Capital Accounts of the Members if it determines that doing so would be appropriate, and may do so in connection with any issuance of any Profits Interests. If Code Section 704(c) applies to LLC property, the Capital Accounts of the Members shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g) for allocations of depreciation, depletion, amortization and gain and loss, as computed for book purposes, with respect to such property. The Capital Accounts shall be maintained for the sole purpose of determining the allocation of items of income, gain, loss and deduction among the Members for tax purposes and shall have no effect on the amount of any distributions to any Members in liquidation or otherwise.

(b)    No Member shall be required to pay to the LLC or to any other Member the amount of any negative balance which may exist from time to time in such Member's Capital Account.

9.2    **Allocations of Net Income and Net Loss**. Net Income, Net Loss and items thereof of the LLC for each Fiscal Year (or other Accounting Period) shall be allocated to the Members in such manner that:

(a)    if the LLC were to liquidate completely after the end of such Fiscal Year (or other Accounting Period) and in connection with such liquidation (i) sell all of its assets at their Carrying Values, (ii) settle all of its liabilities to the extent of the available assets of the LLC (limited, in the case of nonrecourse liabilities, to the collateral securing such liability), and (iii) each Member were to pay to the LLC at that time the amount of any obligation then unconditionally due (in a non-Member capacity) to the LLC, then:

(b)    (i) the distribution by the LLC of any remaining cash to the Members in accordance with their respective Capital Account balances (after crediting or debiting the Capital Accounts for any Net Income, Net Loss, items thereof and allocations pursuant to Section 9.3 for such Fiscal Year or other Accounting Period, including any Partner Nonrecourse Debt Minimum Gain and Partnership Minimum Gain resulting from the hypothetical liquidation and crediting Capital Accounts for all contributions to be made (if any) in connection with the liquidation) would correspond as closely as possible to the liquidating distributions that would result if the

liquidating distributions had instead been made in accordance with Section 10.3; and (ii) any resulting deficit Capital Account balance (after crediting or debiting Capital Accounts for Net Income, Net Loss, items thereof, and allocations pursuant to Section 9.3 for such Fiscal Year or other Accounting Period, including any Partner Nonrecourse Debt Minimum Gain and Partnership Minimum Gain resulting from the hypothetical liquidation and crediting Capital Accounts for all contributions required to be made (if any) in connection with the liquidation) would correspond as closely as possible to the manner in which economic responsibility for such deficit Capital Account balances, if any, would be borne by the Members under the terms of this Agreement or any collateral agreement.  For the avoidance of doubt, unvested Units shall be treated as vested for allocation purposes in accordance with I.R.S. Revenue Procedure 2001-43.

   **9.3** **Special Allocation Provisions**. Notwithstanding any other provision in this Agreement:

    (a) **Minimum Gain Chargeback**.  If there is a net decrease in Partnership Minimum Gain or Partner Nonrecourse Debt Minimum Gain (determined in accordance with the principles of Treasury Regulations Sections 1.704-2(d) and 1.704-2(i)) during any LLC taxable year, the Members shall be specially allocated items of LLC income and gain for such year (and, if necessary, subsequent years) in an amount equal to their respective shares of such net decrease during such year, determined pursuant to Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5).  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f).  This Section 9.3(a) is intended to comply with the minimum gain chargeback requirements in such Treasury Regulations Sections and shall be interpreted consistently therewith; including that no chargeback shall be required to the extent of the exceptions provided in Treasury Regulations Sections 1.704-2(f) and 1.704-2(i)(4).

    (b) **Qualified Income Offset**.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of LLC income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate the deficit balance in its Capital Account (in excess of the amounts described in clauses (i) and (ii) of Section 9.3(c) below) created by such adjustments, allocations or distributions as promptly as possible.  This Section 9.3(b) is intended to constitute a "qualified income offset" within the meaning of Treasury Regulation Section 1.704-1(b)(ii)(d).

    (c) **Limitation on Net Losses**. If any allocation of Net Loss or an item of deduction, expenditure or loss to be made pursuant to Section 9.2 or this Section 9.3 for any Fiscal Year or other Accounting Period would cause a deficit in any Member's Capital Account (or would increase the amount of any such deficit) after (i) crediting to such Capital Account the amount that such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Section 1.704-2(g)(1) and 1.704-2(i)(5), and (ii) debiting to such Capital Account the items described in Treasury Regulations 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6), then such Net Loss or item of deduction, expenditure or loss shall be allocated to the Members that have positive Capital Account balances (in excess of the amounts described in clauses (i) and (ii) of this section for such Member)  in proportion to the respective amounts of such positive balances until all such positive balances have been reduced to zero.

(d)    <u>Gross Income Allocation</u>.  In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Member is obligated to restore, if any, pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Section 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of LLC income and gain in the amount of such excess as quickly as possible; *provided* that an allocation pursuant to this Section 9.3(d) shall be made only if and to the extent that a Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article IX have been tentatively made as if Section 9.3(c) and this Section 9.3(d) were not in this Agreement.

(e)    <u>Nonrecourse Deductions</u>. Nonrecourse Deductions shall be allocated in accordance with the number of Units held by each Member and in the same manner as if such Nonrecourse Deductions were taken into account in determining Net Income and Net Loss for such Accounting Period or fiscal year.

(f)    <u>Partner Nonrecourse Deductions</u>.  Partner Nonrecourse Deductions for any taxable period shall be allocated to the Member who bears the economic risk of loss with respect to the liability to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(j).

(g)    <u>Change in Interests</u>.  If there is a change in any Member's Interest in the LLC during any Fiscal Year, the principles of Section 706(d) of the Code shall apply in allocating Net Income and Net Loss and items thereof for such Fiscal Year to account for the variation. For purposes of applying Section 706(d), the Board of Managers may adopt any method or convention permitted under applicable Treasury Regulations. If there is a change in the Interest of any Member, then for purposes of applying Section 9.2 with respect to the Fiscal Period ending on the date of change, the hypothetical liquidating distributions under Section 9.2 shall be made on the basis of the Interests of each Member as applied before giving effect to such change.

(h)    <u>Adjustments in Connection with Noncompensatory Option Exercise and Convertible Debt</u>.  The Board of Managers is hereby authorized to interpret and implement in its reasonable discretion the allocation provisions described in the proposed Treasury Regulations on partnership noncompensatory options and convertible debt, dated January 22, 2003 (REG-103580-02) or as later finalized.

(i)    <u>Adjustments in Connection with Compensatory Option Exercise and Forfeiture of Restricted Units</u>. The Board of Managers is hereby authorized to interpret and implement in its reasonable discretion the allocation provisions of the proposed Treasury Regulations on compensatory partnership equity dated May 24, 2005 (REG-105346-03) and the proposed IRS Revenue Procedure published in IRS Notice 2005-43 (the "**Proposed Revenue Procedure**").

**9.4**    <u>**Curative Allocations**</u>.  If the Board of Managers determines, after consultation with counsel experienced in income tax matters, that the allocation of any item of LLC income, gain, loss, deduction or credit is not specified in this Article IX (an "<u>unallocated item</u>"), or that

the allocation of any item of LLC income, gain, loss, deduction or credit hereunder is clearly inconsistent with the Members' economic interests in the LLC (determined by reference to the general principles of Treasury Regulation Section 1.704-1(b) and the factors set forth in Treasury Regulation Section 1.704-1(b)(3)(ii)) (a "misallocated item"), then the Board of Managers may allocate such unallocated items, or reallocate such misallocated items, to reflect such economic interests; *provided* that no such allocation shall have any effect on the amounts distributable to any Member (other than tax distributions), including the amounts to be distributed upon the complete liquidation of the LLC.

      **9.5**    **Tax Allocations**.  For income tax purposes only, each item of income, gain, loss and deduction of the LLC shall be allocated in the same manner as the corresponding items of Net Income and Net Loss and specially allocated items are allocated for Capital Account purposes; *provided* that in the case of any LLC asset the Carrying Value of which differs from its adjusted tax basis for U.S. federal income tax purposes, income, gain, loss and deduction with respect to such asset shall be allocated solely for income tax purposes in accordance with the principles of Section 704(c) of the Code so as to take account of the difference between the Carrying Value and adjusted tax basis of such asset.  Unless otherwise agreed by the Board of Managers, for purposes of applying the principles of Section 704(c), the LLC shall use the "traditional method" of Treasury Regulation Section 1.704-3(b).

      **9.6**    **Compliance with Section 704(b) of the Code**.  The allocation provisions contained in this Article IX are intended to comply with Section 704(b) of the Code and the Treasury Regulations promulgated thereunder, and shall be interpreted and applied in a manner consistent therewith.

      **9.7**    **Safe Harbor Election**.  The Board of Managers is hereby authorized and directed to elect the safe harbor described in section 4 of the Proposed Revenue Procedure (or any substantially similar safe harbor provided for in other IRS guidance), if and when such Revenue Procedure (or other IRS guidance) is finalized (the "**Safe Harbor**").  The LLC and each Member (including any Persons to whom a Profits Interest is Transferred or issued in connection with the provision of services, and any Person to whom an Interest is Transferred by another Member) agree to comply with all requirements of the Safe Harbor while such election remains in effect, including making tax filings (if any) consistent with the applicable requirements of such Safe Harbor and any relevant Treasury Regulations.  In addition, the Members agree to amend this Agreement as and if required by the finalized Revenue Procedure (or substantially similar other IRS guidance) in order to ensure that the Transfer or issuance of an Interest in connection with the provision of services to, or on behalf of, the LLC is eligible for the benefits of the Safe Harbor.  Notwithstanding the preceding sentences, no election or amendment shall be made pursuant to this Section 9.7 if the Safe Harbor, when finalized, is substantially different from the Proposed Revenue Procedure and the application of the Safe Harbor would result in materially adverse consequences to the LLC.

## ARTICLE X

## DISTRIBUTIONS

**10.1**    **Distributions**.

(a)    Except as provided in Section 10.2, distributions of the LLC's cash or other assets to the Members shall be made at such times and in such amounts as determined by the Board of Managers; *provided* that the LLC shall retain sufficient working capital reserves as measured immediately after any proposed distribution.  No Member shall be entitled to any distribution or payment with respect to such Member's Interest in the LLC except as set forth in this Agreement.

(b)    Other than distributions pursuant to Section 10.2 or pursuant to a Liquidation Event as set forth in Section 10.3 and distributions pursuant to Section 13.4, if the Board of Managers declares and determines to make any distribution of cash or other assets to the Members, all such distributions shall be made to the Common Members pro rata in proportion to the number of Common Units held by each; *provided, however*, any distributions of all or substantially all of the assets of the LLC to Members will be made such that each Member receives the amount it would have been entitled to receive pursuant to Article XIII if the LLC had been wound-up on and as of the date of such distribution.  Notwithstanding the foregoing provisions of this Section 10.1(b), amounts that would otherwise be distributed to any Common Unit that was issued as a Profits Interest shall be reduced by an amount equal to its remaining Profits Interest Threshold Amount for such Common Unit and the amount by which the distribution to such Profits Interest is reduced shall instead be distributed to the holders of Units as provided in the foregoing provisions of this Section 10.1(b). Further, unless otherwise determined by the Board of Managers, any distributions pursuant to this Section 10.1(b) with respect to unvested Common Units issued out of Reserved Incentive Common Units shall be held by the LLC until such Common Units vest, at which time any such retained distributions shall be released to the holder of such then vested Common Units.  Any retained distributions pursuant to the foregoing sentence that are forfeited as a result of the forfeiture without vesting of the applicable Common Units shall thereafter be allocated in accordance with this Section 10.1(b).  Only after a Common Unit that was issued out of Reserved Incentive Common Units has no Profits Interest Threshold Amount remaining and then, only to the extent vested (unless otherwise determined by the Board of Managers), shall such Common Unit participate in any remaining amounts to be distributed in accordance with the provisions of this Article X.

(c)    Except as otherwise provided by law, no Member shall be required to restore or repay to the LLC any funds properly distributed to it pursuant to Section 10.1.

**10.2**    **Tax Distributions**.  Notwithstanding Section 10.1, within ninety (90) days of the end of each Fiscal Year, the LLC shall, unless otherwise determined by all of the members of the Board of Managers, make a distribution to each holder of Units out of any available cash of the LLC (as determined by the Board of Managers) of an amount equal to the excess of (A) the sum of (i) the product of (x) the amount of net income and gain taxable at ordinary tax rates allocated with respect to such Unit (as shown on Schedule K-1 to the LLC's IRS Form 1065) for such Fiscal Year and all prior Fiscal Years and (y) the maximum marginal rate of federal, state and

local income tax applicable to an individual subject to tax in the Designated Jurisdiction with respect to such income or gain, (ii) the product of (x) the amount of net income and gain taxable at long-term capital gains rates allocated with respect to such Unit (as shown on Schedule K-1 to the LLC's IRS Form 1065) for such Fiscal Year and all prior Fiscal Years and (y) the maximum marginal rate of federal, state and local income tax applicable to an individual subject to tax in the Designated Jurisdiction with respect to such income or gain and, (iii) in the event of allocation by the LLC of net income or gain taxable at a rate other than the ordinary or long-term capital gains rates contemplated in clauses (i) and (ii) above, the product of (x) the amount of such net income and gain taxable at such other rate allocated with respect to such Unit (as shown on Schedule K-1 to the LLC's IRS Form 1065) for such Fiscal Year and all prior Fiscal Years and (y) the maximum marginal rate of federal, state and local income tax applicable to an individual subject to tax in the Designated Jurisdiction with respect to such income or gain, over (B) the cumulative cash distributions previously made with respect to such Unit pursuant to this Section 10.2 and Section 10.1(b) during such Fiscal Year and all prior Fiscal Years.  The determination of the tax rates to be used for purposes of the preceding sentence shall be made by the Board of Managers in their good faith discretion after consulting with the LLC's tax advisors, taking into account among other things changes in applicable tax rates over the relevant period, the deductibility of state and local taxes and any limitations on the ability of an individual to deduct any items of expense or loss under United States federal income tax principles.  For the avoidance of doubt, the references to "net income and gain" in clauses (A)(i)(x), (A)(ii)(x), and (A)(iii)(x) above shall mean that amount of such gross income and gain of the LLC allocated with respect to such Unit for all such Fiscal Years reduced by the gross amount of loss and deduction allocated with respect to such Unit for all such Fiscal Years that is available as an offset to such income and gain.  Without prejudice to the foregoing, the LLC may make a distribution out of any available cash of the LLC (as determined by the Board of Managers) to each holder of Units as soon as practicable following the close of each Estimated Tax Period (each an "**Estimated Tax Distribution**") of each Fiscal Year in amounts equal to the estimated tax liability of each Unit holder relating to such Estimated Tax Period (as estimated by the Board of Managers in their good faith discretion after consulting with the LLC's tax advisors and based on the results of such quarter and using the methodology and assumptions described in the preceding sentences). Estimated Tax Distributions made during a Fiscal Year shall be treated as advances and shall reduce the distributions otherwise distributable in accordance with the first sentence of this Section 10.2 for such Fiscal Year, and upon prior written notice, if the amount of Estimated Tax Distributions for a Fiscal Year exceed the amount otherwise distributable in accordance with the first sentence of this Section 10.2, the excess distributed to such Member shall be credited against and reduce distributions that would otherwise be made to such Member pursuant to this Section 10.2 with respect to subsequent Fiscal Years, and if the amount of Estimated Tax Distributions for a Fiscal Year is less than the amount otherwise distributable in accordance with the first sentence of this Section 10.2, the LLC may distribute the shortfall to the Members within sixty (60) days of the end of such Fiscal Year.  Notwithstanding the foregoing, distributions pursuant to this Section 10.2 shall not be available to a Member with respect to any guaranteed payment under Code Section 707(c) or any payment to a Member not in his, her or its capacity as a Member under Code Section 707(a).  Distributions effected pursuant to this Section 10.2 with respect to each Unit shall be applied to, treated as included in, and reduce the next succeeding distribution(s) (without double counting) to be made with respect to each such Unit pursuant to (i) Section 10.1 to the extent such amount was allocated pursuant to Section 9.2 in

accordance with such 10.1 distribution, and (ii) Section 10.3 to the extent such amount was allocated pursuant to Section 9.2 in accordance with such 10.3 distribution as necessary to ensure that, over the period of time since such Unit was issued and outstanding, the aggregate amount distributed respect to each such Unit under this Agreement shall be equal to the amount which such Unit would have been distributed under this Agreement had there been no distributions pursuant to this Section 10.2 and had this Section 10.2 not been part of this Agreement, as reasonably determined in good faith by the Board of Managers.

**10.3    Liquidation Event Distributions**.

(a)    Upon any Liquidation Event, funds and assets of the LLC determined by the Board of Managers to be available for distribution shall be distributed to the Members as follows, in the following order of priority:

(i)    First, to the Common Members, pro rata in proportion to the number of Common Units held by each, until an aggregate amount equal to the Capital Contributions attributable to each such Common Unit has been distributed by the LLC pursuant to this Section 10.3(a)(i); and

(ii)    Second, to the Common Members pro rata in proportion to the number of Common Units held by each.  Notwithstanding the foregoing provisions of this Section 10.3, amounts that would otherwise be distributed to any Common Unit that was issued as a Profits Interest shall be reduced by an amount equal to its remaining Profits Interest Threshold Amount for such Common Unit and the amount by which the distribution to such Profits Interest is reduced shall instead be distributed to the holders of Units as provided in the foregoing provisions of this Section 10.3.

(b)    For the avoidance of doubt, in the event of any Liquidation Event, any proceeds payable directly to the holders of Units shall be distributed among such holders of Unit as though such proceeds were received by the LLC and were distributed from the LLC to the Members in accordance with this Section 10.3.  For the avoidance of doubt, in the event of any Liquidation Event, if any portion of the consideration payable to the holders of Units is placed into escrow and/or is payable to such holders subject to contingencies, the definitive agreement with respect to such Liquidation Event shall provide that the portion of such consideration that is placed in escrow and/or subject to any contingencies (the "**Contingent Consideration**") shall be allocated to the Members in accordance with this Section 10.3 as if all of consideration ultimately payable in the transaction, including the Contingent Consideration, is paid without restrictions at the time of closing the Liquidation Event (so that the Contingent Consideration shall be allocated among the Members pro rata based on the amount of such consideration otherwise payable to each Member pursuant to this Section 10.3).  Each Member (including any Persons to whom a Common Unit was issued as a Profits Interest in connection with the provision of services, and any Person to whom an Interest is Transferred by another Member) agrees to take such actions as may be required, necessary or advisable to effect the intent of this Section 10.3.

(c)     In any of such events, if the consideration received by the LLC, or payable to the Members, is other than cash, its value shall be deemed to be the fair market value as mutually determined in good faith by the Board of Managers.

**10.4**    **No Other Withdrawals**.    Except as expressly provided in this Agreement, no withdrawals or distributions shall be required or permitted.

**10.5**    **Distribution Limitations**.    Notwithstanding any provision to the contrary contained in this Agreement, the LLC shall not make a distribution to any Member on account of its Interest in the LLC if such distribution would violate the Act or other applicable law or breach any contract or agreement to which the LLC is a party.

**ARTICLE XI**

**TRANSFER OF MEMBERSHIP**

**11.1**    **Transfer**.    No Member may transfer, sell, encumber, mortgage, pledge, assign or otherwise dispose of, either directly or indirectly, by operation of law or otherwise (herein collectively called a "**Transfer**") any portion of its Interest in the LLC without the consent of the Board of Managers, and in the event the Board of Managers consents to a Transfer, such Transfer shall also be subject to the other provisions of this Article XI.

**11.2**    **Transfer Void**.    Any Transfer or attempted Transfer of an Interest in the LLC in contravention of this Agreement shall be absolutely null and void *ab initio* and of no force or effect, on or against the LLC, any Member, any creditor of the LLC or any claimant against the LLC and may be enjoined, and shall not be recorded on the books and records of the LLC.    No distributions of cash or property of the LLC shall be made to any transferee of any Interest Transferred in violation hereof, nor shall any such Transfer be registered on the books of the LLC.    The Transfer or attempted Transfer of any Interest in violation hereof shall not affect the beneficial ownership of such Interest, and, notwithstanding such Transfer or attempted Transfer, the Member making such prohibited Transfer or attempted Transfer shall retain the right to vote, if any, and the right to receive liquidation proceeds with respect to such Interest.

**11.3**    **Effect of Assignment**.    Following a Transfer of an Interest that is permitted under this Article XI, the transferee of such Interest shall be treated as having made all of the Capital Contributions in respect of, and received all of the distributions received in respect of, such Interest, shall succeed to the Capital Account associated with such Interest and shall receive allocations and distributions under Articles IX and X in respect of such Interest as if such transferee were a Member.

**11.4**    **Legends**.

(a)     In the event the Units become certificated Units, any certificate representing Units shall be endorsed with the following legend, as well as with any legends as may be required by applicable federal and state securities laws:

"THE SALE, PLEDGE, HYPOTHECATION, ASSIGNMENT OR TRANSFER OF THE UNITS REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO

THE TERMS AND CONDITIONS OF A CERTAIN WRITTEN AGREEMENT BETWEEN THE REGISTERED HOLDERS OF THE UNITS OF THE LLC (OR THE PREDECESSOR IN INTEREST TO THE UNITS). SUCH AGREEMENT RESTRICTS THE TRANSFER OF UNITS AND GRANTS TO THE LLC AND/OR OTHER HOLDERS OF UNITS CERTAIN RIGHTS OF FIRST REFUSAL AND/OR CO-SALE UPON AN ATTEMPTED TRANSFER OF THE UNITS. SUCH AGREEMENT CONTAINS PROVISIONS REGARDING THE VOTING OF THE UNITS REPRESENTED BY THIS CERTIFICATE. COPIES OF SUCH AGREEMENT MAY BE OBTAINED FROM THE ISSUER UPON WRITTEN REQUEST. BY ACCEPTING ANY INTEREST IN SUCH UNITS THE PERSON ACCEPTING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SUCH AGREEMENT."

(b)    Any certificate issued at any time in exchange or substitution for any certificate bearing such legends shall also bear such legends, unless the Units represented thereby are no longer subject to the provisions of this Agreement or, in the opinion of the LLC (with advice from counsel to the LLC, as the LLC may deem appropriate), the restrictions imposed under the Securities Act or state securities laws are no longer applicable, in which case the applicable legend (or legends) may be removed.

**11.5**    **Publicly Traded Partnership Limitations**. Notwithstanding any other provision of this Agreement, no Transfer shall be permitted if (i) the Board of Managers determines in its sole discretion that such transaction will either cause the LLC to be characterized as a "publicly traded partnership" or will materially increase the risk that the LLC will be so characterized or (ii) such Transfer would occur in a transaction registered or required to be registered under the Securities Act. For purposes of this Section 11.5, the phrase "publicly traded partnership" shall have the meanings set forth in Section 7704(b) and 469(k) of the Code. In particular and without limiting the foregoing, no Transfer shall be permitted, given effect or otherwise recognized, and such Transfer (or purported Transfer) shall be void *ab initio*, if at the time of such Transfer (or as a result of such Transfer) Units are (or would become) traded on an "established securities market" (within the meaning of Treasury Regulation Section 1.7704-1(b)) or are (or would become) "readily tradable on a secondary market or the equivalent thereof" (within the meaning of Treasury Regulation Section 1.7704-1(c)).

**11.6**    **Effective Date**. Any Transfer in compliance with this Article XI shall be deemed effective on the first date as of which with the relevant requirements of this Agreement have been satisfied.

**11.7**    **"Market Stand-Off" Agreement**. Each Member hereby agrees that it will not, without the prior written consent of the managing underwriter, during the period commencing on the date of the final prospectus relating to the LLC's initial public offering and ending on the date specified by the LLC and the managing underwriter (such period not to exceed one hundred eighty (180) days plus such additional period as may reasonably be requested by the LLC or such underwriter to accommodate regulatory restrictions on (i) the publication or other distribution of research reports or (ii) analyst recommendations and opinions, including (without limitation) the restrictions set forth in Rule 2711(f)(4) of the Financial Industry Regulatory Authority and

Rule 472(f)(4) of the New York Stock Exchange, as amended, or any similar successor rules) (i) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any Common Units, or any securities convertible into or exercisable or exchangeable for any such Units or shares held immediately prior to the effectiveness of the registration statement for such offering, or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any such Units or shares, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of such Units or shares or other securities, in cash or otherwise. The foregoing provisions of this Section 11.12 shall apply only to the LLC's Initial Offering of equity securities, shall not apply to the sale of any Units or shares to an underwriter pursuant to an underwriting agreement and shall only be applicable to the Members if all officers, managers, directors and holders of greater than one percent (1%) of the LLC's outstanding securities (on an as-converted basis) enter into similar agreements. The underwriters in connection with the LLC's Initial Offering are intended third-party beneficiaries of this Section 11.12 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto. Each Member further agrees to execute such agreements as may be reasonably requested by the underwriters in the LLC's Initial Offering that are consistent with this Section 11.12 or that are necessary to give further effect thereto. Any discretionary waiver or termination of the restrictions of any or all of such agreements by the LLC or the underwriters shall apply to all Members subject to such agreements pro rata based on the number of Units or shares subject to such agreements.

In order to enforce the foregoing covenant, the LLC may impose stop-transfer instructions with respect to the above described securities of each Member (and the units, shares or securities (as applicable) of every other Person subject to the foregoing restriction) until the end of such period.

(a)    Each Member agrees that a legend reading substantially as follows shall be placed on all certificates representing the all of above described securities of each Member (and the Units, shares or securities (as applicable) of every other Person subject to the restriction contained in this Section 11.12):

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LOCK-UP PERIOD AFTER THE EFFECTIVE DATE OF THE ISSUER'S INITIAL REGISTRATION STATEMENT FILED UNDER THE ACT, AS AMENDED, AS SET FORTH IN AN AGREEMENT BETWEEN THE LLC AND THE ORIGINAL HOLDER OF THESE SECURITIES, A COPY OF WHICH MAY BE OBTAINED AT THE ISSUER'S PRINCIPAL OFFICE. SUCH LOCK-UP PERIOD IS BINDING ON TRANSFEREES OF THESE UNITS.

**11.8**    **Drag-Along Right**. Notwithstanding anything contained herein to the contrary, if a majority of the Board of Managers and Majority in Interest of the Members approve a Liquidation Event, each Member hereby agrees with respect to all securities of the LLC which he, she or it own(s) or otherwise exercises voting or dispositive authority:

(a)    In the event such transaction is to be brought to a vote at a meeting of the Members, after receiving proper notice of any meeting of the Members of the LLC to vote on the approval of a Liquidation Event, to be present, in person or by proxy, as a holder of voting securities, at all such meetings and be counted for the purposes of determining the presence of a quorum at such meetings;

(b)    to vote (in person, by proxy or by action by written consent, as applicable) all Units of the LLC as to which it has beneficial ownership in favor of such Liquidation Event and in opposition of any and all other proposals that could reasonably be expected to delay or impair the ability of the LLC to consummate such Liquidation Event;

(c)    to refrain from exercising any dissenters' rights or rights of appraisal under applicable law (including, without limitation, Section 18-210 of the Act) at any time with respect to such Liquidation Event;

(d)    to execute and deliver all related documentation and take such other action in support of the Liquidation Event as shall reasonably be requested by the LLC; and

(e)    neither any of the Members hereto nor any Affiliates thereof shall deposit any Units beneficially owned by such Member or Affiliate in a voting trust or subject any such Units to any arrangement or agreement with respect to the voting of such Units.

Notwithstanding the foregoing, no Member shall be required to vote in the manner described by this Section 11.13 unless the net proceeds of such Liquidation Event are to be distributed to Members of the LLC in accordance with the Article X, hereof.

During the term of this Agreement, each of the Members agrees to vote all Units now or hereafter owned by such Member, whether beneficially or otherwise, or as to which such Member has voting power at a regular or special meeting of the Members (or by written consent) in accordance with the provisions of this Section 11.13.  Upon the failure of any Member to vote their Units in accordance with the terms of this Section 11.13, such Member hereby grants to the LLC a proxy coupled with an interest in all Units owned by such Member, which proxy shall be irrevocable until this Agreement terminates pursuant to its terms or this Section 11.13 is amended to remove this grant of proxy in accordance with Section 14.1 hereof, to vote all such Units at a regular or special meeting of the Members (or by written consent) as necessary or required to effect the transactions contemplated by this Section 11.13.  It is agreed and understood that monetary damages would not adequately compensate an injured Member for the breach of this Section 11.13 by any other Member, that this Section 11.13 shall be specifically enforceable, and that any breach or threatened breach of this Section 11.13 shall be the proper subject of a temporary or permanent injunction or restraining order.  Further, each Member waives any claim or defense that there is an adequate remedy at law for such breach or threatened breach.

**11.9    Redemption**.  The Common Units shall not be redeemable at the option of the holder thereof.

## ARTICLE XII

## INDEMNIFICATION AND LIMITATION OF LIABILITY

**12.1**  **Indemnification**.

(a)  For purposes of this Section 12.1(a), (i) "agent" means each Manager, former Manager, Officer, former Officer, Member and former Member of the LLC or any direct or indirect subsidiary of the LLC; (ii) "proceeding" means any threatened, pending or completed action or proceeding, whether civil, criminal, administrative, legislative or investigative; and (iii) "expenses" include, without limitation, reasonable attorneys' fees and other expenses of establishing a right of indemnification under this Section 12.1(a).  The LLC shall, to the fullest and broadest extent permitted by law, indemnify and hold harmless each agent (and his heirs and legal and personal representatives) against losses and damages arising out of liabilities or expenses incurred by him as a result of serving in the capacity by reason of which such Person is deemed to be an "agent" pursuant to this subsection (a), regardless of whether the agent is or continues to be a Member, Manager or Officer at the time any such liability or expense is paid. Without limiting the generality of the foregoing, the LLC hereby agrees to indemnify each agent (and his heirs and legal and personal representatives), and to save and hold it or him harmless, from and in respect of all (1) fees, costs and expenses incurred in connection with or resulting from any demand, claim, action or proceeding against such agent (and his heirs and legal and personal representatives) or the LLC that arises out of or in any way relates to the agent's service in the capacity by reason of which such Person is deemed to be an "agent" pursuant to this subsection (a), and (2) such demands, claims, actions and proceedings and any losses or damages resulting therefrom, including judgments, fines and amounts paid in settlement or compromise (if such settlement or compromise is approved in advance by the LLC, which approval shall not be unreasonably withheld) of any such demand, claim, action or proceeding.  Notwithstanding the foregoing, this right of indemnification shall not extend to (i) conduct by an agent if it is determined by a final judgment of a court of competent jurisdiction or by arbitration pursuant to Section 14.10 that such agent's conduct was undertaken in bad faith or that the agent's conduct or its acts or omissions constituted recklessness, fraud or intentional wrongdoing, or (ii) any liability arising by reason of any act or omission of an agent subsequent to his ceasing to be a Member, Manager or Officer or subsequent to the termination of the LLC.  The termination of any proceeding by a judgment, order, settlement, conviction or upon a plea of nolo contendere, or its equivalent, shall not, of itself, create a presumption that the agent failed to meet the applicable standard of conduct.  The LLC shall be required to pay the expenses incurred by any agent indemnified hereunder in connection with any proceeding in advance of the final disposition of such proceeding upon receipt of an undertaking by or on behalf of such agent to repay such payment if there shall be an adjudication or determination that such agent is not entitled to indemnification as provided herein.

(b)  The indemnification accorded to an agent under Section 12.1(a) shall be made solely out of the assets of the LLC, and no Member, Manager or Officer shall have any personal liability or other obligation therefor.  Nothing in Section 12.1(a) shall be deemed to require any Member to make any additional Capital Contribution.

(c)    If such agent wishes to make a claim under Section 12.1(a), the agent shall notify the LLC in writing within thirty (30) days after receiving notice of the commencement of any action that may result in a right to be indemnified under Section 12.1(a); provided however that the failure to notify the LLC will not relieve the LLC of any liability for indemnification pursuant to Section 12.1(a) (except to the extent that the failure to give notice will have been materially prejudicial to the LLC).

**12.2    Exculpation by Members**.    For purposes of this Section 12.2, the term "agent" shall have the meaning assigned to such term in Section 12.1(a).    No agent shall be liable to the LLC or any Member or any Person who acquires any interest in the LLC for (a) honest mistakes in judgment, or for action or inaction, taken reasonably and in good faith and for a purpose that was reasonably believed to be in the best interests of the LLC or (b) losses sustained or liabilities incurred as a result of any act or omission of such agent if such act or omission did not constitute bad faith, recklessness, fraud or intentional wrongdoing on the part of the agent.    Each agent may consult with counsel, accountants and other professionals in respect of LLC affairs and shall be fully protected and justified in acting, or failing to act, if such action or failure to act is in accordance with the reasonable advice or opinion of such counsel, accountant or other professional and if such counsel, accountant or other professional shall have been selected with reasonable care.    Notwithstanding the foregoing, the provisions of this Section 12.2 shall not relieve any Person of liability arising by reason of acting in bad faith, or if such Person's conduct in the performance of its duties hereunder, or its acts or omissions, constitute recklessness, fraud, intentional wrongdoing or gross negligence.    This Agreement shall be construed to give effect to the provisions of this Section 12.2 to the fullest extent permitted by law.

**12.3    Limitation of Liability**.    Notwithstanding anything to the contrary herein contained, the debts, obligations and liabilities of the LLC shall be solely the debts, obligations and liabilities of the LLC and no Member, Manager or Officer shall be obligated personally for any such debt, obligation or liability of the LLC solely by reason of being a Member, Manager or Officer of the LLC.

**12.4    Counsel to the LLC**.    Counsel to the LLC may also be counsel to a Member with respect to matters related to or unrelated to the LLC.    Any Manager may execute on behalf of the LLC and the Members any consent to the representation of the LLC that counsel may request pursuant to the Massachusetts Rules of Professional Conduct or similar rules in any other jurisdiction ("**Rules**").    The LLC has initially selected Gunderson Dettmer Stough Villeneuve Franklin & Hachigian LLP ("**LLC Counsel**") as legal counsel to the LLC.    Each Member acknowledges that LLC Counsel does not represent any Member in its capacity as a Member in the absence of a clear and explicit written agreement to such effect between the Member and LLC Counsel (and then only to the extent specifically set forth in such agreement), and that in the absence of any such agreement LLC Counsel shall owe no duties directly to a Member.    Each Member further acknowledges that, whether or not LLC Counsel has in the past represented or is currently representing such Member with respect to other matters, LLC Counsel has not represented the interests of any Member in the preparation and negotiation of this Agreement.

**ARTICLE XIII**

**DISSOLUTION AND TERMINATION**

**13.1    Dissolution**.  The LLC shall be dissolved, its assets disposed of and its affairs wound up upon the first to occur of the following:

(a)    subject to Section 3.11, the affirmative vote of both the Board of Managers and of a Majority in Interest of the Members; or

(b)    the entry of a decree of judicial dissolution under the Act.

Except as otherwise provided herein, the death, bankruptcy, incompetency, retirement, resignation, expulsion or dissolution of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the LLC, shall not dissolve or terminate the LLC.  Notwithstanding any other provision of this Agreement, the bankruptcy (as defined in Sections 18-101(1) and 18-304 of the Act) of a Member will not cause that Member to cease to be a member of the LLC, and upon the occurrence of such an event, the business of the LLC shall continue without dissolution.  Notwithstanding any other provision of this Agreement, each Member waives any right it might have under Section 18-801(b) of the Act to agree in writing to dissolve the LLC upon the occurrence of the bankruptcy (as defined in Sections 18-101(1) and 18-304 of the Act) of a Member or the occurrence of any other event that causes a Member to cease to be a member of the LLC.

**13.2    Authority to Wind Up**.   Upon the dissolution of the LLC as set forth in Section 13.1, the Board of Managers shall have all necessary power and authority required to marshal the assets of the LLC, to pay the LLC's creditors, to distribute assets and otherwise wind up the business and affairs of the LLC.  In particular, the Board of Managers shall have the authority to continue to conduct the business and affairs of the LLC insofar as such continued operation remains consistent, in the judgment of the Board of Managers, with the orderly winding up of the LLC.

**13.3    Winding Up and Certificate of Cancellation**.  The winding up of the LLC shall be completed when all debts, liabilities and obligations of the LLC have been paid and discharged or reasonably adequate provision therefor has been made, and all of the remaining property and assets of the LLC have been distributed to the Members.

**13.4    Distribution of Assets**.  Upon dissolution and winding up of the LLC, the affairs of the LLC shall be wound up and the LLC liquidated by the Board of Managers.  The assets of the LLC shall be distributed as follows in accordance with the Act:

(i)    to the payment of the expenses of the winding-up, liquidation and dissolution of the LLC;

(ii)    to creditors of the LLC, including, in accordance with the terms agreed among them and otherwise on a pro rata basis (based on amounts owed to them), Members who are creditors (other than in respect of distributions owing to them or to former

Members hereunder), either by the payment thereof or the making of reasonable provision therefor; and

(iii)    to establish reserves, in amounts established by the Board of Managers or such liquidator, to meet other liabilities of the LLC other than to the Members or former Members in respect of distributions owing to them hereunder.

The remaining assets of the LLC shall be applied and distributed among the Members in accordance with the provisions of Section 10.3.

The distribution of cash, securities and other property to a Member in accordance with the provisions of this Section 13.4 shall constitute a complete return to the Member of its Capital Contributions and a complete distribution to the Member of its Interest and all the LLC's property, and shall constitute a compromise to which all Members have consented within the meaning of the Act.  If such cash, securities and other property are insufficient to return such Member's Capital Contributions or returns thereon, the Member shall have no recourse against the Board of Managers, other Members or Officers.

## ARTICLE XIV

## MISCELLANEOUS

**14.1    <u>Amendment</u>**.

(a)    Except as expressly set forth herein, this Agreement may be amended and the observance of any term hereof may be waived (either generally or in a particular instance and either retroactively or prospectively), including any amendment or waiver by merger, consolidation or otherwise, only with the consent of a Majority in Interest of the Members.  Any amendment or waiver so effected shall be binding upon all the Parties hereto.

(b)    The LLC will not, without the written consent of Majority in Interest of the Members (by vote or written consent, as provided by the Act and this Agreement):

(i)    by amendment of this Agreement or through any reorganization, recapitalization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid, or consummate or agree to consummate any such action that has the effect of avoiding, the observance or performance of any of the terms to be observed or performed under this Agreement by the LLC, but will at all times in good faith assist in the carrying out of all the provisions of this Agreement; or

(ii)    amend, alter or repeal this Section 14.1 of this Agreement.

(c)    Notwithstanding the foregoing provisions, (i) the Board of Managers may amend and modify the provisions of this Agreement (including Article IX) and <u>Exhibits A</u> and <u>B</u> hereto to the extent necessary to reflect the issuance of Units or the repurchase of any Units, the granting of Awards, the admission, substitution or removal of any Member permitted under this Agreement and the election, designation, removal, vacancy or resignation of any Manager (in each case subject to the approval of any such action by the requisite vote of Members entitled to

vote pursuant to this Agreement); and (ii) notwithstanding anything to the contrary in this Agreement, this Agreement may be amended or modified to the extent necessary to effectuate the issuance of Additional Interests pursuant to Section 3.5(a). Furthermore, the Board of Managers may amend this Agreement, without the consent of the Members, (i) to make a change that is reasonably necessary to cure any ambiguity or inconsistency and to make changes to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling, regulation or statute of any governmental body which will not be inconsistent with this Agreement, in both cases, subject to the requirement that any Member not be materially and adversely affected; or (ii) to prevent any material and adverse effect to the LLC or any Member arising from the application of legal restrictions to any Member, subject to the requirement that no Member be adversely affected without its consent; or (iii) to reflect changes made in the composition of the Members in accordance with the provisions of this Agreement. Promptly after entering into any amendment pursuant to this Section 14.1(b), the Board of Managers shall provide the Members a copy of such amendment.

**14.2    Power of Attorney**.

(a)    By signing this Agreement, each Member hereby makes, constitutes and appoints the Board of Managers, and each of them, with full power of substitution and resubstitution, his, her or its true and lawful agent or agents and attorney- or attorneys-in-fact for him, her or it and in his, hers or its name, place and stead, to sign, execute, certify, acknowledge, file and record (i) the Certificate, (ii) all instruments amending, restating or canceling the Certificate, as the same may hereafter be amended or restated, that may be appropriate and (iii) such other agreements, instruments, elections or documents as may be necessary or advisable (a) to reflect the exercise by a Member of any of the powers granted to him, her or it under this Agreement, (b) to reflect the admission to the LLC of any Additional Member in accordance with Section 3.5, (c) that may be required of the LLC or of the Members by the laws of Delaware or any other jurisdiction, (d) to comply with all applicable requirements associated with implementing the Safe Harbor as provided in Section 9.7. and (e) to effect the agreements and transactions set forth in Sections 11.8 with respect to structuring and consummating a Liquidation Event. Each Member authorizes such agent or attorney-in-fact to take any further action that such agent or attorney-in-fact shall consider necessary or advisable in connection with any of the foregoing, hereby giving such agent or attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite or advisable to be done in and about the foregoing as fully as such Member might or could do if personally present, and hereby ratifying and confirming all that such agent or attorney-in-fact shall lawfully do or cause to be done by virtue hereof. Each Member shall provide to the Board of Managers copies of all documents executed pursuant to the power of attorney contained in this Section 14.2.

(b)    The power of attorney granted pursuant to this Section 14.2:

(i)    is a special power of attorney coupled with an interest and is irrevocable;

(ii)    may be exercised by such attorney-in-fact by listing all of the Members executing any agreement, certificate, instrument or document with the single signature of such attorney-in-fact acting as attorney-in-fact for all of them; and

(iii)    shall survive the assignment by a Member of its Interest in the LLC, except that where the assignee thereof is admitted as a Member, the power of attorney shall survive such assignment as to the assignor Member for the sole purpose of enabling such attorney-in-fact to execute, acknowledge and file any such agreement, certificate, instrument or document as is necessary to effect such admission.

**14.3    Withholding**.  The LLC shall at all times be entitled to make payments with respect to any Member in amounts required to discharge any obligation of the LLC to withhold or make payments to any governmental authority with respect to any federal, state, local, or other jurisdictional tax liability of such Member arising as a result of such Member's Interest in the LLC.  To the extent each such payment satisfies an obligation of the LLC to withhold, with respect to any distribution to a Member on which the LLC did not withhold or with respect to any Member's allocable share of the income of the LLC, each such payment shall be deemed to be a loan by the LLC to such Member (which loan shall be deemed to be immediately due and payable) and shall not be deemed a distribution to such Member.  The amount of such payments made with respect to such Member, plus interest, on each such amount from the date of each such payment until such amount is repaid to the LLC at an interest rate per annum equal to the prime rate published in the *Wall Street Journal* on the date of such payment by the LLC with respect to such Member, shall be repaid to the LLC by (a) deduction from any cash distributions made to such Member pursuant to this Agreement, or (b) earlier payment by such Member to the LLC, in each case as determined by the LLC in its discretion.  The LLC may, in its discretion, defer making distributions to any Member owing amounts to the LLC pursuant to this Section 14.3 until such amounts are paid to the LLC and shall in addition exercise any other rights of a creditor with respect to such amounts.  Each Member agrees to indemnify and hold harmless the LLC and each of the Members, from and against liability for taxes, interest, or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to said Member.  Any amount payable as indemnity hereunder by a Member shall be paid promptly to the LLC upon request for such payment from the LLC, and if not so paid, the LLC shall be entitled to claim against and deduct from the Capital Account of, or from any distribution due to, the affected Member for all such amounts.

**14.4    Apportionment of Amounts Withheld at the Source or Paid by the LLC**.

(a)    If the LLC receives securities disposition proceeds or other income with respect to which taxes have been withheld at the source or with respect to which the LLC makes payments to any taxing authority, the aggregate amount of such taxes so withheld or paid shall be deemed for all purposes of this Agreement to have been received by the LLC and then distributed by the LLC to and among the Members based on the amount of such withholding or other taxes attributable to each Member, as determined by the Board of Managers after consulting with the LLC's accountants or other advisers, taking into account any differences in the amount of such withholding or other taxes attributable to each Member because of such Member's status, nationality or other characteristics.  The intent of the preceding sentence is to have the burden of taxes withheld at the source or paid or reimbursed by the LLC borne by those Members to which such withholding or other taxes are attributable to the maximum extent possible.  If the amounts deemed distributed to the Members in accordance with such sentence do not comport with the provisions of this Agreement relating to the apportionment of distributions among the Members, then, notwithstanding such distribution provisions, subsequent

distributions to the Members shall be adjusted in an equitable manner by the Board of Managers to reflect the intent of such sentence.

(b)    If the LLC is required to remit cash to a governmental agency in respect of a withholding obligation arising from an in-kind distribution by the LLC or the LLC's receipt of an in-kind payment, the Board of Managers may cause the LLC to sell an appropriate portion of the property at issue and, to the extent permitted by applicable law (as determined by the Board of Managers), any resulting income or gain shall be allocated solely for income tax purposes entirely to the Member or Members in respect of which such withholding obligation arises (in such proportion as the Board of Managers shall determine in its reasonable discretion).

14.5    **Notice to and Consent of Members**.    By executing this Agreement, each Member acknowledges that it has actual notice of and consents to (a) all of the provisions hereof (including the restrictions on Transfer), and (b) all of the provisions of the Certificate.

14.6    **Further Assurances**.    The parties agree to execute and deliver any further instruments or documents and perform any additional acts which are or may become necessary to effectuate and carry on the LLC created by this Agreement.

14.7    **Binding Effect**.    Subject to the restrictions on Transfer set forth in this Agreement, this Agreement shall be binding on and inure to the benefit of the Members and their respective transferees, successors, assigns and legal representatives.

14.8    **Governing Law**.    This Agreement shall be governed by and construed under the laws of the State of Delaware as applied to agreements among Delaware residents entered into and to be performed entirely within Delaware.

14.9    **Title to LLC Property**.    Legal title to all property of the LLC will be held and conveyed in the name of the LLC.

14.10    **Dispute Resolution**.    Any controversy, dispute, or claim arising out of, in connection with, or in relation to the interpretation, performance or breach of this Agreement or any agreement or other instrument executed pursuant hereto or otherwise arising out of the execution of any of the foregoing, including, without limitation, any claim based on contract, tort, or statute, shall be resolved or determined, at the request of any party, by arbitration conducted in Boston, Massachusetts, in accordance with the then-existing Rules for Commercial Arbitration of the American Arbitration Association.    Any judgment or award rendered by the arbitrator will be final, binding and non-appealable, and judgment may be entered by any State or Federal court having jurisdiction thereof.    The arbitrator shall be required to decide the controversy in accordance with applicable substantive law.    Any controversy concerning whether a dispute is an arbitrable dispute or as to the interpretation or enforceability of this Section 14.10 shall be determined by the arbitrator.    The arbitrator shall be a retired or former judge and must have substantial professional experience with regard to corporate or partnership legal matters. All arbitration proceedings shall be held in the strictest of confidence and all parties and counsel shall be bound by such requirement of confidentiality.    The parties intend that this agreement to arbitrate be valid, enforceable and irrevocable.    The designation of a situs or a governing law for this Agreement or the arbitration shall not be deemed an election to preclude application of the

Federal Arbitration Act, if it would be applicable.  In the arbitrator's award, the arbitrator shall allocate, in his or her discretion, among the parties to the arbitration all costs of arbitration, including the fees of the arbitrator and reasonable attorney's fees, costs and expert witness expenses of the parties.

**14.11  Entire Agreement**.  This Agreement and the Exhibits hereto constitute the entire agreement among the parties with respect to the subject matter herein.  This Agreement and the Exhibits hereto replace and supersede all prior agreements by and among the Members or any of them in respect of the LLC.  This Agreement and the Exhibits hereto supersede all prior written and oral statements; and no representation, statement, condition or warranty not contained in this Agreement or the Exhibits hereto will be binding on the Members or the LLC or have any force or effect whatsoever.

**14.12  Counterparts**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  For the avoidance of doubt, affirmation or signature of this Agreement or Unit purchase or issuance agreement by electronic means (an "**Electronic Signature**") shall constitute the execution and delivery of a counterpart of this Agreement or a Unit purchase or issuance agreement by or on behalf of such Person intending to be bound by the terms of this Agreement.  The parties hereto agree that this Agreement, each Unit purchase or issuance agreement and any additional information incidental thereto may be maintained as electronic records.  Any Person providing an Electronic Signature further agrees to take any and all additional actions, if any, evidencing their intent to be bound by the terms of this Agreement, as may be reasonably requested by the Board of Managers.

**14.13  No State-law Partnership**.  The Members intend that the LLC not be a partnership (including a limited partnership) or joint venture, and that no Member be a partner or joint venturer of any other Member by virtue of this Agreement, for any purposes other than for U.S. federal income tax purposes as set forth in Section 14.14, and neither this Agreement nor any other document entered into by the LLC or any Member relating to the subject matter hereof shall be construed to suggest otherwise.

**14.14  Tax Classification**.  It is the intent of the Members that, prior to any conversion of the LLC to a corporate legal entity in compliance with the provisions of this Agreement, the LLC shall always be operated in a manner consistent with its treatment as a "partnership" for federal, state and local income and franchise tax purposes at all times that it has two (2) or more Members.  In accordance therewith, (a) no Member shall file any election with any taxing authority to have the LLC treated otherwise, and (b) each Member hereby represents, covenants, and warrants that it shall not maintain a position inconsistent with such treatment.  The Members agree that at all times that it has two (2) or more Members, except as otherwise required by applicable law, they (i) will not cause or permit the LLC to elect (A) to be excluded from the provisions of Subchapter K of the Code, or (B) to be treated as a corporation or an association taxable as a corporation for any tax purposes; (ii) will cause the LLC to make any election reasonably determined by the Tax Matters Member to be necessary or appropriate in order to ensure the treatment of the LLC as a partnership for all tax purposes; (iii) will cause the LLC to file any required tax returns in a manner consistent with its treatment as a partnership for tax

purposes; and (iv) have not taken, and will not take, any action that would be inconsistent with the treatment of the LLC as a partnership for such purposes.

14.15  **Severability**.  If any provision of this Agreement is held to be illegal, invalid, or unenforceable under any present or future laws applicable to the LLC effective during the term of this Agreement, such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement.

14.16  **No Third Party Beneficiary**.  This Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and permitted assigns, and no other Person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

14.17  **Interpretation**.  The titles and section headings set forth in this Agreement are for convenience only and shall not be considered as part of agreement of the parties.  When the context requires, the plural shall include the singular and the singular the plural, and any gender shall include all other genders.  No provision of this Agreement shall be interpreted or construed against any party because such party or its counsel was the drafter thereof.

14.18  **Aggregation of Units**.  All Units held or acquired by Affiliates of Members shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

(Remainder of page intentionally left blank.)

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first indicated above.

**MEMBERS:**

_____

**Joshua Abramson**

_____

**Alexander Ritz**

_____

**Maxwell Ritz**

_____

**Adam Schwartz**


_____

**Patrick "PJ" Gilbert**

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first indicated above.

*If individual:*

_____
*(signature)*
Print name: _____

*If entity:*

_____
*(Name of entity)*

By _____
Name:
Title:

EXHIBIT A
TO THE
THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF LOYALIST, LLC

MEMBERS; UNITS

[Attached]

| Member | Profits Units | Common Units |
|---|---|---|
| Josh Abramson | 1,011,110.00 | 2,341,732.00 |
| Xander Ritz | 462,963.00 | 1,958,649.00 |
| Maxwell Ritz | 1,023,017.00 | - |
| Adam Schwartz | 192,593.00 | 720,000.00 |
| P.J. Gilbert | - | 617,284.00 |

EXHIBIT A
(Continued)

<u>Name and Address of Members</u>

Joshua Abramson
149 E. 18th Street, Apartment 2
New York, NY 10003

Patrick J. Gilbert
[Unknown]

Alexander Ritz
c/o Loyalist, LLC
109 S. 5th Street, Suite 4108
Brooklyn, NY 11249

Adam Schwartz
8 Sharon Street
Brooklyn, NY 11211

Maxwell Ritz
c/o Loyalist, LLC
109 S. 5th Street, Suite 4108
Brooklyn, NY 11249

EXHIBIT B

<u>Managers</u>:

Alexander Ritz, Chairman of the Board
Patrick J. Gilbert
Josh Abramson

<u>Officers:</u>
Alexander Ritz, President
Alexander Ritz, Treasurer
Alexander Ritz, Secretary
Patrick J. Gilbert, Authorized Signatory
Josh Abramson, Authorized Signatory

<u>Tax Matters Member</u>:
Alexander Ritz

## <u>CERTIFICATE OF SERVICE</u>

I, Anthony R. Bisconti, certify that I am a member of the Bar of this Court and that on October 14, 2025, I served the foregoing document described as **DEFENDANT'S NOTICE OF REMOVAL AND PETITION** on all parties in this action via the method of service stated below:

[X]    **BY ELECTRONIC TRANSMISSION** - I transmitted a PDF version of this document by electronic mail to the following parties using the e-mail address(es) indicated.

[X]    **BY UNITED STATES MAIL** – I enclosed the document(s) in a sealed envelope addressed to the person(s) at the address(es) listed in the attached service list and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United State Postal Service, in a sealed envelope with postage fully paid. I am employed in the county where the mailing occurred. The envelope was placed in the mail at Los Angeles, California. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

Adam Kauff
Jonathan Perrelle
KAUFF LATON MILLER LLP
810 Seventh Avenue, 33rd Floor
New York, NY 10019
akauff@klmllp.com
jperrelle@klmllp.com

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: October 14, 2025        **BIENERT KATZMAN**
                                        **LITTRELL WILLIAMS LLP**

                                    By: */s/ Anthony R. Bisconti*
                                          Anthony R. Bisconti
                                          360 E. 2nd Street, Ste. 625
                                          Los Angeles, CA 90012
                                          T: 213.528.3400
                                          F: 949.369.3701
                                          E-mail: tbisconti@bklwlaw.com